UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

COMPANHIA ENERGÉTICA POTIGUAR,

      Plaintiff,

      --against--

CATERPILLAR INC., CATERPILLAR
AMERICAS SERVICES CO. and
CATERPILLAR AMERICAS CO.,

      Defendants.

CASE NO. _____

**COMPLAINT**

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

Plaintiff Companhia Energética Potiguar ("CEP"), by and through its undersigned

counsel, for its Complaint against defendants Caterpillar Inc. ("CAT"), Caterpillar Americas

Services Co. ("CASC") and Caterpillar Americas Co. ("CAC") (CAT, CASC and CAC

collectively referred to herein as "Defendants") states and alleges as follows:

## THE NATURE OF THE ACTION

1.      This is an action for fraud, negligent misrepresentation, promissory estoppel,

breach of express and implied warranties, strict product liability, unfair trade practices and

revocation of acceptance, all arising out of the catastrophic failure, malfunction and inadequacy

of 144 generators manufactured by CAT and installed in CEP's power plants in the City of

Macaíba, State of Rio Grande do Norte, Brazil.

2.      CEP's predecessor Termoelétrica Potiguar S/A ("TEP"), a private company, won

two auctions held by the Brazilian Electricity Regulatory Agency ("ANEEL") to supply

electricity to utility companies that serve the public.  TEP purchased a total of 144 CAT C32 diesel generator sets, each consisting of a diesel engine and a generator, for over US$13 million in order to generate that electricity in its power plants.  Both before and after the generator sets were purchased, Defendants represented numerous times, in writing and orally, that the generator sets were reliable, capable of continuous operation, and fit for a very specific function, namely, to each generate 830 ekW or 1037 kVA of power continuously, that is "without varying load for an unlimited time."  Unfortunately for CEP, nothing could be further from the truth.  The generator sets have been plagued with a series of failures and malfunctions, ranging from fan guards that tear apart and puncture aftercoolers and other parts, electronic control panels that go black, excessive consumption of lubricating oil, and most seriously, generator engines that explode, destroying the engines themselves and causing significant damage to other generator sets around them.

3.     Defendants have refused to replace all of the generator sets and to compensate CEP for its damages, and instead have subjected CEP to a hodgepodge of product recalls, replacement parts, equipment modifications and maintenance changes that have failed to remedy the problems.   Even more troubling, it appears that Defendants knew or should have known from the very beginning that these generator sets were unfit for use in CEP's power plants.  Yet, instead of admitting that, they allowed the generator sets to be installed and operated under circumstances that easily could have caused grave injury or death to CEP's personnel.

4.     The ongoing malfunction and catastrophic failure of Defendants' generator sets also have caused and are continuing to cause significant monetary damage to CEP, and they are jeopardizing the very operation of CEP's power plants and could expose CEP to fines, penalties and damages caused by its inability to meet its power generating obligations to ANEEL.  CEP

seeks both compensatory damages resulting from Defendants' actions and punitive damages based on Defendants' inexcusable conduct.

## JURISDICTION & VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that the action is between citizens of States and a citizen of a foreign state, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events and omissions giving rise to Plaintiff's claim occurred here. Moreover, Defendants CASC and CAC have their principal places of business in this district.  In the alternative, all Defendants are subject to this Court's personal jurisdiction with respect to this action.

## PARTIES

7.      CEP is a Brazilian company with its principal place of business at Highway BR 304 KM 301, 4, Centro Industrial, Macaíba, Rio Grande do Norte, Brazil.

8.      Upon information and belief, CAT is a Delaware company with its principal place of business at 100 NE Adams Street, Peoria, Illinois.

9.      Upon information and belief, at all times relevant to this Complaint, CASC was a Delaware company with its principal place of business at 3450 Executive Way, Miramar, Florida, 33025.  Upon information and belief, at all times relevant to this Complaint, CASC was the predecessor-in-interest to CAC, and/or an affiliate of CAC, and/or a subsidiary of CAT. Upon information and belief, at all times relevant to this Complaint, CASC was a CAT division responsible for CAT's dealings with customers located in Latin America.

10.     Upon information and belief, CAC is a Delaware company with its principal place of business at 701 Waterford Way NW 62nd Avenue, Suite 600, Miami, Florida 33126.  Upon information and belief, CAC is the successor-in-interest of CASC, and/or an affiliate of CASC, and/or a subsidiary of CAT.

## FACTS

**Brazil's Ongoing Energy Crisis Leads to
Contracts with Power Companies to Generate Power**

11.     Brazil has a population of over 200 million.  It is the largest country in South America and its leading energy consumer.

12.     Most of Brazil's energy is hydroelectric, which has left it vulnerable to power supply shortages during dry years.

13.     In or about 2004, the Government of Brazil implemented a Power Generation Program to address the country's ongoing energy crisis.

14.     ANEEL's function is to regulate and control the generation, transmission and distribution of power in compliance with the legislation, directives and policies dictated by the Government of Brazil.  In or about 2005, ANEEL began holding energy auctions where Brazilian and foreign companies could bid on agreements to produce energy for local utility companies in connection with Brazil's Power Generation Program.

15.     Power plants that enter into these unique agreements called Power Purchase Agreements ("PPAs") are asked to generate energy only when needed, and once built, may stand idle for weeks, months or even years.  But when the Operator of the National Electricity System ("ONS") calls upon an individual power plant to provide such energy, it must then do so immediately, and it must run continuously to produce a predetermined power output, without fluctuation (unless ONS asks for a lower power output), until ONS gives it the order to stop.

ONS is a not-for-profit legal entity that, under the regulation and supervision of ANEEL, aims at coordinating and controlling the generation and transmission of energy, under the National Interconnected Power System. The compensation the power plants receive under PPAs reflects this unique structure.  The power plants are paid a fixed fee, whether they produce energy or not, and an additional variable fee for actual energy produced during the times they are dispatched by ONS.

16.     As of the time of the filing of this Complaint, ANEEL has executed PPAs with over 100 power generation entities in Brazil.

**TEP's Power Purchase Agreements with ANEEL**

17.     Global Participações em Energia S/A ("Global") is a holding company that owns thermal and hydroelectric power plants in Brazil with a total installed capacity of over 520 megawatts.  In or about 2001, Global entered into a strategic partnership with Petrobrás Distribuidora S/A ("Petrobrás") to form TEP.  Global and Petrobrás both had representatives on the Board of Directors of TEP.

18.     In or about June of 2006, TEP participated in one of ANEEL's energy auctions, and won two PPAs.

19.     The first PPA was signed in or about January of 2007.  It was a 15 year contract that required TEP to build and operate a diesel generator power plant with 52.8 megawatts installed capacity.  In other words, the power plant had to have the ability to produce at least 52.8 megawatts of electricity, continuously, when called upon by ONS.  TEP ultimately housed this power plant on a site it leased in Macaíba, Rio Grande do Norte, Brazil and called it UTE Potiguar.

20.     The second PPA was signed in or about May of 2007.  It was also a 15 year contract that required TEP to build and operate a diesel generator power plant with 66.0 megawatts installed capacity.  TEP ultimately housed this separate power plant on the same site as UTE Potiguar, and called it UTE Potiguar III.

21.     UTE Potiguar and UTE Potiguar III generate electricity for approximately 30 utility companies serving the public of Brazil.  Their combined output (approximately 118 megawatts) generates enough energy to light over 350,000 Brazilian homes.

**TEP Negotiates with CAT and its Dealer to Supply**
**Generator Sets for UTE Potiguar and UTE Potiguar III**

22.     The energy crisis, and the resulting energy auctions and PPAs, presented equipment manufacturers with a significant opportunity to enter a new market, and manufacturers such as CAT, Mitsubishi, Hyundai, Wartsila and others aggressively competed to supply equipment to power generation companies.

23.     TEP's Chief Executive Officer, Fernando Magalhães Filho ("Mr. Magalhães") was approached by several equipment manufacturers about supplying the diesel generator equipment UTE Potiguar and UTE Potiguar III would need to run continuously when needed, and to generate 52.8 and 66.0 megawatts of power output respectively.

24.     Upon information and belief, Sotreq S/A ("Sotreq") is the largest Caterpillar equipment dealer in Brazil.

25.     Upon information and belief, Sotreq is CAT's exclusive dealer for almost all of Brazil, with more than forty branches across the country.  Upon information and belief, Sotreq is authorized by CAT to act as CAT's sales agent as evidenced by, among other things, Sotreq's logo, a true and correct copy of which is as follows:



26.    In or about October 2006, Mr. Magalhães was contacted by Fernando Antonio Lopes Costa ("Mr. Costa"), Director – Energy Segment of Sotreq.  Upon information and belief, Sotreq had learned from publicly-available auction results that TEP had won the two PPAs, and would be looking for diesel generator sets to generate 52.8 megawatts for UTE Potiguar and 66.0 megawatts for UTE Potiguar III.

27.    In their first conversation, Mr. Costa suggested to Mr. Magalhães that TEP purchase diesel generator sets powered by CAT C32 engines, pictured below.



28.    Mr. Magalhães responded that he was not interested in C32s, but might be interested in purchasing another type of generator set, in the CAT C35 family, called the CAT C3516B.  Mr. Magalhães was familiar with the C3516B, one of the most common generator sets for this type of diesel power plant application, and had heard that it was reliable.

29.     Upon information and belief, in or about October of 2006, C3516B generator sets were in short supply, because so many of them were needed as a result of Hurricane Katrina, the Iraq War, and other applications.

30.     In the conversation in or about October 2006, between Mr. Costa and Mr. Magalhães, Mr. Costa stated that Sotreq did not have any C3516Bs available for sale, and said that Sotreq would not be able to get any C3516Bs for at least a year, which would not be in time for TEP to install them in its power plants.

31.     Instead of the generator sets Mr. Magalhães said he wanted, Mr. Costa and others at Sotreq, including but not limited to Gustavo Sepulveda, Commercial Manager – Energy Segment ("Mr. Sepulveda"), recommended that TEP buy the C32s.

32.     In conversations in or about October of 2006, Mr. Costa and Mr. Sepulveda said to Mr. Magalhães that:

   a.   the CAT C32 generator sets were TEP's best alternative, since the C3516Bs were not available;

   b.   the CAT C32 generator sets were as reliable as the C3516Bs; and

   c.   the CAT C32 generator sets were suitable for use by TEP to continuously generate electricity output of 52.8 megawatts and 66.0 megawatts by UTE Potiguar and UTE Potiguar III respectively.

33.     On or about October 26, 2006, Sotreq and CAT provided TEP with their written "technical-commercial proposal" dated October 24, 2006 for the "supply of CATERPILLAR model C32 ATAAC generating sets" to TEP for the "52.8 MW and 66.0 MW thermoelectric plants at Natal," which are UTE Potiguar and UTE Potiguar III respectively (the "Proposal").

34.     As part of the Proposal, CAT provided TEP with written information about the specifications of its C32 diesel generator sets (the "Specifications Sheet").  A true and correct copy of the Specifications Sheet that was received by TEP on or about October 26, 2006 is attached hereto as Exhibit A.

35.     Upon information and belief, the term "diesel generator set" as used on the Specifications Sheet means the packaged combination of a diesel engine, a generator and various ancillary devices (such as its base, canopy, control systems, circuit breakers and starting system).

36.     A "generator set" can also be referred to as a "genset" for short.

37.     Generator sets can be classified in one of three ways – continuous, prime or standby -- depending on their mode of operation.

38.     CAT represented on the Specifications Sheet that "continuous" operation meant "[o]utput available without varying load for an unlimited time."

39.     A power rating of a generator set is the energy output of the generator set expressed in kilowatts or kilovolts-amperes.

40.     CAT represented on the Specifications Sheet that the generator sets it was offering were "CONTINUOUS" with a power rating of "830 ekW 1037 kVA" in continuous mode.

41.     CAT represented on the Specifications Sheet that:

    a.  the CAT C32 ATAAC diesel engine had a "[r]eliable, rugged, durable design;" and

    b.  the CAT C32 ATAAC diesel engine was a "[f]our-cycle diesel engine" that "combine[d] consistent performance and excellent fuel economy with minimum weight."

9

42.     Mr. Magalhães received proposals to supply diesel generator sets for UTE Potiguar and UTE Potiguar III from several other equipment manufacturers, including Mitsubishi, F.G. Wilson, Cummins, MTU and Hyundai.

**TEP Relies on CAT's Representations in
Choosing CAT as its Equipment Supplier**

43.     By in or about April of 2007, TEP had narrowed down the field of equipment suppliers it was considering to CAT and Mitsubishi.

44.     CAT aggressively pursued TEP to be selected as its equipment provider.

45.     For example, in an effort to win the business, Sotreq and CAT provided TEP with comparisons of their generator sets to Mitsubishi's generator sets.  Sotreq and CAT highlighted that while the CAT C32 generator sets could meet TEP's requirements because they were capable of continuous operation, Mitsubishi's generator sets were not, noting "Caution: Mitsubishi does not declare values for continuous power in its catalogue."

46.      In order to go forward with the generator set purchase, TEP needed the approval of its Board of Directors, made up of representatives from both Global and Petrobrás.  On or about April 24, 2007, in reliance on CAT's representations regarding its continuous power capabilities, Mr. Magalhães stated to Petrobrás that the CAT C32 generator sets were preferable to those of Mitsubishi because Mitsubishi would ensure "continuous operation of only 2000 hours per year, and therefore cannot be compared with equipment designed and guaranteed for a continuous operation with unlimited hours."

47.     Mr. Magalhães also stated that, based on the needs of the UTE Potiguar and UTE Potiguar III projects, Mr. Magalhães "considered only the equipment rated for continuous operation."

10

48.     Mr. Magalhães concluded by recommending that TEP purchase 144 CAT C32 "continuous power" generator sets.

49.     In an effort to apply pressure to TEP to make a decision, CAT imposed a deadline of April 30, 2007 for TEP to submit its order, or TEP would risk that the equipment would be sold to another buyer or to TEP at a higher price.

50.     TEP requested additional time from CAT and Sotreq for its Board of Directors to make a final decision.

51.     On May 3, 2007, the TEP Board of Directors convened to try to decide which equipment to purchase for the UTE Potiguar and UTE Potiguar III power plants.

52.     At the meeting, Petrobrás' thermal power manager presented the Mitsubishi and CAT proposals to the Board of Directors, along with Mr. Magalhães' recommendation that TEP should purchase CAT C32 generator sets, and Petrobrás' recommendation was in favor of Mitsubishi.  Given the divergent views, the Board could not agree on the best course of action and another meeting was scheduled for May 9, 2007 with the equipment decision to be the only item on the agenda.  The Board requested that, by May 7, 2007, formal written "justifications" be presented by TEP Directors for each recommended proposal.

53.     Upon information and belief, at all relevant times to this Complaint, Timothy Scott ("Mr. Scott") was employed by CAT as a Power Systems Manager for South America, with a business address of 3701 State Road 26 E, Lafayette, IN  47905.

54.     On or about May 4, 2007, Mr. Magalhães, Mr. Costa, Mr. Sepulveda, Mr. Scott and others met at the CAT office in São Paulo, Brazil. At that meeting:

a.  Mr. Magalhães once again asked for assurances from CAT that the CAT C32 generator sets would be able to operate continuously with the total power outputs required by the PPAs.  Mr. Scott represented that they would.

b.  Mr. Magalhães expressed concern that CAT was proposing only a one-year warranty on the CAT C32 generator sets.  Mr. Magalhães explained that, because of the unique nature of PPAs, the power plants might not be dispatched at all during the warranty period and might first be dispatched after the warranty had expired.  Mr. Scott and Mr. Costa represented to Mr. Magalhães that the CAT C32 generator sets were so well constructed that a longer warranty period was not necessary.

55.  Using the information supplied by Mr. Scott from CAT, on or about May 7, 2007, TEP submitted its formal ten-page letter to the Board of Directors recommending the acquisition of CAT C32 generator sets, noting that CAT equipment was able to run continuously for an unlimited time, as opposed to a 2,000 hour limitation Mitsubishi placed on its equipment, which TEP stated was "less than 25% of the necessary to characterize Base Load or Continuous Power."

56.  TEP relied on other representations from CAT as well in making the purchasing decision.

57.  For example, with respect to UTE Potiguar, TEP relied on CAT's and Sotreq's representations that 64 separate C32 Continuous generator sets would generate 52.8 megawatts of power output.

58.     With respect to UTE Potiguar III, TEP relied on CAT's and Sotreq's representations that 80 separate C32 Continuous generator sets would generate 66.0 megawatts of power output.

59.     Although TEP anticipated that each generator set would require some downtime for maintenance and repair, TEP did not purchase more generator sets than CAT and Sotreq said were required to generate 52.8 megawatts of electricity from UTE Potiguar and 66.0 megawatts of electricity from UTE Potiguar III.

60.     The decision not to purchase extra generator sets was made based on a number of factors.  For example, TEP's original auction bid, and both PPAs, allowed for some built-in downtime at the power plants for maintenance and repair.  The PPA for UTE Potiguar, for example, built in a 4% reduction on megawatt output for scheduled and unscheduled downtime of individual generator sets.  The PPA for UTE Potiguar III only required 82.5% of the 66.0 megawatt output be delivered on average, also allowing for periods of downtime for individual generator sets at the plant.

61.     TEP determined that the built-in downtime in both of its PPAs was sufficient, without the purchase of extra generator sets, in reliance on representations from CAT and Sotreq, including but not limited to, that the CAT C32 generator sets:

      a.   were reliable and well-built;

      b.   were able to run continuously at maximum power (delivering 830 ekW);

      c.   were equipped with a 68 liter lubrication oil sump and only would require lubrication oil changes at every 250 hours of operation;

      d.   would only require top end overhauls at 7,500 hours of operation and major overhauls at 15,000 hours of operation.

62.     On or about May 9, 2007, the TEP Board of Directors unanimously authorized the acquisition of 144 CAT C32 generator sets.

63.     Based on the representations alleged above, TEP entered into an agreement with Sotreq for the purchase of 144 CAT C32 generator sets, 64 generator sets for UTE Potiguar, and 80 generator sets for UTE Potiguar III.

**The CAT C32 Generator Sets are Delivered**
**and Installed and the Power Plants are Completed**

64.     TEP paid US$13,824,000 to CAT directly for the 144 CAT C32 generator sets.

65.     TEP paid an additional R$3,670,450.00 to Sotreq for additional equipment and R$775,472.00 to Sotreq for additional services.

66.     On or about December 19, 2007, CEP was formed to develop the UTE Potiguar and UTE Potiguar III sites.

67.     On or about March 26, 2008, TEP assigned to CEP its agreement with Sotreq.

68.     Upon information and belief, CAT manufactured the 144 CAT C32 generator sets at one of its plants in the United States.

69.     From in or about March of 2008 to June of 2008, CAT delivered the 144 CAT C32 generator sets to CEP in Jacksonville, Florida, FOB, and the generator sets were then shipped to Brazil.  The term FOB, or "Free on Board," means that CAT arranged for and paid to deliver the gensets to CEP in Florida, and Florida is the place where title passed to CEP.

70.     In or about September 2008, construction of UTE Potiguar and UTE Potiguar III began.  Installation of the 144 CAT C32 generator sets was completed by in or about December of 2008, and the power plants were commissioned in or about February of 2009.

71.     In addition to the cost of purchasing and transporting the generator sets, TEP and CEP spent approximately another US$40,000,000 on the site development, installation and commissioning of UTE Potiguar and UTE Potiguar III.

72.     By on or about March 3, 2009, the power plants were ready for commercial operations.

**CAT's C32 Generator Sets Begin Malfunctioning**
**After Only Minor Dispatch of the Power Plants**

73.     As alleged above, PPAs are unique in that ANEEL may not require a power plant to operate for months, weeks, years, or even potentially at all, during the contract term.  But once the dispatch order comes, the power plant must be able to operate continuously and to deliver the required output without interruption until further notice.

74.     During the period from on or about September 3, 2009 to on or about October 26, 2012, ONS required only minor dispatches of UTE Potiguar and UTE Potiguar III.

75.     During the period from on or about September 3, 2009 to on or about October 26, 2012, the CAT C32 generator sets operated intermittently for an average of only about 70 hours per generator set at full power.

76.     Yet after only this minor and intermittent period of operation, CEP began experiencing malfunctions with the C32 generator sets.

77.     For example, by on or about December 16, 2009, those malfunctions included:

    a.   excessive lube oil consumption and leakages;

    b.   display blackouts on approximately 30 control panels;

    c.   excessive engine vibration;

    d.   broken engine bolts;

    e.   loose and broken alternator belts;

15

  f. burned out rectifier boards;

  g. loose fan belts; and

  h. excessive engine temperatures.

  78. By on or about April 16, 2010, CEP not only continued to experience the same malfunctions listed above, but also new ones, including but not limited to:

  a. excessive smoke from exhaust pipes;

  b. fan guards breaking and puncturing radiators, aftercoolers and heat exchangers;

  c. alternator damage;

  d. cracked cylinder blocks;

  e. crankshaft bearing bolt damage;

  f. oxidation of steel covers;

  g. leaking cylinder heads; and

  h. breaking bearing bolts.

  79. In fact, the display modules on the CAT C32 generator sets experienced so many failures that in or about April of 2010, CAT's authorized and exclusive repair company for the region where the power plants were located, called Marcosa S/A Máquinas e Equipamentos ("Marcosa"), replaced all of the display modules with a different one.

  80. Before TEP purchased the CAT C32 generator sets, Sotreq and CAT had represented to TEP that the CAT C32 generator sets only needed lubrication oil replacement every 250 hours of continuous operation.

  81. TEP relied on that representation in choosing to purchase the CAT C32 generator sets, and in determining how many generator sets were necessary to operate its power plants as required by ANEEL.

82.     In or about April of 2010, Sotreq and CAT radically changed their lubrication oil requirements and recommended that the lubrication oil be changed at every 19,000 liters of fuel oil consumption, or approximately 150 hours of continuous operation (the "Lubrication Oil Issue").

83.     On or about August 18, 2010, Ivan César Souto Fernandes ("Mr. Fernandes"), the Technical Director of CEP, sent a letter to CAT (addressed to Mr. Scott) and Sotreq listing the malfunctions CEP was experiencing with the CAT C32 generator sets, including but not limited to problems with the display modules, aftercoolers, radiators and vibration dampers.

84.     In response, on or about September 28, 2010, a meeting was held at CEP's office on the site of UTE Potiguar and UTE Potiguar III, which included Mr. Fernandes and others from CEP and Global, representatives from Marcosa, and Carlos Salvador ("Mr. Salvador"), upon information and belief, an employee of CAT.

85.     At that meeting, CEP reported that there were 105 occurrences of display module blackouts.  Mr. Salvador represented that the modules would be replaced, that 40 of them had been sent to CAT in the United States for further analysis, and that the root cause of this problem would be found.

86.     Mr. Salvador assured CEP, specifically Mr. Fernandes, that the C32 generator sets were of the highest quality and would perform as promised.

87.     Mr. Salvador also assured CEP, specifically Mr. Fernandes, that the problems with the aftercoolers would be solved.

88.     Mr. Salvador also informed CEP, specifically Mr. Fernandes, that CAT had analyzed one of the broken fan guards in the United States, and had detected fusion problems (upon information and belief a manufacturing defect) in the welding of attachment wires.

17

89.     Mr. Salvador also confirmed CAT's position on the Lubrication Oil Issue, specifically that the lubrication oil needed to be completely changed in all 144 CAT C32 generator sets at approximately every 150 hours of operation, rather than the 250 hours originally specified.

90.     On or about September 28, 2010, Mr. Salvador conducted a walkthrough of both UTE Potiguar and UTE Potiguar III.

91.     During that walkthrough, Mr. Salvador discovered, and pointed out to Mr. Fernandes, that the CAT C32 generator sets had not been properly assembled by CAT in its manufacturing facility before delivery to CEP.

92.     The improper assembly included a failure by CAT to provide adequate spacing between the radiators and aftercoolers on all 144 generator sets.

93.     The improper assembly also included providing only 2 belt pulleys, instead of the 4 belt pulleys required, on 142 out of the 144 generator sets.  In other words, only 2 generator sets were delivered with the required 4 belt pulleys.

**CAT and CASC Impose Recalls, Design Modifications and Increased Maintenance Requirements on the CAT C32 Generator Sets**

94.     On or about November 23, 2010, CAT sent CEP a recall notice, informing CEP that it "had identified the potential need of an update of engines installed in Cat C32 generating sets," because "[p]istons may fail in some C32 engines in . . . continuous operation."

95.     Upon information and belief, the pistons on the CAT C32 generator sets that TEP purchased contained a manufacturing defect in the cylinder pack, resulting in a new design being necessary.

96.     On or about November 23, 2010, a meeting was held at CEP's office on the site of UTE Potiguar and UTE Potiguar III, which included representatives from CEP (including Mr. Fernandes), Mr. Scott from CAT, and others to respond to CEP's continuing concerns.

97.     On or about March 1, 2011 a meeting was held at CEP's office on the site of UTE Potiguar and UTE Potiguar III, which included representatives of CEP (including Mr. Fernandes), Global, Marcosa and CAT.

98.     Mark Smalley ("Mr. Smalley"), upon information and belief at all times relevant to this Complaint an employee of CAT and the Product Support Manager for Latin America of CASC, with a business address of 3450 Executive Way, Miramar, Florida, 33025, attended the meeting on March 1, 2011.

99.     Because CEP was frustrated by the service Marcosa was providing, CEP had asked that a higher-up from CAT, with authority to direct Marcosa, attend the meeting.  Upon information and belief, Mr. Smalley was the person CAT identified to fulfill CEP's request.

100.    Renato Pertusi, upon information and belief at all times relevant to this Complaint an employee of CAT, also attended the meeting.

101.    At the meeting, Defendants, specifically Mr. Pertusi, unveiled an action plan for the recall that included the replacement of all aftercoolers, belt pulleys, radiator guards and oxidized metal sheets on the 144 CAT C32 generator sets.

102.    Defendants, specifically Mr. Pertusi, informed CEP, specifically Mr. Fernandes, at the meeting that the entire recall process would be supervised by and certified by Defendants, including assembly, execution, quality control, and testing of all of the equipment in both power plants.

103.     Among other things, Defendants, specifically Mr. Pertusi, again represented to CEP, specifically Mr. Fernandes, that the display modules were undergoing analysis of their structure and design and that they were working on a solution to that problem, but that in the meantime Defendants would continue to replace the display panels.

104.     On or about March 1, 2011, Mr. Smalley conducted a walkthrough of UTE Potiguar and UTE Potiguar III and observed the installation, maintenance and operation of CAT's C32 generator sets.

105.     It took approximately 11 months to replace the cylinder packs in all 144 CAT C32 generator sets, and each generator set was down for more than 1½ days.

106.     During testing for the recall, one of the CAT C32 generator sets had a fuel hose failure, causing fuel oil leakage and setting the genset on fire.

107.     CAT subsequently decided to replace the hose sets on all 144 CAT C32 generator sets.

108.     In or about May of 2011, Defendants and Sotreq proposed to solve the Lubrication Oil Issue by replacing (at their expense) the 68 liter oil sump on each of the 144 CAT C32 generator sets with a larger 99 liter oil sump, which would then provide oil lubrication for 250 hours as originally promised.

109.     This replacement plan was an admission by Defendants that the oil lubrication system on the CAT C32 generator sets was not adequate as originally manufactured.

110.     CEP has had to pay for more lubrication oil than originally anticipated as a result of the Lubrication Oil Issue.

111.    Before TEP purchased the CAT C32 generator sets, Sotreq and CAT represented to TEP that the CAT C32 generator sets only needed a top end overhaul at 7,500 hours of operation and a major overhaul at 15,000 hours of operation.

112.    TEP relied on that representation in choosing to purchase the CAT C32 generator sets, and in determining how many generator sets were necessary to operate its power plants as required by ANEEL.

113.    In or about February of 2013, CAT and Sotreq informed CEP that top end overhauls would now be required at 4,200 hours and major overhauls would be required at 7,200 hours.

114.    Top end overhauls take approximately 120 hours to complete per generator set. These changes to the specified times for top end and major overhauls have caused and continue to cause increased downtime at the power plants and increased maintenance costs.

**CAT and CASC Make New Promises to CEP**

115.    By June of 2011, Defendants found themselves faced with mounting complaints from CEP regarding the CAT C32 generator sets.

116.    On or about June 3, 2011, Mr. Smalley wrote a letter from his office in Miramar, Florida to CEP that he represented to be "Caterpillar Inc.'s official technical response and commitment to the several conversations held between Sotreq and Caterpillar concerning CEP's fleet of 144 C32 gensets located in Natal, Brazil."  A true and correct copy of Mr. Smalley's letter is attached hereto as Exhibit B.

117.    Among other things, Mr. Smalley acknowledged in his letter that there were two separate repair initiatives currently going on, one to complete the ongoing recall of the cylinder packs on all 144 generator sets, the other to "respond to those units which have other repairs to [be] made."

21

118.    With respect to the Lubrication Oil Issue, Mr. Smalley represented that using a 99 liter oil pan would "result in a 250 hour oil change interval and will not affect or void the standard warranty in any way."

119.    Finally, Mr. Smalley promised, in black and white, that "after completing the service updates and repairs on the 144 units installed at the CEP power plant in Natal, *the 144 gensets will perform as originally purchased delivering 830 ekVA [sic] in a continuous operation*, and will be equipped with the same configuration of current production C32 gensets leaving the factory today." (emphasis added).

120.    "[A]s originally purchased," the CAT C32 generator sets were rated to deliver 830 ekW, not 830 ekVA.  In fact, the designation of "ekVA" does not exist.  Upon information and belief, the designation of 830 ekVA is a typographical error in Mr. Smalley's letter, and he meant 830 ekW.

121.    In order to "*provide the customer more confidence in these units*," Mr. Smalley promised that CAT would "extend the warranty to the 'as delivered' warranty; that is, as the service updates are completed the units will be covered by a 2 year warranty . . . unless the total hours exceed 500 hours at which time the warranty will be reduced to one year (standard continuous rating warranty)." (emphasis added).

122.    In reliance on Mr. Smalley's representations and promise, among other things, CEP did not replace the CAT C32 generator sets, believing CAT at its word that they would operate properly.

**Defendants Break Their Promise:**
**the Generator Engines Begin Exploding**

123.    In or about October of 2012, ANEEL informed CEP that UTE Potiguar and UTE Potiguar III were to be dispatched, and were required to begin producing 52.8 megawatts (UTE Potiguar) and 66.0 megawatts (UTE Potiguar III) of electrical power output immediately.

124.    Believing Defendants to be true to their word, and believing Defendants that the CAT C32 generator sets were capable of operating continuously and delivering the power output Defendants had said they could, on or about October 26, 2012 CEP turned on all 144 CAT C32 generator sets.  UTE Potiguar ran continuously from that date until in or about May of 2013, and then again continuously from December of 2013 to present.  UTE Potiguar III ran continuously from that date until in or about June of 2013, and then again continuously from December of 2013 to present.

125.    At all times, CEP has operated its CAT C32 engines within the operation parameters established by CAT, and has followed all operation, maintenance and other guidelines imposed by Defendants and Sotreq.

126.    Nonetheless, the CAT C32 generator sets have exhibited numerous mechanical failures and problems when asked to perform continuously at full power.   The most significant of these failures is engine crankcase explosions, which propel shards of the metal crankcase into the air and create gaping holes in the CAT C32 engines.  The crankcase explosions also cause damage to other generator sets in the vicinity and serious risk to personnel.

127.    True and correct photographs of the damage to one of the CAT C32 generator sets after a crankcase explosion, appear below in full view and close-up:

CAT ENGINE NO. SYC 02677

Full View:



Close-Up:



128.     Since August of 2012, over 35 of CEP's CAT C32 generator set engines have

exploded, as recently as on or about November 1, 2014.  Attached hereto as Exhibit C are true

and correct copies of photographs taken of the resulting damage to the engines of some of those

generator sets.

129.     In addition, over 20 of CEP's CAT C32 generator sets have experienced crankshaft seizure or other serious failures that have taken them out of service.

130.     Upon information and belief, crankcase explosions and other catastrophic failures have occurred because the CAT C32 engines cannot sustain operation at 100% continuous power, even though CAT represented that they could.

131.     With respect to crankcase explosions, upon information and belief, operation at 100% continuous power produces mechanical failures in the engine crankcases in way of the main bearings and/or crankpin bearings, which in some cases can then produce "hotspots" and turn the lubrication oil into an oil mist, creating an explosive vapor.  The hotspots can then, upon information and belief, ignite this explosive vapor and cause an explosion, leaving gaping holes in the crankcase.  This overheating occurs despite the operation and maintenance of the CAT C32 engines within the parameters prescribed by Defendants and Sotreq, and despite the generator sets being maintained by Sotreq.

132.     As of the time of the filing of this Complaint, only 87 of the original CAT C32 generator sets TEP purchased are still in service.  Over 30 now rest in a "graveyard" CEP has established at the site, a true and correct image of which (at or about the time of the filing of this Complaint) is below:



133.    In order to reduce the risk of explosion or other serious failure, CEP has been forced to reduce the remaining CAT C32 generator sets to 90% (or less) of their load capacity. This has contributed to CEP not being able to meet its megawatt output requirements for several months.  CEP has also been forced to rent generator sets to fill in the gaps in its power plants left by malfunctioning CAT C32s at considerable expense to CEP.

**CAT Has Offered No Workable Solution for These Issues**

134.    By letter dated July 28, 2014, CEP formally requested that Defendants replace all 144 CAT C32 generator sets at the UTE Potiguar and UTE Potiguar III power plants.

135.    On or about August 11, 2014, representatives of Defendants, including Michael

D. Smith ("Mr. Smith"), upon information and belief a CAT employee with the title of Investor

Sales Manager – Latin America/ Electric Power Americas and a business address of P.O. Box

610, AC 6109, Mossville, IL 61552, and representatives of Sotreq met with Mr. Magalhães and

others from CEP in São Paulo, Brazil.

136.    Instead of offering a solution for these serious issues, by letter dated August 19,

2014, Defendants proposed that CEP should purchase from Defendants 18 new, larger generator

sets at an additional cost to CEP of between US$10 million and US$12.4 million plus

Defendants would replace and/or refurbish 25 gensets of the ones that had exploded at

Defendants' cost.  Defendants' proposal was FOB United States, meaning that CEP would have

to pay for transportation, import tax, insurance, installation, testing and commissioning of the

new generator sets.

137.    Defendants also recommended (in direct contradiction to their prior

representations and promises) that CEP operate the CAT C32 generator sets at 80% of capacity,

rather than 100%, in continuous mode.

138.    Defendants' proposal did nothing to address the remaining generator sets that had

not yet exploded, but were incapable of operating at 100% continuous power without exposing

CEP's property to damage and its employees to mortal danger.

139.    On or about August 20, 2014, CEP communicated to Defendants that their

proposal was inadequate because it did not offer a complete solution to CEP's problems with the

144 CAT C32 generator sets.

140.     In or about October of 2014, CEP contracted with another equipment manufacturer, Cummins, to purchase 50 replacement generator sets (FOB England), at a cost to CEP of US$9,750,000.

141.     On or about October 22, 2014, representatives of Defendants, including Mr. Smith, and representatives of Sotreq, met with Mr. Magalhães and others from CEP at CEP's offices in Salvador, Brazil.  Defendants proposed to give CEP 36 larger generator sets (C3512As) if CEP purchased 24 additional C3512As at US$195,800 each (a cost to CEP of US$4,700,000), which Defendants represented would provide the power plants with an additional 20% load capacity.  This proposal was also FOB United States, meaning again that CEP would have to pay for transportation, import tax, insurance, installation, testing and commissioning of the new generator sets.

142.     In all, Defendants' proposals have been nothing more than sales pitches, an attempt to turn the catastrophe Defendants have created into another sales opportunity for themselves.

143.     Defendants' proposals to replace the CAT C32 generator sets that have exploded with fewer, larger generator sets is also an admission on Defendants' part that the CAT C32 generator sets are woefully inadequate for the job.

144.     On or about November 5, 2014, CEP again communicated to Defendants that their settlement proposal was inadequate because it failed to offer a complete solution to CEP's problems.

**The Consequences to CEP of Defendants' Actions**

145.     Defendants' actions have had grave consequences for CEP.

146.    For example, on or about October 9, 2014, CEP received a notification from ANEEL that its total daily values of electricity output had fallen well below schedule, and that ONS records showed the existence of serious failures at the power plants, including engine failures and prolonged maintenance outages.  CEP could face fines, penalties and other consequences to its PPAs, as well as investigations from federal, state and local authorities as a result.

147.    Moreover, CEP has suffered monetary losses, including but not limited to:

a.  The purchase price (US$96,000 each) of over 50 out of service CAT C32 generator sets (the vast majority of which exploded);

b.  The costs to install, test and commission the 144 CAT C32 generator sets;

c.  The cost of labor and materials to rebuild and repair any CAT C32 generator sets that are out of service, including but not limited to over 20 damaged, but potentially salvageable CAT C32 generator sets;

d.  The cost of transporting and storing failed and damaged equipment;

e.  Lost profits from reduced power generation capabilities at UTE Potiguar and UTE Potiguar III plants, due to, among other things:

   i.  the complete failure of over 40 CAT C32 generator sets;

   ii.  the high number of CAT C32 generator sets that have been and remain out of service;

   iii.  the change in timing for top end overhauls (from 7,500 hours of operation to 4,200 hours) and major overhauls (from 15,000 hours of operation to 7,200 hours); and

iv.   running all remaining operative CAT C32 generator sets at 90% load in order to reduce (but not eliminate) the risk of catastrophic failure;

f.   The increased cost of monitoring and maintaining the approximately 87 CAT C32 generator sets still in operation at 90% load;

g.   The cost of renting approximately 25 generator sets to replace the failed and damaged CAT C32 generator sets;

h.   The cost of purchasing 50 replacement Cummins generator sets for US$9,750,000 (FOB England) required to fulfill CEP's PPA requirements;

i.   The cost of transporting from England to Brazil, insuring, installing, testing and commissioning the 50 replacement Cummins generator sets;

j.   The cost of increased labor, maintenance and other operating costs associated with performing top end overhauls and major overhauls more frequently and well ahead of schedule;

k.   The cost of increased labor, maintenance and other operating costs, including increased cost of oil, associated with operating, at 90% load, the remaining CAT C32 generator sets;

l.   The labor, travel and associated costs of CEP's management, employees and counsel who have been required to work exhaustively to deal with the CAT C32 failures; and

m.   The fees of CEP's outside attorneys, experts and engineers who have been retained in connection with the CAT C32 failures.

**Publicly Available Information Reveals CAT's**
**Prior Knowledge of CAT C32 Failures**

148.    On CAT's own blog, numerous buyers of the CAT C32 generator sets complained

about serious issues with the CAT C32 generator sets, including but not limited to "premature

failures," having "lost engines," having "21 units that stopped," the loss of "4 out of 7 to

premature failures," the loss of 4 out of 8 units in Saudi Arabia, having 40 generator sets that

have had "the same problem," and the failure of 15 out of 42 CAT C32 generator sets.  See

https://forums.cat.com/t5/Power-Generation-Product/C32-High-Blow-by/m-p/834.

**Defendants' False Representations Continue to this Day**

149.    One of the most shocking things about Defendants' conduct is that, even with all

of the knowledge they have about the serious defects in the CAT C32 generator sets, including

that the CAT C32s are utterly incapable of operating continuously at the power rating specified,

Defendants to this day continue to represent on their website, and elsewhere, that CAT C32

generator sets are capable of functioning in continuous mode at 830 ekW or 1037 kVA.  *See,*

*e.g.,* http://www.cat.com/en_US/power-systems/electric-power-generation/diesel-generator-

sets/18332039.html.

**FIRST CLAIM FOR RELIEF**
**(FRAUD)**

150.    CEP incorporates by reference each of the preceding paragraphs as if fully set

forth herein.

151.    By means of knowingly false and misleading representations and promises, made

during the time period from 2006 to and including 2014, which included that the CAT C32

generator sets could operate continuously, without varying load for an unlimited time, and could

provide the power output specified by ANEEL, and by virtue of the material omissions about the

limitations of the CAT C32 generator sets, as alleged above, Defendants intended to and did in

31

fact cause CEP and its predecessor, TEP, to enter into the transactions at issue through trickery, deception, and deceit, and to continue to operate CEP's power plants under conditions that Defendants knew to be unreliable and dangerous.

152.    At the time such representations and promises were made, upon information and belief, Defendants knew that they were false by virtue of, among other things, consumer complaints that had been received with respect to the CAT C32 generator sets and similar equipment, including complaints that such equipment was not performing adequately when run under continuous operation mode and used in substantially similar circumstances to those encountered at CEP's power plants.

153.    In the alternative, Defendants made the representations and omissions recklessly and without having a basis to know whether the equipment could perform as Defendants represented.

154.    Defendants' false promises, representations and omissions were material to TEP and CEP.

155.    Defendants intended that their false and misleading representations would cause TEP and CEP to purchase the 144 CAT C32 generator sets described above and to forbear from seeking repayment or replacement of the defective machinery from Defendants.

156.    TEP and CEP reasonably relied on Defendants' false and misleading representations and omissions alleged above, which caused TEP and CEP to purchase the 144 CAT C32 generator sets and to continue employing them in CEP's power plants.

157.    CEP has suffered damages as a direct and proximate result of the foregoing.

158.    Defendants' bad faith and malicious, willful, reckless, wanton, and fraudulent actions warrants the imposition of exemplary and punitive damages.

## SECOND CLAIM FOR RELIEF
## (NEGLIGENT MISREPRESENTATION)

159.    CEP incorporates by reference each of the preceding paragraphs as if fully set forth herein.

160.    If it is determined that Defendants did not make the representations and omissions alleged above intentionally or recklessly, then Defendants failed to use reasonable care when supplying TEP and CEP with false information regarding the CAT C32 generator sets, and by failing to disclose accurate information.

161.    Defendants knew or should have known that the information about the capabilities of their generator sets, and other information provided, would be used and relied upon by CEP and its predecessor, TEP.

162.    Defendants knew that TEP and CEP intended to use the CAT C32 generator sets for the operation of power plants generating electricity for public use.

163.    Defendants therefore were aware that their representations concerning the capabilities of the CAT C32 generator sets were of utmost importance to TEP and CEP since, upon request by ONS, CEP's power plants would be required to supply electrical power for the benefit of the public generally.

164.    TEP and CEP relied on the purported expertise of Defendants with respect to the power generation capabilities of the CAT C32 generator sets and other matters, in entering into the transaction to purchase the equipment and in continuing to use the CAT C32 generator sets once the problems began to surface.

165.    Defendants' representations to TEP and CEP include:

a. CAT issuing a Specification Sheet that represented that the CAT C32 generator sets installed in CEP's power plants would operate continuously, which CAT defined as "output available without varying load for an unlimited time."

b. CASC representing that "the 144 gensets will perform as originally purchased delivering 830 [ekW] in a continuous operation . . . ."

166.   Defendants knew or should have known that TEP and CEP were relying upon and did, in fact, rely upon their misrepresentations and material omissions.

167.   Accordingly, TEP and CEP reasonably and justifiably relied on misrepresentations and material omissions made by Defendants, including because Defendants had obligations to provide TEP and CEP with truthful information especially in the context of providing equipment that would be used for generating electricity for public use.

168.   If not for Defendants' misrepresentations and material omissions, TEP and CEP would not have purchased the CAT C32 generator sets for use in their power plants, would not have engaged in ultimately fruitless extended maintenance and repair operations, and would not have continued to use the CAT C32 generator sets.

169.   CEP has suffered damages as a direct and proximate result of the foregoing.

**THIRD CLAIM FOR RELIEF**
**(PROMISSORY ESTOPPEL)**

170.   CEP incorporates by reference each of the preceding paragraphs as if fully set forth herein.

171.   As alleged above, Defendants made specific promises to TEP and CEP that the CAT C32 generator sets could run continuously and deliver the electrical output TEP and CEP required, including but not limited to: (i) CAT's statement in the Specification Sheet that the CAT C32 generator sets could run "without varying load for an unlimited time;" and (ii) CASC's

34

statement in its letter of June 3, 2011 that "the 144 gensets will perform as originally purchased delivering 830 [ekW] in a continuous operation . . . ."  Defendants' promises were made repeatedly throughout the period where CEP was experiencing severe failures, including as alleged above, with respect to the CAT C32 generator sets.

172.    The promises made by Defendants as alleged above with respect to the CAT C32 generator sets were false.

173.    Defendants acknowledged that the continuous power and power output promises and other representations they made about the CAT C32 generator sets were false by later

a.   recommending that the load capacity of each CAT C32 generator set be limited to 80% as a means to solve the generator sets' functional limitations;

b.   installing new oil sumps with a higher capacity of lubricating oil simply to allow for the generator sets to operate;

c.   requiring, through a recall, the replacement of all cylinder packs in all 144 CAT C32 generator sets;

d.   requiring that top end overhauls be conducted at 4,200 hours of operation rather than 7,500 hours of operation as originally promised;

e.   requiring that major overhauls be conducted at 7,200 hours of operation rather than 15,000 hours of operation as originally promised;

f.   acknowledging that their own maintenance personnel could not repair the generator sets (even in the case where a new engine was installed) and offering to sell CEP new, larger equipment to meet CEP's needs; and

g.   producing written CAT reports entitled "CEP Catastrophic Engine Failure Analys[es]" that detailed the nature of the generator set failures, which CAT

would not have had to issue if the CAT C32 generator sets had worked as promised.

174.    Defendants knew that TEP and CEP intended to use the CAT C32 generator sets for the continuous operation of power plants generating electricity for public use.

175.    Defendants therefore were aware that their promises concerning the capabilities of the CAT C32 generator sets were of utmost importance to TEP and CEP, since upon request from the ONS, CEP's power plants would be required to supply continuous electrical power under the PPAs for the benefit of the public generally.

176.    TEP and CEP relied upon Defendants' promises to their detriment.

177.    TEP and CEP also relied on the purported expertise of Defendants in entering into the transaction to purchase the equipment and in continuing to use the CAT C32 generator sets once the problems began to surface.

178.    Defendants should have expected that TEP and CEP would rely on Defendants' promises.

179.    CEP has suffered damages as a direct and proximate result of Defendants' promises.

180.    Defendants should be estopped from denying the enforceability of their promises and ordered to compensate CEP for the resulting harm.

### FOURTH CLAIM FOR RELIEF
### (BREACH OF EXPRESS WARRANTY)

181.    CEP incorporates by reference each of the preceding paragraphs as if fully set forth herein.

182.    Defendants made express verbal and written warranties about the quality and performance of the CAT C32 generator sets.

36

183. Among other things: (i) CAT issued a Specification Sheet that represented that the C32 generator sets in the power plants would operate continuously, which CAT defined as "output available without varying load for an unlimited time;" and (ii) CASC stated that "the 144 gensets will perform as originally purchased delivering 830 [ekW] in a continuous operation . . . ."

184. Defendants breached the express warranties they provided because, among other things, the CAT C32 generator sets could not run continuously or provide the power output Defendants warranted they could.

185. CEP notified Defendants of the breach of their express warranties on repeated occasions.

186. After Defendants tried but failed to remedy the defects through a series of attempted quick fixes, Defendants offered up a series of ever changing and blame-deflecting explanations and excuses for the multitude of significant failures experienced by the CAT C32 generator sets.

187. CEP has suffered damages, which could not reasonably be prevented by cover or otherwise, as a direct and proximate result of the foregoing.

**FIFTH CLAIM FOR RELIEF**
**(BREACH OF IMPLIED WARRANTY OF**
**FITNESS FOR A PARTICULAR PURPOSE)**

188. CEP incorporates by reference each of the preceding paragraphs as if fully set forth herein.

189. Defendants knew that TEP and CEP intended to use the CAT C32 generator sets for the purpose of continuous operation of power plants generating electricity for public use.

190.    Defendants therefore were aware that their representations concerning the capabilities of the C32 generator sets were of utmost importance to CEP and TEP.

191.    Defendants, in inducing TEP to initially purchase the generator sets, and in inducing CEP to continue to use the generator sets and not to seek repayment and replacement of the defective equipment, repeatedly represented both orally and in writing that the CAT C32 generator sets were fit for their particular purpose.

192.    For example, among other things, CAT issued a Specification Sheet that represented that the CAT C32 generator sets in the power plants would operate continuously, which CAT defined as "output available without varying load for an unlimited time."

193.    In addition, among other things, CASC stated that "the 144 gensets will perform as originally purchased delivering 830 [ekW] in a continuous operation . . . ."

194.    TEP and CEP relied on the purported expertise of Defendants in entering in to the transaction to purchase the equipment and in continuing to use the CAT C32 generator sets once the problems began to surface.

195.    The CAT C32 generator sets are unfit for the particular purpose for which they were intended.

196.    The problems with the CAT C32 generator sets were not the result of any abnormal or unique use of the equipment.

197.    CEP notified Defendants of the breach of the implied warranty of fitness for a particular purpose on repeated occasions.

198.    After Defendants tried and failed to remedy the defects through a series of attempted quick fixes, Defendants offered up a series of ever changing and blame-deflecting

explanations and excuses for the multitude of failures experienced by the CAT C32 generator sets.

199.    As a result of Defendants' breach of the implied warranty of fitness for a particular purpose, CEP has suffered, and continues to suffer, significant damages in an amount to be proven at trial.

### SIXTH CLAIM FOR RELIEF
### (STRICT PRODUCT LIABILITY)

200.    CEP incorporates by reference each of the preceding paragraphs as if fully set forth herein.

201.    The CAT C32 generator sets and component parts purchased by TEP and CEP are defective as to their manufacturing and/or design.

202.    Among other things, with respect to crankcase explosions, upon information and belief, operation at 100% continuous power produces "hotspots" in the engine crankcases in way of the main bearings and/or all crankpin bearings, which can then turn the lubrication oil into an oil mist, creating an explosive vapor.  The hotspots can then, upon information and belief, ignite this explosive vapor and cause an explosion.  This overheating occurs despite the operation and maintenance of the CAT C32 engines within the parameters prescribed by Defendants and Sotreq, and despite the generator sets being maintained by Sotreq.

203.    CAT was directly involved in the manufacture and design of the defective equipment.

204.    The manufacturing and design defects existed at the time the equipment left the control of CAT.

205.    CEP used the equipment in a way that was reasonably foreseeable to CAT.

206.    The risk of danger inherent in the design of the CAT C32 generator sets outweighs the benefits of such design.

207.    The CAT C32 generator sets have failed to perform as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

208.    The serious defects contained within the design and manufacture of the CAT C32 generator sets has led, and continues to lead, to a series of catastrophic failures, including explosions that have damaged equipment and property other than the exploding engines themselves.

209.    The continuing malfunctions alleged above render all 144 of the CAT C32 gensets unusable.

210.    As a result of the foregoing, CEP has suffered damages and continues to be damaged in an amount to be determined at trial.

211.    In addition to compensatory damages, given Defendants' bad faith and/or malicious, willful, reckless wanton, or fraudulent conduct, CEP is entitled to recover punitive damages.

**SEVENTH CLAIM FOR RELIEF**
**(VIOLATIONS OF FLORIDA'S DECEPTIVE**
**AND UNFAIR TRADE PRACTICES ACT)**

212.    CEP incorporates by reference each of the preceding paragraphs as if fully set forth herein.

213.    Through the acts alleged above, Defendants knowingly made false representations as to the characteristics and quality of goods for sale.

214.    Defendants' misconduct occurred in Florida because the CAT C32 generator sets were delivered by CAT in Florida, title to the CAT C32 generator sets passed to CEP in Florida,

and Defendants' false statements and promises about, among other things, the ability of the CAT C32 generator sets to operate continuously, with the power output promised, were made by Defendants from within Florida.

215.   TEP and CEP are consumers as defined in the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

216.   Defendants' actions constitute unlawful acts and practices as defined in the FDUTPA because they are unfair methods of competition, and/or unconscionable acts or practices and/or unfair or deceptive acts or practices in the conduct of Defendants' business.

217.   CEP has suffered damages, and continues to be damaged, in an amount to be determined at trial.

218.   By virtue of the provisions of the FDUTPA, CEP should be awarded compensatory damages as well as its attorneys' fees and court costs.

**EIGHTH CLAIM FOR RELIEF**
**(REVOCATION OF ACCEPTANCE)**

219.   CEP incorporates by reference each of the preceding paragraphs as if fully set forth herein.

220.   Defendants induced acceptance of the CAT C32 generator sets, including at the time title to those CAT C32 generator sets passed to CEP in Florida, by intentionally concealing the nonconformity and defects of the CAT C32 generator sets.

221.   The nonconformity and defects of the CAT C32 generator sets substantially impaired the value of the CAT C32 generator sets to CEP.

222.   Acceptance was reasonable under the circumstances given the difficulty of discovery of the defects and nonconformities in the CAT C32 generator sets before acceptance.  CEP had no knowledge of such defects and nonconformities, reasonably could not

41

have discovered them, and such nonconformity and defects were contradicted by the affirmative representations of Defendants.

223.    CEP has demanded revocation but such demands have been refused.

224.    Pursuant to Florida law, including Section 672.608 and 672.715, as an additional and/or alternative claim, CEP seeks revocation of acceptance and recovery of the purchase price for all 144 CAT C32 generator sets together with all incidental and consequential damages.

## PRAYER FOR RELIEF

WHEREFORE, CEP demands Judgment in its favor and against Defendants:

a.      Awarding CEP compensatory damages;

b.      Awarding CEP punitive or exemplary damages;

c.      Awarding CEP pre- and post- judgment interest;

d.      Awarding CEP its disbursements, costs and expenses, including reasonable attorneys' fees; and

e.      Awarding CEP such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

CEP hereby demands trial by jury.

Dated this 12th day of November, 2014.


VENABLE LLP

/s/ Patrick J. Boyle
*Patrick J. Boyle
*Lead Counsel for Plaintiff*

(212) 808-5678
*Jessie F. Beeber
(212) 808-5677
*Sarah S. Park
(212) 503-0653
Rockefeller Center
1270 Avenue of the Americas
The Twenty-Fourth Floor
New York, NY 10020
(212) 307-5500
(212) 307-5598 (fax)
pboyle@venable.com
jbeeber@venable.com
spark@venable.com

VENABLE LLP

/s/ Randall K. Miller
*Randall K. Miller
*Nicholas M. DePalma
8010 Towers Crescent Drive, Suite 300
Tysons Corner, VA 22182
(703) 905-1449
(703) 821-8949 (facsimile)
rkmiller@venable.com
nmdepalma@venable.com

*pending admission pro hac vice*


RUSSOMANNO & BORRELLO, P.A.

/s/ Herman J. Russomanno III
Herman J. Russomanno III, Esq.
Museum Tower - Penthouse 2800
150 West Flagler Street
Miami, Florida 33130
(Phone) 305-373-2101
(Fax) 305-373-2103
herman2@russomanno.com

*Local Counsel for Plaintiff*