## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 14-24277-CIV-MARTINEZ/GOODMAN

COMPANHIA ENERGETICA POTIGUAR,

      Plaintiff,

v.

CATERPILLAR INC., et al.,

      Defendants.

_____/

## PUBLIC[1] *OMNIBUS* REPORT AND RECOMMENDATIONS CONCERNING *DAUBERT*[2] MOTIONS

---

[1]     This Report was initially filed under seal because the parties filed the various documents concerning the *Daubert* motions under seal. The parties, however, now consent to having this Report filed as a public document. [ECF No. 400, p. 2].

[2]     Plaintiff describes its motion as a "motion in limine to preclude expert testimony (of named experts) pursuant to Federal Rules of Evidence 402, 403 and 702." [ECF No. 301]. Defendants describe their motion as a "motion and memorandum of law in support of motion to exclude the opinions and testimony of [named experts]." [ECF No. 300]. Nevertheless, the motions are, for all practical purposes, motions which rely on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, and their submissions expressly rely on *Daubert* and the case law authority it spawned.

     The motions also include *other* grounds, such as an argument that Plaintiff's experts did not provide enough information in their reports about the basis for their opinions or that some defense experts were not actually rebuttal experts (even though they were portrayed that way). For purposes of titling this Report, though, *Daubert* will suffice, as it is a basis for most of the challenges made here.

This Report and Recommendations concerns expert witnesses. In particular, it involves *challenges* to expert witnesses, who are often used in litigation. In fact, in an article issued by the American Bar Association's Section of Litigation,[3] the author noted that "[t]he prevalence of experts today in litigation seems unprecedented." When parties do the expected and retain experts, the opposing parties frequently seek to prevent the other side's expert witnesses from testifying at trial. Sometimes they try to foreclose *all* of the other side's experts from testifying. That's what's going on here.

So the use of experts is routine today, and songwriters have even referenced experts in their lyrics. For example, iconic musician Bob Dylan wrote, "Ever gone the opposite of what the experts say? Tell me. Tell me."[4] And The Flaming Lips announced, "And yeah, it took some help, with lots of machines, the experts could tell, with their equipment pushed to the max."[5] Former Eagles bandmate Don Henley advised, in his solo musician days, "Today I made an appearance downtown / I am an expert witness, because I say I am / And I said, gentlemen, and I use that word loosely / I will testify for

---

[3]     Ladd A. Hirsch, *A Pragmatic Approach to Retaining and Presenting Expert Witnesses: Picking All-Stars and Avoiding Busts*, 2012 ABA Sec. Litig., p. 2.

[4]     BOB DYLAN, *Tell Me, on* THE BOOTLEG SERIES, VOL. 1-3: RARE & UNRELEASED 1961-1991 (Columbia 1991).

[5]     THE FLAMING LIPS, *The Abandoned Hospital Ship, on* CLOUDS TASTE METALLIC (Warner Bros. 1995).

you."[6]   Former Beatle George Harrison musically said, "This tune has nothing bright about it / This tune ain't bad or good and come ever what may / My experts tells me it's okay."[7] Even the Boston Pops Orchestra has something to say about experts: "The experts came to hear and see / but none of them could solve the mystery / They called Professor Einstein too / He said: 'There's nothing I can do.'"[8]

Turning from musical lyrics about experts to the actual use or intended use of experts in this specific case, the Undersigned will first address the procedural and factual background underlying the motions involved in this Report:

Plaintiff Companhia Energetica Potiguar ("CEP") and Defendants Caterpillar Inc., Caterpillar Americas Services Co. and Caterpillar Americas Co. (collectively, "Caterpillar" or "CAT") each moved to exclude all of the other side's experts. United States District Judge Jose E. Martinez referred the motions to the Undersigned.  [ECF No. 312].

## I.    BACKGROUND

### A.    Relevant Facts

Since 2006, Caterpillar has manufactured the C32 Diesel Generator Set ("genset"), a product that incorporates a diesel engine and generator and is used for

---

[6]    DON HENLEY, *The Garden of Allah*, *on* ACTUAL MILES: HENLEY'S GREATEST HITS (Geffen 1995).

[7]    GEORGE HARRISON, *This Song*, *on* THIRTY THREE & 1/3 (Dark Horse 1976).

[8]    BOSTON POPS ORCHESTRA, *on* FIEDLER GREATEST HITS (RCA Victor 1991).

power production. On May 31, 2007, CEP's predecessor, TEP, executed a contract for the purchase of 144 Caterpillar C32 gensets with Sotreq, an authorized dealer of Caterpillar products in Brazil. The TEP-Sotreq Contract required TEP to pay $13,824,000 for the gensets and additional amounts in Brazilian currency for products and services provided by Sotreq. CEP now alleges that the gensets are defective and asserts numerous claims against Caterpillar. CEP alleges that 62 of the 144 gensets "catastrophically failed" and seeks damages for 57 of those gensets.[9]

CEP alleges that these gensets failed to perform and required more maintenance than it expected. It further alleges that CAT knew or should have known from the very beginning that these gensets were unfit for use in CEP's power plants, where they were expected to be used for continuous operation. CEP alleges that the gensets have been plagued with problems, including engines which explode -- a scenario which destroys the engines themselves and causes significant damage to other nearby gensets. CEP alleges that CAT has refused to replace all the gensets and to compensate CEP for its damages.

CEP's Complaint asserts eight counts: fraud (Count I); negligent misrepresentation (Count II); promissory estoppel (Count III); breach of express warranty (Count IV); breach of implied warranty (Count V); strict product liability

---

[9]    CEP seeks damages for only 57 of the 62 because Caterpillar removed and replaced five of the gensets.

(Count VI); Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count VII); and revocation of acceptance (Count VIII). [ECF No. 1].

CAT raises myriad purported defenses to these claims. But one of its principal factual positions is best summarized as follows: CEP did not properly maintain the gensets and chose to hide behind its incorrect understanding of the guidelines in the manual and written limited warranty.

The parties engaged in extensive discovery, including multiple trips to Brazil and the hiring of several expert witnesses.

CEP provided Caterpillar with reports from five experts, summarized as follows:

1) **John Poulson**:  John Poulson ("Poulson") is a mechanical engineer who opined on the root cause of the alleged failures of the gensets.  Poulson opined that the damage to the engines in the power plants at CEP was caused by crankshaft bearing failures, which were sustained as a consequence of a breakdown of the lubrication of the crankshaft bearings when a continuous load was being demanded of the engine.

2) **Joseph Crosson**: Joseph Crosson ("Crosson") is a metallurgical engineer who opined on the metallography of the bearings of the engines in the gensets. Crosson opined that the failures of the engines are attributable to a lack of oil or inadequate lubricating properties of the engine lubricating oil during continuous operation of the engines.

3)     **James Fitch**: James Fitch ("Fitch") is a tribologist (someone specializing in the study of friction, lubrication and wear between moving surfaces) who analyzed oil samples taken from the gensets at CEP. Fitch opined that a large number of the engines suffered accelerated bearing wear from collapsed film thickness.  He also found strong evidence that the collapsed film thickness was due to fuel dilution further compounded by heat and high loading conditions.

4)     **Ole Haaland**:  Ole Haaland ("Haaland") is a power plant design engineer who opined on the design of CEP's plant, CEP's maintenance practices, and CEP's operating costs. Haaland opined that the failures of the "Power Module" are not due to the design and configuration of the power plants, that the operation and maintenance practices at the power plant are adequate and comply with Caterpillar requirements, and the cost of operating the "Power Modules" was significantly higher than the cost CEP anticipated. The Undersigned previously entered an Order [ECF No. 361] granting CAT's motion to strike Haaland's declaration (but that ruling did not address the threshold issue of whether he would be permitted to testify at trial or whether CAT's motion to exclude him should be granted). CEP filed an objection to that earlier Order [ECF No. 373]. Judge Martinez denied CEP's objections and affirmed and adopted my recommendations. [ECF No. 390].

5)     **Henry Fuentes**: Henry Fuentes ("Fuentes") is CEP's damages expert. The Undersigned previously entered a Report and Recommendations regarding Fuentes.

This prior Report [ECF No. 371] addressed, among other issues, a specific CAT challenge concerning Fuentes' failure to specify the pages of the materials he relied upon in his report, his failure to cross-reference each opinion with specific pages of the materials listed and his failure to personally and independently verify the accuracy of the information CEP provided him. The Report recommended denial of CAT's motion to exclude Fuentes. CAT filed an objection. [ECF No. 375]. Judge Martinez affirmed and adopted my recommendations. [ECF No. 391].

CAT provided CEP with reports from seven experts, summarized as follows:

1)     **Michael Minks**: Michael Minks ("Minks") is a Caterpillar customer service engineer who specializes in engine performance and operation. Minks is being offered as a rebuttal expert to CEP experts Poulson, Crosson, Fitch, and Haaland. Minks examined failed C32 engines at CEP, provided explanations for the failures, and pointed out factors that CEP's experts should have considered.  Minks concluded that the failures of the CEP engines were due to lack of proper maintenance and failure to perform timely Scheduled Oil Sampling analyses, oil changes, and overhauls.  He also opined that CEP improperly removed and reused major engine component parts and failed to comply with Caterpillar guidelines for engine rebuilds.

2)     **Nathan Rasmussen**:  Nathan Rasmussen ("Rasmussen") is a Caterpillar field service engineer specializing in C32 (among others) series engines in off-highway mining applications.  Rasmussen is being offered as a rebuttal expert to CEP experts

Poulson, Fitch, and Haaland. Rasmussen opined on engine maintenance. Rasmussen opined that CEP failed to perform preventative maintenance, insufficiently performed Scheduled Oil Sampling, improperly reused major components, improperly performed rebuilds, and failed to acknowledge/resolve warning alarms. Rasmussen also criticized CEP's decision to use biofuels, which at times contained high levels of contamination.

3)    **Alan Daniel**:   Alan Daniel ("Daniel") is a Caterpillar product service manager and engineer who opined that some of the gensets experienced failures because CEP did not operate and maintain them properly. He identified numerous problems at CEP, including operating gensets at excessive mechanical loads, failing to acknowledge warning alarms, failing to use a centralized monitoring system, failing to perform preventative maintenance, and using a corrosive cleaning agent.

4)    **David Nycz**:   David Nycz ("Nycz") is a Caterpillar oil specialist offered as a rebuttal witness to CEP expert Fitch. Nycz opined on oil sampling and analysis. Nycz opined that Fitch's theory that widespread fuel diluted the oil and led to bearing failures was incorrect. Nycz also opined that oil degradation caused by extended oil drain intervals and high operating temperatures contributed to some failures at the CEP site.

5)    **Brian Howe**:   Brian Howe ("Howe") is a mechanical engineer and diesel engineer failure specialist offered as a rebuttal witness to CEP expert Poulson. Howe opined that Caterpillar's NPI process used to design the C32 engine was thorough and

8

comparable to Caterpillar's peer companies. He also concluded that the C32 engines CEP received were tested at the factory and met the specification for generated power; CEP has many times the failure rate for C32 gensets compared with the rest of the world's failure rate; and CEP employed many substandard maintenance and operation practices that likely contributed to engine failures.

6)   **Esteban Arroyave**: Esteban Arroyave ("Arroyave") is a Brazilian management engineer offered as an affirmative expert and rebuttal witness to Haaland, Poulson, and Fitch.   Arroyave opined that CEP failed to maintain the gensets in accordance with the Caterpillar O&M manual and failed to operate the gensets properly in a power plant the size of those at CEP. Arroyave found that these systematic failures significantly increased the risk of damage and malfunction to the gensets. Additionally, Arroyave found that the design and configuration of the CEP power plants do not comport with sound engineering practices and CEP's maintenance and operation practices are inadequate to ensure efficient power generation.

7)   **Reza Nikain**: Reza Nikain ("Nikain") is Caterpillar's damages expert offered as a rebuttal expert to Fuentes.

## II.   LEGAL STANDARDS (RE: EXPERT TESTIMONY, IN GENERAL)

The admission of expert testimony is governed by Federal Rule of Evidence 702, as explained and refined by the United States Supreme Court in *Daubert* and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Under this framework, district courts are

charged with a gatekeeping function "to ensure that speculative, unreliable expert

testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253,

1256 (11th Cir. 2002).

> Rule 702 provides that:
>
> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise
> if:
> (a) the expert's scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to determine a fact in
> issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts
> of the case.

Fed. R. Evid. 702.

To fulfill its obligation under *Daubert*, a trial court engages in a three-part

inquiry: (1) whether the expert is qualified to testify competently; (2) whether the

methodology used to reach the conclusions is sufficiently reliable; and (3) whether the

testimony assists the trier of fact to understand the evidence or to determine a fact at

issue. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

The district court has "broad discretion in determining whether to admit or

exclude expert testimony, and its decision will be disturbed on appeal only if it is

manifestly erroneous." *Evans v. Mathis Funeral Home*, 996 F.2d 266, 268 (11th Cir. 1993)

(citing, *inter alia*, *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962)).

"To warrant or permit the use of expert testimony, two conditions must be met: first, the subject matter must be closely related to a particular profession, business or science and not within the common knowledge of the average layman; second, the witness must have such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *Faircloth v. Lamb-Grays Harbor Co.*, 467 F.2d 685, 694 (5th Cir. 1972) (internal quotation omitted).

Concerning qualifications, an expert needs to be minimally qualified and any objections to the level of his expertise typically go to the credibility and weight of the expert's opinion, not the admissibility of it. *See Clena Invs., Inc. v. XL Specialty Ins. Co,* 280 F.R.D. 653, 661 (S.D. Fla. 2012); *Vision 1 Homeowners Ass'n Inc. v. Aspen Specialty Ins. Co.,* 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009). The test is "whether the subject matter of the witness's proposed testimony is sufficiently within the expert's expertise." *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 711 F. Supp. 2d 1348, 1367 (M.D. Ga. 2010) (citing, as an example, *Maiz* v. *Virani,* 253 F.3d 641, 665 (11th Cir. 2001)).

A lack of formal education does not automatically preclude an expert from testifying; "**experience** in a field may offer another path to expert status." *United States v. Masferrer*, 367 F. Supp. 2d 1365, 1372 (S.D. Fla. 2005) (emphasis supplied) (citing *United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004)). Indeed, the Committee Note to the 2000 Amendments of Rule 702 explains that "[n]othing in this amendment is

11

intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony." Fed. R. Evid. 702 Advisory Committee's Note (2000 Amendments.).

Rule 702 requires an expert witness to have "specialized knowledge" regarding the area of testimony. Fed. R. Evid. 702(a). As noted, the basis of this specialized knowledge "can be practical experience as well as academic training and credentials." *Am. Tech. Resources v. United States*, 893 F.2d 651, 656 (3d Cir. 1990); *see also Hammond v. Int'l Harvester Co.*, 691 F.2d 646, 653 (3d Cir. 1982) ("under Rule 702, an individual need possess no special academic credentials to serve as an expert witness. . . . 'Practical experience as well as academic training and credentials may be the basis of qualification (as an expert witness).'") (internal citation omitted).

Courts have liberally interpreted the specialized knowledge requirement, and have stated that this policy of liberal admissibility of expert testimony "extends to the substantive as well as the formal qualification of experts." *See, e.g., In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994); *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (quoting *In re Paoli R. R Yard*, 35 F.3d at 741).

However, on the other hand, "the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express." *Frazier*, 387 F.3d at 1261 (emphasis in original). "[O]ne may be considered an expert but still

offer unreliable testimony." *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341-42 (11th Cir. 2003).

The proponent of testimony based on experience rather than scientific knowledge must show "how that experience led to the conclusion [] reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts of the case." *Frazier*, 387 F.3d at 1265.

Reliability of the methodology, a separate factor, requires "an exacting analysis of the proffered expert's methodology." *McCorvey*, 298 F.3d at 1257. That analysis takes into consideration a number of factors, including: (1) whether the expert's methodology can be, and has been, tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method employed has a known rate of error; and (4) whether the technique is generally accepted in the scientific community. *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341; *Rink*, 400 F.3d at 1292.

These reliability factors, however, are non-exhaustive. *Kumho Tire*, 526 U.S. at 150; *Rink*, 400 F.3d at 1292. Thus, "[i]n evaluating the reliability of an expert's method . . . a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293 n.7 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997)). The burden of establishing the reliability of an expert's opinions rests on the proponent of that expert's testimony. *Frazier*, 387 F.3d at 1244.

13

To be sure, the thoroughness of an expert's investigation may play a role in determining if the opinion's methodology is reliable; however, the Court does not make this judgment in a vacuum. The fact that an expert did not personally inspect the scene of an incident or physically inspect all allegedly defective products is not by itself determinative; personal inspections are not necessarily required.[10]

As an overarching principle, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey*, 298 F.3d at 1256. "In order to be admissible, an expert's testimony must be based on 'more than subjective belief or unsupported speculation.'" *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1167 (S.D. Fla. 1996) (quoting *Daubert*, 509 U.S. at 590). There should be "[s]cientific method; good grounds and appropriate validation," *Masferrer*, 367 F. Supp. 2d at 1371.

Expert testimony is admissible "if it concerns matters that are beyond the understanding of the average lay person." *Whelan*, 976 F. Supp. 2d 1322, 1327 (S.D. Fla. 2013) (quoting *Frazier*, 387 F.3d at 1244). Expert testimony is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able

---

[10]     *See Bryant v. BGHA, Inc.*, 9 F. Supp. 3d 1374, 1392 (M.D. Ga. 2014) (permitting opinion of expert who did not personally visit the scene of the incident and did not inspect the hunting tree stand because he relied upon partner's measurements, photos and data); *Desert Falcon-Special Mar. Enter. v. E. Coast Terminal Co.*, No. 402CV156, 2004 WL 5612966, at *3-4 (S.D. Ga. Jan. 5, 2004) (finding failure to view the actual collapsed crane insufficient to render expert's opinion inadmissible); *Hankins v. Ford Motor Co.*, No. 3:08-cv-639, 2011 WL 6046304, at *5 (S.D. Miss. Dec. 5, 2011) (finding expert was not required to inspect the accident site or plaintiff's vehicle because opinion based on accident reconstruction reports and other case-specific information, combined with experience in field and research, was sufficient).

to comprehend for themselves. *Id*. Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005).

The party proffering the expert has the burden of "laying the proper foundation for the admission of the expert testimony . . . and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). "Where the burden has not been satisfied, [Federal Rule of Evidence 702] precludes expert testimony." *Siharath v. Sandoz Pharm. Corp.*, 131 F. Supp. 2d 1347, 1351 (N.D. Ga. 2001), *aff'd sub nom.*, *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194 (11th Cir. 2002).

Expert testimony must be "based on sufficient facts or data" to be admissible. Fed. R. Evid. 702. The facts or data must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703. Because experts can "opine about a complicated matter without any firsthand knowledge of the facts in the case," the trial court's gatekeeping role is "especially significant." *Frazier*, 387 F.3d at 1260; s*ee also Daubert*, 509 U.S. at 592 (expert's "wide latitude to offer opinions" is "premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline").

As outlined above, each party is challenging all experts designated by its opponent. The briefing on these issues has been comprehensive and voluminous. There is no doubt that **every** expert's opinion here can be legitimately challenged as flawed in *some* way.

Nevertheless, mistakes, defects, omissions, problems, weaknesses and warts with an expert's opinion do not necessarily mean that it must be *excluded*. To the contrary, many challenges to expert testimony ultimately can be viewed as an attack on the *weight* of the expert's opinions, which can be addressed at trial through vigorous cross-examination, rather than to admissibility. *See generally Holiday Inns, Inc. v. Holiday Out in Am.*, 481 F.2d 445, 447 (5th Cir. 1973) ("format of the questions and the manner of conducting the survey" go to "weight of [the] evidence"); *Pods Enters., Inc. v. U-Haul Int'l, Inc.*, 12-01479, 2014 WL 2625297, at *2-3 (M.D. Fla. June 12, 2014) ("improper universe" and "improper questioning" were "technical deficiencies" that "go to the weight of [the] opinions, not their admissibility"); *Hoff v. Steiner Transocean, Ltd.*, No. 12-22329, 2014 WL 273075, at *4 (S.D. Fla. Jan. 24, 2014) ("As long as a reliable basis exists for the expert's opinion, it is admissible, and it is then up to the parties to vet the opinion before the jury"); *Nightlight Sys., Inc. v. Nitelites Franchise Sys., Inc.*, 2007 WL 4563873, at *7-8 (N.D. Ga. July 17, 2007) (finding allegedly flawed survey universe and question formats were technical deficiencies of weight, not admissibility).

"It is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341; *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001) (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999)). Thus, the district court cannot exclude an expert because it believes the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n. 7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596).

Because the parties have launched so many attacks on all experts, the Undersigned is compelled to stress that a less-than-perfect expert opinion may still be admitted, even if it contains gaps. *See In re Trasylol Prods. Liab. Litig.*, No. 08–MD–01928, 2010 WL 1489793, at *6 (S.D. Fla. Feb. 24, 2010) ("Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.").

Similarly, the Undersigned "must be *careful not to conflate questions of* **admissibility** *of expert testimony with the* weight appropriately to be accorded to such testimony by the fact finder." *In re Trasylol Products Liab. Lit.*, No. 08-MD-01928, 2010 WL 1489793, at *7 (S.D. Fla. Feb. 24, 2010) (quoting *Quiet Tech*, 326 F.3d at 1341) (emphasis supplied).

17

<u>*Kumho Tire*</u>

Given the nature of the experts proffered and the type of challenges asserted, the Undersigned deems it helpful to first present a fairly comprehensive outline of *Kumho Tire*, which both sides cite in their motions and related memoranda.

The proffered expert in *Kumho Tire* was an engineer named Dennis Carlson. Carlson performed root cause failure analysis (but on a tire that blew out, not, as is the case here, for engines that "ventilated"). 526 U.S. at 142. Carlson conducted a visual and tactile examination of the damaged tire. *Id*. at 143. He opined that a manufacturing defect had caused the blowout, based on certain physical symptoms that he said he could see with the naked eye. *Id*. at 144. Specifically, Carlson opined that if the tire had failed due to misuse, rather than a defect, he would see four symptoms: (1) tread wear on the tire's shoulder greater than wear in the center; (2) signs of a "bead groove" where the beads had been pushed too hard against the inside of the tire's rim; (3) deterioration, such as discoloration, of the tire sidewalls; and/or (4) marks on the tire's rim flange. *Id.* According to Carlson, if he did not find at least two of these four signs, then the tire had failed due to a defect.  *Id*.

Holding that the District Court's gatekeeper responsibility applied even in the case of "technical" rather than "scientific" testimony (*id*. at 149), the Supreme Court found it appropriate to ask "even of experience-based testimony . . . how often an engineering expert's experience-based methodology has produced erroneous results, or

18

whether such a method is generally accepted in the relevant engineering community." *Id*. at 151. The Court then explained why the District Court was within its "lawful discretion" to exclude Carlson as an expert. *Id*. at 158.

The *Kumho Tire* Court began by noting that Carlson's "two-factor test and his related use of visual/tactile inspection" relied on "what seemed small observational differences." *Id*. at 157. The *Kumho Tire* Court was troubled by Carlson's inability to answer with any certainty the most basic questions about his theory. It observed that the District Court "could reasonably have wondered about the reliability of a method of visual and tactile inspection sufficiently precise to ascertain with some certainty the . . . significance of minute shoulder/center relative tread wear differences, but insufficiently precise to tell 'with any certainty' from the tread wear whether a tire had traveled less than 10,000 or more than 50,000 miles." *Id*. at 155. Those "concerns" were "augmented" by the "subjectiveness of [Carlson's] mode of analysis in response to questions seeking specific information regarding how he could differentiate between a tire that actually had been overdeflected and a tire that merely looked as though it had been." *Id*.

In *Kumho Tire*, there was "no indication in the record that other experts in the industry used Carlson's two-factor test or that tire experts such as Carlson normally make the very fine distinctions about, say, the symmetry of . . . wear that were necessary, on Carlson's own theory, to support his conclusions." 526 U.S. at 157.

Carlson's "methodology failed Rule 702's reliability requirement" because, although he came up with a strict two-factor test, he could not and did not apply it to the tire in question. 526 U.S. at 145. Carlson "conceded" that certain factors indicating tire misuse were present, but "in each instance, he testified that the symptoms were not significant" and attempted to explain them away. *Id*. For example, while he did see shoulder wear on the tire, one of his symptoms of misuse, he said it "appeared primarily on one shoulder," whereas a misused tire "would reveal equally abnormal wear on both shoulders." *Id*.

The District Court's "concerns" in *Kumho Tire* were reasonably "further augmented" by "the fact that Carlson said he had inspected the tire itself for the first time the morning of his deposition, and then only for a few hours. (His initial conclusions were based on photographs.)." 526 U.S. at 155. Therefore, the Supreme Court held that the trial court did not abuse its discretion in using a *Daubert* analysis and excluding the tire failure analyst's expert testimony that a particular tire failed due a manufacturing or design defect.

## III.   ANALYSIS

### CAT's RULE 26 AND RULE 37 ARGUMENTS

In addition to challenging all of CEP's experts under a *Daubert* analysis, CAT also seeks to exclude four of them (Fuentes, Poulson, Haaland and Crosson) for purportedly failing to comply with Federal Rule of Civil Procedure 26. This failure, CAT says,

justifies the extreme sanction of exclusion under Federal Rule of Civil Procedure 37. At

bottom, CAT contends that these four CEP expert reports violate Rule 26(a)(2)(B)(ii)'s

requirement that a testifying expert disclose the facts or data considered in forming his

or her opinion. CAT argues that the reports and the experts' testimony are too vague to

pass muster because they do not specifically cite or refer to particular pages of the

exhibits or other material relied upon. CAT contends that this failure entitles it to an

order striking the reports and testimony under Rule 37 because CAT will "be harmed if

Plaintiff's experts are permitted to testify about their unsupported opinions." [ECF No.

300, p. 6]. Although CAT took the depositions of CEP's experts, it argues that it "will be

unfairly prejudiced with surprise testimony of CEP's experts if they disclose specific

evidence." [ECF No. 300, p. 6].

The Undersigned previously addressed this argument, at least as it relates to

Fuentes, in the Report and Recommendations [ECF No. 371] on CAT's motion to

exclude Fuentes' damages report. In the Report and Recommendations, I found that his

expert report, which lists 29 categories of materials he relied upon, did not violate Rule

26's disclosure requirements when it failed to specify the particular pages he considered

and did not connect the opinions and analysis back to specific pages.

That Report is a fact-specific and expert-specific assessment that does not

necessarily apply to the other three witnesses being challenged.  It does, however,

adequately address the argument which CAT raises again as to Fuentes. Judge Martinez

affirmed and adopted the Report. Accordingly, the Undersigned knows of no reason to change the earlier conclusion rejecting the view that Fuentes' expert opinions should be stricken or excluded for failure to provide a more-precise, page-specific list of materials he relied upon.

Nevertheless, the earlier report concerned only **Fuentes**, and it did not evaluate the purported deficiencies of the other three CEP experts challenged on that point.  So this Report will do that now.

Poulson's Report

CAT contends that Poulson's report "cites no record evidence, facts or data to support his opinions." [ECF No. 300, p. 10]. Moreover, it argues that his list of documentation is "no more helpful," because it contains "broad categories" of information, such as "maintenance and service records and documents," with no further specificity. [ECF No. 300, p. 10]. In his deposition, Poulson admitted that he did not look at all reports, does not have a list of which reports (of the thousands of reports available) he reviewed, cannot say whether he reviewed service orders for a particular engine discussed in his report and is unable to say which service orders he reviewed.

Poulson also prepared a Rebuttal Report. [ECF No. 300-30]. It noted that continued surveys were conducted at one of the power plants from October 22 through 26, 2015. It included photographs of engines pasted into the report, as well as myriad charts reflecting information about engines and cylinders. It also contained a section

entitled "Additional Documentation Reviewed," which listed 26 items. All but one (i.e., the first one, which describes review of "Caterpillar Productions") contain a specific Bates number for each item reviewed.

In response to CAT's challenge, CEP says several things. First, CEP contends that CAT is taking inconsistent positions because it argues that CAT's own experts would also have to be stricken for a similar failure to provide specific references to the materials reviewed. Second, CEP contends that Rule 26 does not require specific citation to evidence. These responses are generic and relate to *all* of the CEP experts being challenged for an alleged failure to provide more-detailed references to the materials reviewed. Third, concerning Poulson (in particular), CEP notes that Poulson' preliminary report is 111 pages and brands as untrue the claim that he could not identify the documents he reviewed. CEP emphasized that it produced (albeit after Poulson's deposition) two binders of service orders which Poulson had "culled from CEP's prior document productions, printed, reviewed and highlighted during the preparation of his report" . . . and "made Poulson available for a second deposition concerning those documents." [ECF No. 316, pp. 6-7]. CEP also notes that Poulson's rebuttal expert report "contains a two page list of documents he reviewed and relied upon, identified by bates number."

In its Reply [ECF No. 335], CAT attacks CEP's explanation because it relies upon two binders that CEP produced **after** Poulson's deposition (and after CAT questioned

the veracity of the assertion that Poulson reviewed 30,0000 Portuguese documents using an online translator) and because CEP still explained that the documents in the two binders "do not comprise all the service orders/reports reviewed or considered by Mr. Poulson." [ECF No. 335, p. 6]. Thus, CAT concludes, "neither Poulson nor CEP can identify with specificity the service and work orders that Poulson reviewed." [ECF No. 335, p. 6].

There is little doubt that Poulson's report does not provide much specific guidance about which particular materials he reviewed, and his deposition does not provide much clarification. Likewise, the two binders provide *some* level of additional detail, but CEP's caveat that the materials are incomplete undermines the helpfulness provided by the binders.

Under these circumstances, the Undersigned is not inclined to *strike* Poulson as a testifying trial expert based on the lack of specificity in the list of materials he relied upon. As noted in the earlier Order on CAT's efforts to strike Fuentes' report, the Undersigned is not convinced that Rule 26 requires an expert report to footnote each specific page or section of the background materials or imposes a cross-reference obligation.

Nevertheless, this failure to provide a link between an opinion and specific background materials is surely an issue which can be flagged and highlighted. In my view, the lack of detail and failure to correlate are challenges best addressed through

vigorous cross-examination, efforts to impeach Poulson's preparation and opinions, and contrasting his lack of particular references to the more-specific references and cross-references provided by CAT's counterpart experts.

Haaland's Reports

Haaland's Preliminary Report [ECF No. 300-3] contains, in Appendix A, an eighteen-item list of "documents read, reviewed, analyzed and cited." Eight of those eighteen items include the specific Bates document designation number of the item. Many of the others contain specific descriptions, albeit without a Bates number, such as "'Technical Report' Companhia Energetica Potiguar S.A., December 2013" (item 12). The final item is broad and vague: "generally reviewed discovery documents to determine applicability." [ECF No. 300-3, p. 24].

Although his Preliminary Expert Report does not contain many[11] pinpoint citations to particular items from the eighteen-page appendix, it does, at times, quote from specific documents. For example, paragraph 24 quotes from CAT's "Operation and Maintenance Manual, C32 Power Module," paragraph 30 makes specific temperature references from CAT's "Application and Installation Guide – Engine Room Ventilation," paragraph 34 references provisions from the same guide mentioned in paragraph 30, paragraphs 60 and 64 quote from the CAT "Operation and Maintenance

---

[11]    The Report, however, does contain *some* pinpoint citations. For example, paragraph 50 mentions a specific CAT document (i.e., CAT010484) listing nine different failures, and paragraph 51 mentions issues documented in a technical report designated as CEP 000555-000564.

Manual," and paragraph 88 quotes from CAT's "Demystifying Generator Set Ratings" document.

Haaland's Rebuttal Report [ECF No. 300-10] does not contain an appendix of any additional materials he reviewed. It does, however, mention that he visited two power plants again, from October 23 through 25, 2015. And specific materials (such as photographs, spreadsheets, work orders, control sheets, tracking reports, data collection sheets, maintenance records and attendance sheets) are actually pasted into the report. In addition, the Rebuttal Report is designed to discuss and respond to an expert report of Esteban Arroyave from STEAG Energy Services do Brazil, Ltda. ("Steag"), and it repeatedly references specific provisions from the Steag report.

The Undersigned rejects the argument that Haaland's expert reports should be stricken and his testimony excluded for an alleged failure to submit a sufficient report which includes the bases for his opinions. CAT is free to cross-examine him on this argument (to the extent that Judge Martinez, who will be presiding at the trial, deems it permissible).

Crosson's Report

The text portion of Crosson's Report is only five pages long. Appendix A lists eight categories of materials he reviewed. [ECF No. 300-4]. Only one contains a Bates designation number. The other categories are general, such as "lubricating oil analysis reports," "documents and correspondence regarding failure analysis, including failure

analysis reports," and "maintenance and service records and documents." [ECF No. 300-4, p. 9].

However, the total report is 68 pages, and it includes dozens of pages of photographs (of the engines), charts and metallography reports.

CAT says Crosson's list of documents is so generic and detail-free that it is "impossible to determine what information he considered in reaching his opinions." [ECF No. 300, p. 5].

To meet this attack, CEP argues that Crosson's report is based on examinations performed and includes "approximately 52 pages of extensive documentation supporting his examination – photographic evidence, detailed narratives regarding his visual inspection of the engine components, and laboratory results of metallography, EDS, SEM and compositional analyses." [ECF No. 316, pp. 13-14].  Moreover, CEP points out that CAT and its counsel were present for all of the examinations and tests.

Although the appendix of materials relied upon is broad and without specific Bates designations, it is clear that Crosson relied upon the results of the examinations and tests. Additionally, it is clear that the other materials in the other appendixes attached to his report provide a sufficient basis for CAT to understand the materials on which he based his expert opinion. Striking Crosson's report and precluding him from offering expert opinion testimony at trial would be too harsh a punishment for the

purported sin of not providing a detailed enough appendix and not cross-referencing specific opinions to particular documents.

The Substantive <em>Daubert</em> Challenges

CAT's Challenges to CEP's Expert Witnesses [ECF No. 300]

John Poulson

Poulson has a master's degree in maritime studies. He is a chartered engineer, chartered marine engineer, and a registered marine surveyor. [ECF No. 300-2]. He sailed on merchant vessels from 1975 to 1989. He has 38 years of experience in diesel engine operation, maintenance and failure investigation. His field experience includes investigation into machinery failures and damages, particularly diesel propulsion and auxiliary generating engines in vessels, including floating power generation plants. [ECF No. 300-2].

Basically, Poulson has four opinions: (1) crankshaft bearing failure caused the damage to the power plant generating engines; (2) these bearing failures are consequences of a breakdown of the crankshaft bearing's lubrication when a continuous load is being demanded of the C32 engines; (3) the engines are incapable of producing their claimed continuously rated output of 830KW without sustaining catastrophic damages; and (4) CAT overrated the engines for continuous full load generating operation and are therefore not fit for the intended purpose of continuously generating the power demanded at the two facilities (i.e., Potiguar I and Potiguar II).

28

CAT asserts two broad attacks on CEP's ability to use Poulson as an expert trial witness providing opinion testimony. The first challenge is part of a challenge to *several* of CEP's experts, where CAT contends that their "causation" opinions must be excluded because they are unreliable and not helpful. For Poulson, this challenge is divided into three sub-challenges: (1) there was an inadequate root cause analysis; (2) CEP's cannibalization of the gensets and its haphazard maintenance records make it impossible to know whether the few gensets analyzed contain the same parts as when the gensets failed; and (3) not all of the failed gensets were analyzed.

The second challenge to Poulson is divided into four challenges: (a) Poulson is not qualified; (b) his testimony about the root cause of the genset failures is based solely on a survey of the failed gensets; (c) he improperly cherry-picked facts and failed to consider alternative explanations; and (d) his only evidence and analysis to support his opinion that the gensets are incapable of producing their claimed continuously rated output is that the engines failed.

In my view, it makes sense to first address Poulson's qualifications. CAT focuses on his lack of experience with the type of gensets at issue here or with land-based power plants. His only experience with diesel engines before this case has been with marine engines, not diesel power plants. Likewise, his only prior experience with Caterpillar engines is with those in marine vessels. Thus, CAT argues, Poulson cannot

provide opinion testimony about the root cause of the engine failures because he is not sufficiently familiar with the gensets and power plants.

In response, CEP says that it is not offering Poulson as a power plant expert. Instead, it explains that it asked him to examine the engines and opine on their failures. In addition, CEP notes that CAT admits that the C32 engines are appropriate for both land-based and marine applications.

The qualification standard for expert testimony is "'not stringent,' and 'so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility.'" *Vision I Homeowners Ass'n, Inc.,* 674 F.Supp.2d at 1324 (alteration in original) (finding expert witness qualified to provide opinions on wind damage in lawsuit filed by homeowners association against insurance company for not paying claim for damages incurred in Hurricane Wilma -- even though he is not an engineer or a meteorologist).

As long as there is "some reasonable indication of qualifications," a trial court may permit the expert to testify "without abdicating its gate-keeping function." *Rushing v. Kansas City So. Ry. Co.,* 185 F.3d 496, 507 (5th Cir. 1999) (superseded by statute on other grounds). Once the proponent demonstrates that the expert has the sufficient expertise, the "qualifications become an issue for the trier of fact father than for the court in its gate-keeping capacity." *Id.*

To be sure, CEP might be in a better trial posture had it retained an expert with substantial experience with diesel engines used in land-based power plants. Perhaps a jury would find that type of expert more credible. But CEP did not do that, so the issue is whether Poulson's experience is so far afield that his opinions must be excluded.

Given that the parties do not dispute that the diesel engines at issue here can be used in **both** land and marine applications, Poulson's marine-focused experience (as opposed to experience with engines used in land-based applications) is inadequate to justify an order invoking the extreme consequence of outright exclusion. Evaluated from the opposite perspective, Poulson's experience and credentials, while surely subject to substantial challenge on vigorous and perhaps successful cross-examination, meet the minimal standard necessary for admissibility. *Cf. Deutz Corp. v. City Light & Power, Inc.,* No. 1:05-cv-3113, 2009 WL 2986415, at *9-12 (N.D. Ga. Mar. 21, 2009) (finding, in action against manufacturer of failed gensets, customer properly relied on two different experts, a mechanical engineer who performed a visual inspection of the failed gensets, and a metallurgical engineer who analyzed certain parts).

The Court will now turn to the first category of challenges because they apply to several CEP experts (Poulson, Crosson, and Fitch). Therefore, **the Undersigned will not repeat the analysis to this challenge when discussing these same arguments concerning Crosson and Fitch.**

31

CEP disputes the allegation that Poulson merely looked at a handful of engines. It explains that he and other experts *examined* 57 of the 62 failed engines (but could not examine the other five because they had been removed from the site and replaced by CAT). [ECF No. 316, p. 15, n. 5].  It emphasizes that this review took twenty-two full days.

CEP also takes issue with attacks regarding the parts cannibalization and sloppy maintenance. It says the challenges are based on a misleading interpretation of select testimony, which are taken out of context, and they ignore the record evidence of CEP's actual maintenance practices.

Bypassing, for now, the issue of whether CEP properly logged parts, CEP emphasizes that none of CAT's experts opined that parts-swapping or the engine's position caused the engine failures. Therefore, according to CEP, there is no logical connection between alleged cannibalization or engine positioning and the cause of the failures. Indeed, CEP contends that CAT's challenges "may not even be appropriate fodder for cross examination." [ECF No. 316, p. 23].

The Undersigned does not agree that these challenges would be off limits for cross-examination. To the contrary, there is more than ample testimony about less-than-adequate maintenance practices, incomplete record-keeping, and parts-swapping to justify substantial cross-examination on these challenges. However, the mere fact that CAT may score significant victories during cross-examination and may undermine

32

Poulson's opinions (and the opinions of CEP's other experts) does not mean that an order **excluding** him from providing trial testimony is warranted. It is not.

CAT may pursue the challenges described above during cross-examination of Poulson. *See generally Frazier*, 387 F.3d at 1294 (citing with approval the advisory committee notes for Federal Rule of Evidence 702 for the notion that "rejection of expert testimony is the exception rather than the rule").

<u>Ole Haaland</u>

CEP retained Ole Haaland to provide opinions about the design and configuration of its power plants in Brazil (i.e., the ones where the CAT engines failed). Haaland has a bachelor's degree in mechanical engineering, is a registered professional engineer and was a senior nuclear power plant reactor operator. He has experience in conventional, nuclear and alternate fuel power plant mechanical and electrical systems management, design, construction, plant outage management, start-up, performance testing and operation. He has written articles and book chapters concerning power generation.

By way of summary, Haaland has several basic opinions: (1) the power plant's design and configuration meet all the design requirements for the C32 power module; (2)  the power plant is well run and its operators are well trained; (3) the C32 power module is not well suited for the Potiguar I and Potiguar II power plant applications; (4) the availability of the C32 power modules is far below the expected availability; (5) the

C32 power modules suffered unexpected failures, significantly higher maintenance costs and a catastrophic failure (i.e., more than 39% of the C32 engines).

CAT's primary challenge to Haaland's opinions is that he supposedly analyzed the wrong product. Specifically, CAT contends that Haaland analyzed C32 **power modules** -- which it argues is different than the C32 *gensets* at issue in this case. CAT argues that this is a significant distinction. Power modules are transportable units which can be towed to different locations in their own tractor trailer, while the gensets in this case are stationary units which can be installed in power plants. Moreover, in addition to the transportable-stationary distinction, CAT contends that the two products have different kilowatt ratings, volt amp ratings, and fuel consumption rates.

According to CAT, Haaland's significant misstep in examining the wrong product is aggravated by his reliance on the wrong operation and maintenance manual.

Because Haaland examined the power modules (and not the gensets) and reviewed the wrong manual, CAT argues that his opinion does not encompass CEP's claims (which allege that the gensets are defective) and therefore cannot assist the jury.

Finally, CAT argues that Haaland's opinions are (1) unreliable (because they relate to the wrong product and because his experience is only with Caterpillar natural gas engines, not diesel engines) and (2) conclusory and superficial.

In response, CEP argues that CAT's "wrong-product-analyzed" theory is merely a semantic distinction, elevating form over substance, and contends that there is no

meaningful difference between a power module and a genset. CEP explains that Haaland merely "may not have described CEP's gensets with the appropriate Caterpillar term." It notes that he visited CEP's sites three times, with each trip lasting multiple days.

CEP also submitted a declaration from Haaland in an effort to confront the argument that he inspected the wrong engines but, as noted above, the Undersigned entered an Order [ECF No. 361] striking it because it is, for all practical purposes, an untimely supplemental expert report not permitted under the substantially justified or harmless exception. Therefore, the Undersigned is not considering the arguments raised in Haaland's supplemental declaration to rule on the motion to exclude his opinion testimony at trial.

In addition, CEP stresses that the primary purpose of Haaland's multiple visits was to evaluate the power plants to see if some aspect of their design, installation, operation or maintenance could be causing CEP's C32s to fail. Moreover, it emphasizes that Haaland did not perform any mechanical analysis of the C32 engine itself and is not offering an opinion on the C32 gensets themselves in any mechanical sense.

Concerning Haaland's expertise, qualifications and experience, CEP argues that his lack of experience with Caterpillar diesel engines is irrelevant because he has personally assessed the operation and maintenance of more than 50 power plants and worked with diesel, nuclear, oil, gasoline and alternative energy plants. CEP argues that

his specific lack of experience with the specific Caterpillar diesel engine at issue in this case makes no difference to his opinion on power plant design.

CEP also notes that CAT did not ask Haaland any specific questions about the opinions in his nineteen-page preliminary report and his forty-one-page rebuttal report.

There is little doubt in the Undersigned's mind that Haaland's opinions are subject to myriad challenges on several fronts. CEP may argue that the power modules are, in effect, the same as the gensets, but the spec sheets show different rates of fuel consumption, which could lead to a different operation and maintenance schedule, which could impact Haaland's opinions. Moreover, CEP did not address the argument that Haaland reviewed incorrect manuals.

In addition, the Undersigned is not persuaded by CEP's argument that CAT did not ask certain questions at Haaland's deposition. CAT may have had sound strategic reasons for its apparent decision to not probe too deeply into Haaland's opinions at his deposition. That does not mean that CEP is somehow excused from fulfilling its obligation to demonstrate that Haaland is an appropriate expert witness who can express his opinions at the trial.

Nevertheless, despite these substantial questions about the reliability and helpfulness of Haaland's opinions, the Court is not prepared to take the extreme step of simply excluding him from providing expert opinion testimony at trial. Instead, the Undersigned concludes that a full-fledged cross-examination will adequately address

the many concerns arising over Haaland's opinions. Because Haaland's opinion is centered on the design of the power plants and plant operations, **not the engines themselves,** the Undersigned finds that his reference to power modules and his apparent review of an incorrect manual are not fatal to his opinion. It is, however, subject to a probing cross-examination which a jury may find compelling enough to reject or significantly discount his opinions. But it is up to the jury to decide what weight, if any, to give to Haaland's opinions. Haaland should be permitted to testify, and CAT is free to explore Haaland's multiple purported errors on cross-examination and in closing argument.

<u>Joseph Crosson</u>

CEP retained Joseph Crosson to render an expert opinion about the metallurgical properties of the engines at issue. His opinion is that the lack of lubricating oil or inadequate lubricating properties of the engine lubricating oil is the root cause of the engines' failure.

In addition to the other general challenges made about several of CEP's experts (e.g., haphazard maintenance records and borrowing of parts), CAT's motion argues that Crosson's opinion should be excluded because it is based on unreliable evidence and data and cannot show the root cause of the gensets' failure.

CAT's motion emphasizes an excerpt from Crosson's deposition, where he testified that he did not perform a root cause analysis and explained that his report was

wrong when it suggests otherwise. Therefore, CAT argues, Crosson's testimony would be neither relevant nor reliable and should therefore be excluded.

CEP did not respond to CAT's substantive arguments about Crosson. Although it filed a forty-page opposition [ECF No. 16] to CAT's Motion to Exclude, it did not include any specific responses to the Crosson-specific grounds asserted in the motion. It did not, for example, rebut (or offer to rebut) Crosson's testimony that he did not conduct a root cause analysis.

Because Crosson did in fact testify that he did not conduct a root cause analysis and CEP does not challenge that point, the Undersigned concludes that CAT's motion should be **granted**, at least *in part*, for Crosson. Specifically, Crosson is not permitted to testify at trial about his opinion that lack of oil or inadequate lubricating properties are the root cause of the engines' failure. However, he *will* be permitted to testify factually about his observations during his on-site visit, including his observations about the complete disassembly of two of the failed engines, and his metallurgical analysis of bearing samples taken from both damaged and undamaged C32 engines at the facility. He may not, however, attempt to link those observations or the results of the laboratory analyses with any type of conclusion on the cause or root cause of the failures.

<u>James Fitch</u>

CEP retained James Fitch to opine about the lubrication of diesel engines in CEP's power plants. In his preliminary report, he explained that his preliminary

opinion is that engine bearing failures were caused by insufficient viscosity, which, in turn, resulted from fuel contamination of the lubricating oil.

CAT asserts only limited Fitch-specific grounds to exclude his testimony. Instead, its primary challenge to Fitch is the same argument (or arguments) it raised about *all* of CEP's experts: that their reports are deficient for failing to specifically refer to supporting facts and data, that the opinions are unreliable because of the parts-swapping and haphazard maintenance records and because they did not analyze all of the failed gensets. CAT's motion argues, albeit briefly, that Fitch examined the bearings of only five engines but did not write down the engine numbers of those analyzed. Thus, it raises the same argument that it did for other CEP experts -- that they are improperly extrapolating their findings concerning only a small percentage of the engines to all of the failed gensets.

But the Undersigned has already considered those arguments and found them insufficient to justify the extreme relief of exclusion.

For the Fitch-specific challenge, CEP contends that CAT misunderstands his opinions because he is a tribologist, an oil expert who analyzed oil samples taken from 46 of the 62 failed engines, as well as other engines in CEP's fleet. Therefore, CEP argues, the attack on the limited number of bearings he examined is off the mark because it says his bearings analysis was merely to "see whether they were consistent

with his opinion that the oil showed evidence of viscosity starvation, and they were."

[ECF No. 316, p. 20].

Fitch is certainly subject to challenge, but CEP's explanation is sufficient to permit a jury to assess the weight, if any, to give to his opinions. A jury could conclude that Fitch did not even need to look at any engine bearings because he is not an engine expert and did not analyze the engines. On the other hand, it might conclude that his decision to examine bearings from four of five engines demonstrates that *some* level of engine analysis was important (why else would Fitch have examined any bearings?) and afford his opinions little or no weight.

So, like most of the less-than-perfect expert opinions at issue in the motions to exclude, the District court should permit the jury to assess Fitch's opinions. The Undersigned concludes that the motion should be denied. However, CAT should be given wide latitude to explore these issues on cross-examination. For example, CAT should be permitted to comprehensively question Fitch on issues surrounding his sample size and his conclusion about engine damage without disassembling most of the engines, without examining more engine bearings and without even writing down the engine numbers of those engines he looked at during his inspection.

<u>Henry Fuentes</u>

CAT asserts several challenges to Fuentes, CEP's damages expert: (1) he relied on documents prepared by CEP and did nothing to confirm or verify the date provided; (2)

40

he incorrectly based his damages and lost profits analysis on total power capacity, not the amount actually requested; (3) he did not consult industry texts or use an objective measurement to test his assumptions about CEP's future profitability; (4) he used a speculative discount rate which purportedly came from some type of unidentified "literature;" (4) he did not consider additional factors used in a damages analysis, such as whether CEP's annual contracts would lead to adjustments in the rates paid to CEP.

The Undersigned is not persuaded by CAT's first argument. It is standard and accepted for damages experts to accept as correct the information provided by the counsel who retained them without independently investigating the accuracy of the information. Obviously, if it turns out that the information is incorrect, then the opinion is based, at least in part, on incorrect information and the finder of fact could reject the opinion completely or adjust its reliance. But that does not mean that a financial/damages expert also needs to confirm the factual assumptions provided by her client.

Under CAT's version of expert opinion testimony from a damages expert, the expert (typically an accountant) would need to conduct a probe into fields for which the expert has little or no experience -- diesel engines and oil viscosity and contamination, the use of stents by an interventional cardiologist, comparison of nuclear versus coal in a power plant, the value of a trademark, the likelihood of obtaining FDA approval in a case involving pharmaceutical companies, the worldwide distribution rights of a certain

movie, the expected lifespan of a computer chip before technology develops a more-efficient/less-expensive one, etc.

This is an unworkable, illogical approach, and courts reject it because the assumptions provided are the type of information which experts rely upon when performing a damages analysis. *B.J. Tidwell Indus., Inc. v. Diversified Home Prods., Inc.*, No. 06-CA-0264, 2007 WL 3118300, at *2 (W.D. Tex. Oct. 19, 2007) (rejecting argument challenging expert who did not verify the accuracy of data before he valued the economic loss and noting that "it seems unreasonable to expect valuation experts to ascertain the accuracy of the financial information provided by their clients" and that "[i]t seems reasonable for a business valuation expert to rely on information the client provides"); *see also SolidFX, LLC v. Jeppesen Sanderson, Inc.*, No. 11-cv-01468, 2014 WL 983507, at *6 (D. Colo. Mar. 13, 2014) (finding expert's reliance on a client's spreadsheets and assumptions was not improper); *Guidance Endodontics, LLC v. Dentsply Int'l*, No. 07-cv-3302, 2009 WL 3672495, at *11 (D.N.M. Sept. 29, 2009) (finding consulting financial expert need not "do an audit to verify each and every assumption" of the client); *Wilspec Tech., Inc. v. Dunan Holding Grp. Co. Ltd.*, No. CIV-06-818, 2008 WL 7254328, at *1 (W.D. Okla. June 20, 2008) (finding expert's assumptions about planned and actual sales, used to project lost profits without independent verification or inquiry about reliability, go to weight, not admissibility); *Supervalu, Inc. v. Assoc. Grocers, Inc.*, No. 04-2936, 2007 WL 624342, at *3 (D. Minn. Jan. 3, 2007) (finding expert's assumption that

plaintiff would win a contract renewal does not render lost profits opinion unduly speculative and that attacks to the foundation of the opinion concern weight, not admissibility).

Moreover, CEP notes that the vast majority of Fuentes' damages calculations are not lost profits projected into the future, but are instead computations of historical expenditures supported by the third-party invoices and payment confirmations he reviewed, or historical lost profits based upon publicly available energy production data published by the Brazilian government. Specifically, CEP stresses that more than $65 million of his $75 million calculation concern historical expenditures and lost profits. It notes that only $10 million of the damages estimate concerns future projected losses, and none of those are technically lost profits.

CEP further responds to the Fuentes' challenges by explaining that the Brazilian government adjusted its demand based on what a particular power plant had been able to produce in the past. Therefore, as the C32s began to fail, CEP needed to lower the availability information, and the Brazilian government therefore lowered its demand. Consequently, CEP says, it was appropriate for Fuentes to compare the amount CEP actually produced against its full installed capacity. To the extent that CAT's expert concludes differently, then the difference in approaches is one for the jury to wrangle with, as opposed to one causing the outright exclusion of one expert's opinion testimony.

Concerning the discount rate Fuentes used, CEP correctly notes that Fuentes never used the phrase "scientific method" in his deposition. Moreover, Fuentes <u>did</u> explain, albeit in a general way, why he selected 15% as the discount factor. He explained that the rate is "generally . . . somewhere between 14 and 18 percent." [ECF No. 300-8, p. 39]. CAT may find this rationale insufficiently specific and its expert may disagree with it, but it does not render his opinion *inadmissible.*

CAT's contention that Fuentes did not consider all relevant components in his damages analysis is not convincing enough to justify an order excluding his testimony. CAT's argument on this point in its motion is contained in only one paragraph. To the extent CAT pinpoints omitted factors, such as its argument that Fuentes did not consider Caterpillar warranty language or the purported period of warranty, it can probe those issues during cross-examination.

<u>CEP's Challenges to CAT's Expert Witnesses</u>

<u>Michael Minks</u>[12]

Minks is a Customer Service Engineer at CAT. Sixty-two engines have failed at CEP. [ECF No. 301-12]. Minks discusses the failure of eleven of those engines in his

---

[12]   Although CEP's motion challenges seven CAT experts, its discussion of Minks' opinions is its lead argument, and it spends the largest portion of its multiple challenges to experts furthering its effort to exclude Minks. This emphasis on Minks is apparent in both the initial motion [ECF No. 301] and CEP's reply memorandum [ECF No. 333].

report.[13]   [ECF Nos. 301-4, ¶¶ 10, 11; 301-9, 237:21-239:12; 301-10, 489:13-491:10, 492:14-493:18, 600:4-14, 604:18-605:15]. He has no opinion on the cause of the other 51 failures at CEP. [ECF No. 301-10, 492:17-493:18]. Minks' report also contains observations about on site conditions at CEP that he does not tie to the failure of CEP's C32 engines or any other issue in the case.[14]

Minks opines that contamination is the most probable root cause of failure for five engines, SYC2684, SYC2688, SYC2689, SYC2718, and SYC2774, and a likely cause of failure for a sixth, SYC2713. [ECF Nos. 301-15; 325-10]. On one engine, SYC2700, he sees evidence of contamination, but he could not determine a root cause.[15] [ECF No. 301-15].

Minks's methodology is based on his visual examination of these engines' bearings and crankshafts with the naked eye. In four instances, he reviewed only photos or videos. He concludes that certain "fine scratches," "gouges" and "grooves" (called abrasive wear) that he saw, and in some instances could feel, were caused by foreign particles introduced into the engines from the outside. Based on the location and

---

[13]   CAT says that Minks discussed 27 different engines in his report. But CEP contends that he discussed the cause of failure for only eleven engines.

[14]   *See, e.g.*, [ECF Nos. 301-9,  463:19-23 (switching ECMs not a root cause of failure), 446:25-447:17 (same for routine operation and maintenance), 466:21-467:1 (same for loose starter wires), 471:17-21 (cannot say exhaust bellows were root cause of failure), 469:9-14 (same for fuel lines), 303:11-305:2 (same for CEP's supposed failure to install injector trim files); 301-10, 630:21-632:14 (doesn't know that oil sample data "not being recorded or processed in a timely manner" "has any bearing" on failures)].

[15] The parties seem to disagree about whether Minks examined engine SYC2706 or not. *See* [ECF Nos. 301-15; 325-10].

appearance of these scratches, gouges and grooves, he says he can determine whether they were caused by: (1) foreign contaminants in the oil system (what he calls "oil contamination"); or (2) foreign particles introduced into the engine during an overhaul (what he calls "built-in contamination").

According to Minks, this abrasive wear does not itself cause engine failure. Rather, in some instances, over an unspecified amount of time, abrasive wear can lead to the far-more destructive adhesive wear, or metal to metal contact, which will then cause catastrophic engine failure. Minks says that adhesive wear renders the affected bearing so "smeared" and blackened that physical evidence of earlier abrasive wear on that bearing (if it existed at all) cannot be seen by the naked eye.  Thus, Minks can see abrasive wear only on bearings that were *not* the cause of the engine failure, and he cannot see any abrasive wear on bearings that *were* the cause of the engine failure, because if the abrasive wear originally was there, then the adhesive wear has now wiped it all away.  [ECF No. 301-9, 411:7-412:14].

CEP emphasizes that Minks says that the abrasive wear was caused by foreign particles but did not capture or examine any such foreign particles. In addition, it focuses on the fact that he did not determine whether they were indeed outside contaminants (such as dirt) or internal contaminants (such as something left in the engine during CAT's manufacturing process, or material from a failed bearing) that scratched the unfailed bearing at the time of the engine's failure.

46

Minks says that if he sees abrasive wear originating from the center of the crankshaft or bearing, where the "oil feed" hole is, then the abrasive particles were in the oil.  [ECF No. 301-4, ¶¶ 92, 162].  If he sees abrasive wear that does *not* originate from the oil feed, then it must be from "built-in contamination."  [ECF No. 301-4, ¶¶ 87, 209]. He also believes that "CEP's experts' theory of the engines' failures, fuel dilution, affects all bearings equally while contamination does not."  [ECF No. 301-4, ¶ 31].

CEP argues that Minks' methodology is strikingly similar to the methodology excluded by the Supreme Court in *Kumho Tire*.[16]  As noted earlier in this Report, the proffered expert in *Kumho Tire* was an engineer named Carlson, who like Minks, performed root cause failure analysis, though on a tire that blew out, not engines that "ventilated."  526 U.S. at 142. Carlson, again like Minks, conducted a visual and tactile examination of the damaged tire. *Id*. at 143.  He opined that a manufacturing defect had caused the blowout, based on certain physical symptoms that, like Minks, he said he could see with the naked eye.  *Id*. at 144.

---

[16]     CAT argues that *Kumho Tire* is distinguishable and suggests that it should not apply at all because it involved the exclusion of a **plaintiff's** expert (who "bears the burden"), not a defendant's expert. I do not find that argument persuasive. Regardless of who retains a proposed expert, plaintiff or defendant, all experts are subject to the same Federal Rules of Evidence and all must meet the standards of *Daubert* and *Kumho Tire* before they are permitted to address the jury. *See In re Novatel Wireless Secs. Litig.,* No. 08-cv-1689, 2013 U.S. Dist. LEXIS 154599, at *44-45 (S.D. Cal. Oct. 25, 2013) (noting that same Federal Rule of Evidence 702 and *Daubert* standards apply to defendant's rebuttal expert witnesses); *see also Quiet Tech. DC-8, Inc.,* 326 F.3d at 1335-52 (analyzing defense expert's opinion under standards of Federal Rule of Evidence 702, *Daubert* and *Kumho Tire*).

The *Kumho Tire* Court began by noting that Carlson's "two-factor test and his related use of visual/tactile inspection" relied on "what seemed small observational differences," *id.* at 157, and CEP argues that the same is true here. CEP contends that Minks is not opining about any of the obvious damage to CEP's engines; rather, he is relying on the "superficial" and "fine" signs he sees on engine parts that have not failed. [ECF No. 301-4, ¶¶ 86, 124, 136, 190]. And to Minks, "very fine distinctions" supposedly matter, such as whether the barely perceptible "scoring" on an unfailed bearing "originat[ed] from the center" and "work[ed] out evenly from left to right," or not. [ECF No. 301-4, ¶ 249].

CEP claims that Minks, like Carlson, came up with a "method of visual and tactile inspection" that he claims is precise enough to determine the source of engine contamination, based on the "significance of minute . . . wear differences" on unfailed engine parts. [ECF No. 301-4, ¶ 249]. According to CEP, Minks could not answer "with any certainty" basic questions about that theory. [ECF Nos. 301-10, 548:6-550:19 (doesn't know amount of debris that would cause failure); 301-11, 511:15-24 (doesn't know how much abrasive wear has to occur before adhesive wear results)]. And Minks could not say how he would differentiate between abrasive wear caused by foreign particles versus abrasive wear caused by material from the engine itself. [ECF Nos. 301-9, 285:18-286:24; 301-11, 516:10-519:15].

CEP also argues that there is nothing in the record indicating that "other experts in the industry" use Minks' particular observational tests, or make the "very fine distinctions" necessary for Minks' analysis.

To be sure, CAT did not submit any peer-reviewed journals, textbooks, studies or articles supporting Minks' methodology of linking fine abrasive wear on unfailed bearings and adhesive wear on failed bearings to foreign particle contamination. Instead, it cited to two slides from a CAT PowerPoint entitled "Welcome to Applied Failure Analysis." CAT also cited to one page from course materials for an internal CAT failure analysis class: "good visual examination is a key part of root cause determination." The very next page details an "organized procedure" for visual examination that "includes: [o]btain, identify and protect parts related to the failure;" "[c]lean parts properly;" "[l]ook at all surfaces;" "[u]se magnification;" and "[p]rotect parts for storage;" all steps that CEP stresses were not followed by Minks, especially with respect to the examinations he did only from photographs.

CAT cited a textbook for the non-controversial point that "damage . . . is often obvious to the naked eye," though the next sentence in that textbook says that "[i]n other cases, a hand held x10 magnifying glass," something CEP notes Minks did not use, "can reveal further details."  [ECF No. 323-1]. CAT also tried to minimize Minks' failure to have metallurgic analysis done by citing to another textbook that says

"[d]etailed laboratory analysis can also be necessary *in some situations*."  [ECF No. 323-2, p. 15].

However, CEP points out that one sentence away from that quote by CAT, the authors affirm that "[a]nalysis of embedded dirt particles in the babbitt [the top layer of the bearing] can help determine their composition, and subsequently, their source." [ECF No. 323-2, pp. 1-16]. Minks did not do that, or anything else, to confirm the existence of the particles he claimed caused engine damage at CEP.

CEP further argues that the concerns over methodology in *Kumho Tire* are actually *stronger* in the instant case because Minks never examined four of the engines he opines on at all (SYC2774, SYC5910, SYC2713 and SYC2630) and based his analysis for those four engines on only photographs taken by Rasmussen.  [ECF Nos. 301-4, ¶¶ 94-115; 301-9, 211:5-12, 223:14-19, 226:5-228:7, 236:22-237:14]. For another two engines, SYC2718 and SYC2689, while Minks could have examined them on site, he instead used videotapes. [ECF No. 301-4, ¶¶ 159, 172-244, 249-50].

CEP argues that Minks' examination of these engines based on photos and videos taken by others is not only unreliable but is also in violation of CAT's own training materials, which state that it is important to conduct any visual and tactile examination of parts **in person**. [ECF Nos. 301-9, 262:10-23; 301-11, 537:3-25, 538:9-12; 301-16, 2-3]. Likewise, CEP says that Minks also did not follow what he claims is CAT's

procedure, to examine the entire bearing system of a given engine, even though engines with complete bearing systems were available to him. [ECF No. 301-10, 516:5-518:14].

CAT admits that "Minks was unable to conduct a complete and thorough failure analysis," and that "Caterpillar and its experts admit they could not reach a definitive root cause for the failure of the Gensets at CEP," but CAT blames **CEP** for that, saying it was "due to CEP's failure to preserve the evidence[.]" [ECF No. 318, p. 29].

CEP argues that CAT's explanation is not convincing because Minks had 62 failed engines to choose from, many of which had their bearings, ECM and other parts intact. [ECF Nos. 301-6, 19:15-20:15, 161:21-25, 172:22-173:6; 301-10, 514:20-515:3, 667:7-668:6, 679:6-680:8; 301-11, 529:15-530:13; 333-3, 186:9-187:5]. Also, CAT employees, including Rasmussen and Daniel, were at CEP immediately after the first failures happened but did not ask CEP to preserve failed engines, ECMs or any other parts then or any other time they visited. [ECF No. 333-3, 123:18-125:18].

Finally, CEP contends that Minks' methodology is unreliable because he cannot say with any degree of certainty what kind of particles caused the abrasive wear that he says led to the engines' demise, or whether that wear was caused by foreign particles at all.

Thus, CEP emphasizes that Minks cannot say what "phantom particles" created the scores and gouges he observed. He does not know their size, shape or composition, where they came from, where they are now, or whether they were introduced into the

engine from outside or not. In sum, CEP points out that there is no direct evidence that they *ever* existed, other than the scores, gouges and other fine marks that they supposedly left behind.

To further bolster its challenge, CEP argues that Minks had the personnel and tools at his disposal to do such an analysis, but he did not. Significantly, Minks knows that CAT considers it important to identify what the abrasive particles are and where they came from, as a means of determining who is responsible for the damage. [ECF Nos. 301-11, 493:22-495:20; 301-17].

CEP further notes that Minks is not a metallurgist, and it argues that neither he, nor anyone at CAT, did anything to identify the "phantom particles" he relies on to support his theory of outside contamination. *See Deutz Corp. v. City Light & Power, Inc.*, No. 05-cv-3113, 2009 WL 2986415, at *6 (N.D. Ga. Mar. 21, 2009) ("wear analysis can be performed only by trained metallurgists with expertise in tribology, and not mechanical or electrical engineers"); *Schipp v. Gen. Motors Corp.*, 443 F. Supp. 2d 1023, 1029 (E.D. Ark. 2006) (excluding as unreliable expert who "did not do the chemical analysis that could confirm or disconfirm his theory" to determine if material was dirt or rust).

CEP also argues that Minks' opinions on the remaining engines should not be admitted. Specifically, for three engines (SYC2630, SYC5910, and SYC2665), Minks posits three different root causes of failure. For SYC5910, Minks speculates that the engine over-fueled. [ECF No. 301-4, ¶ 97]. He explains this conclusion was not his work

at all, but "was a culmination of efforts amongst a number of folks that were involved. There was a few meetings that were had. I couldn't tell you the details about who was there or what was said or who came up with the idea, but that was the outcome of the meeting." [ECF No. 301-11, 566:5-11].

He did not provide any facts, data, conclusions, methodology or other support for his opinion, and, according to CEP, to the extent that he based this opinion on the work of CAT's metallurgical lab, he is not qualified to opine. *See Deutz*, 2009 WL 2986415, at *6 ("An expert who is not qualified in the field of metallurgy is not permitted to simply adopt the conclusions of the report of a metallurgist in forming his opinion.").

For engine SYC2630, Minks examined only the engine parts from photographs, which he admits were insufficient. [ECF Nos. 301-11, 553:16-554:5; 325-10].  Ultimately, Minks actually agrees with CEP's experts that the engine failed from fuel dilution. [ECF No. 301-4, ¶ 106]. Then he speculates that the fuel dilution was "most probably" a problem with the fuel transfer pump, although he admits "I don't have anything from a failure perspective that will support that."  [ECF No. 301-10, 665:19-666:4].  Thus, CEP contends that his fuel transfer pump theory is speculation that cannot be permitted at trial.

Finally, Minks opines that engine SYC2665 failed because one of its two thrust washers was left out when it was reassembled after an overhaul. [ECF No. 301-4, ¶¶ 47-

48]. In his report, he bases this conclusion on his visual observation that "there was only one thrust washer adhered to the crankshaft," and "[t]he other thrust washer was not present in the engine" when he examined it.  [ECF No. 301-4, ¶¶ 47-48]. However, he admitted at a deposition that both thrust washers (not one) were actually missing when he saw the engine, so he deduced (as opposed to seeing) that one was left out. When he opined that "one thrust washer" was "adhered" to the crankshaft, what he actually meant was that he saw what he thought could be remnants of the thrust washer that sat on the back of the main journal, but no such remnants where the other one would have sat on the front of the same journal. [ECF No. 301-10, 560:21-562:21]. He did not test the remnants, or either side of the journal, to determine if they contained thrust washer material.

According to CEP's challenge, Minks' approach here, like his contamination theory discussed above, is also similar to Carlson's methodology in *Kumho Tire* because he based his entire conclusion on very fine distinctions he saw between the appearance of the two spots where the thrust washers would have sat, if either had been present when he examined the engine. [ECF No. 301-4, ¶ 47]. CEP says that CAT does not dispute any of this in its opposition, or support Minks' findings in any way. CEP therefore concludes that Minks' opinion on the failure of SYC2665 is unreliable and speculative.

In his report, Minks opines on many other topics that he admits have no demonstrable connection to the failure of CEP's C32 engines or any other issue in the case.[17] He claims he gives such testimony "from a holistic perspective." [ECF Nos. 301-4, ¶ 61; 301-9, 466:21-467:1; 468:18-20; 463:19-23]. CEP classifies this scenario as one where Minks' opinions are not helpful, a situation which it says should lead to an order excluding the testimony. To support this request, CEP cites *Winn-Dixie, Inc. v. Dolgencorp, LLC*, 862 F. Supp. 2d 1322, 1330-32 (S.D. Fla. 2012) (excluding testimony that "analyz[ed] the wrong problem" and failed to establish causation of damages, where probative value was "substantially outweighed by the danger of misleading the jury"), *aff'd by Winn-Dixie*, 746 F.3d at 1028-29 ("[A]dmission of the evidence could mislead a jury into believing that the data speaks to a causal link."); *Allison*, 184 F.3d at 1312.

Switching the analysis to one oriented from CAT's perspective, I note that Minks' report is an attempt to *rebut* CEP's various technical experts' causation opinions. The Court disagrees with CEP's claim that a defendant's expert has an obligation to specifically opine on root cause. CAT is under no affirmative obligation to prove the root cause of the gensets' failure -- it is CEP who must carry the burden. Defense experts have no obligation to make an affirmative link between the alleged failures and

---

[17] *See, e.g.*, ECF Nos. 301-9, 463:19-23 (switching ECMs not a root cause of failure), 446:25-447:17 (same for routine operation and maintenance), 466:21-467:1 (same for loose starter wires), 471:17-21 (cannot say exhaust bellows were root cause of failure), 469:9-14 (same for fuel lines), 303:11-305:2 (same for CEP's supposed failure to install injector trim files); 301-10, 630:21-632:14 (does not know that oil sample data "not being recorded or processed in a timely manner" "has any bearing" on failures).

the lack of maintenance. "[W]here defendant seeks to introduce evidence merely to cast doubt on the plaintiff's theory of causation, the expert need not definitively rule out plaintiff's theory for his testimony to be admitted." *Wolfe v. McNeil-PPC, Inc.*, No. 07-348, 2011 WL 1673805, at *14 (E.D. Pa. May 4, 2011) (internal citations omitted) (explaining that "this difference stems from the fact that plaintiff is the party with the burden of proving causation"); *Wilder v. Eberhart*, 977 F.2d 673, 676-77 (1st Cir. 1992) ("[T]he defendant need not disprove causation. Rather, he must produce credible evidence which tends to discredit or rebut the plaintiff's evidence.").[18]

But a defense expert's ability to provide opinions designed to rebut a plaintiff's expert opinion without reaching an independent opinion on causation does not mean that the defense expert need not be qualified under *Daubert* or meet its reliability and helpfulness requirements. *Quiet Technology,* 326 F.3d at 1340-50.

---

[18]    In *Wilder*, the appellate court reversed a judgment in favor of a patient in a medical malpractice lawsuit because the trial judge committed clear error in excluding defendant's expert testimony about other *possible* causes to the injury (i.e., a tear to the plaintiff's esophagus). In doing so, the appellate court provided an insightful hypothetical: "ninety-nine out of one hundred medical experts agreed that there were four equally **possible** causes of a certain injury, A, B, C and D, and plaintiff produces the one expert who **conclusively** states that A was the certain cause of his injury, defendant would be precluded from presenting the testimony of any of the other ninety-nine experts, unless they would testify conclusively that B, C, or D was the cause of injury. Even if all of defendant's experts were prepared to testify that any of the possible causes A, B, C or D, could have equally caused plaintiff's injury, so long as none would be prepared to state that one particular cause, other than that professed by plaintiff more probably than not caused plaintiff's injury, then defendant's experts would not be able to testify at all as to causation." The appellate court explained that "resulting inequities would abound" if this were to be permitted. *Id.* at 677.

Minks (and the other technical experts) is a hybrid fact-expert witness who is offering opinion testimony to rebut CEP's expert witnesses and who is providing factual testimony about facts personally known to him. [ECF No. 318, pp. 19-20]. For example, Minks (along with other Caterpillar experts) apparently will wear his "fact witness" hat when he testifies about CEP's alleged swapping of Electronic Control Modules.  [ECF No. 318, p. 22 n. 3.]

At a minimum, Minks should not be prevented from testifying about what he **observed**. *U.S. v. Morris*, 11-40068, 2012 WL 1658775, at *2 (D. Kan. May 11, 2012) (noting *Daubert* analysis is unnecessary as to proposed testimony regarding what treating physicians "personally observed . . . and can testify reliably (it can be assumed) regarding their observations and actions as fact witnesses"); *Lawrence v. City of San Bernadino*, No. 04-336, 2006 WL 5105560, at *2 (C.D. Cal. July 19, 2006) (specifying that proposed expert witness "may testify as a fact witness to matters he personally observed," notwithstanding exclusion as expert for lack of qualification and duplicative nature of testimony on subjects proposed expert was qualified to offer testimony).

As noted above, CAT contends that Minks actually discussed 27, not 11, engines in his report.  CAT argues that Minks did not extrapolate his findings across all of the failed engines at CEP, a decision it characterizes as "prudent[ ]." [ECF No. 318, p. 24]. Minks concluded that it was not possible to determine a definitive root cause for each failure given the limited amount of data available to Minks (and CEP's experts). CAT

explained the large number of limitations on the information available as a result of CEP's record keeping and maintenance practices. [ECF No. 318, pp. 28-29].

CAT asserts that Minks' methodology is reliable because he opined only on engines he actually could see (in photographs or a video) or analyzed, and it identified numerous texts that purportedly show Minks' method of failure analysis as having been accepted. [ECF No. 318, p. 26]. Of course, some (but not all) of the purported sources of acceptance are CAT's *own* materials. Other sources are independent, such as a symposium in which the materials explain that the identification of damage is "often obvious to the naked eye." [ECF No. 318, p. 26].

CAT also defended Minks' failure analysis, stating that it does not require laboratory analysis and claims that doing so would "contaminate and ruin potential evidence." [ECF No. 318, p. 27].

The Court finds that Minks's methodology is sufficiently reliable (but barely) to pass muster -- **but only for the 11 engines he discussed in detail in his report.** Thus, Minks will be permitted to testify as a fact witness (concerning all engines) and to offer *opinions* as an expert on only the 11 engines (because he has no opinion on the cause of the other engine failures at CEP).

As noted, a trial court performing its gatekeeping function for proposed expert testimony has considerable discretion. Under the applicable abuse of discretion standard, a trial court's ruling admitting expert witness opinion testimony is subject to

the abuse of discretion standard, which requires an appellate court to defer to the district court's evidentiary ruling unless it is "manifestly erroneous." *Quiet-Tech*, 326 F.3d at 1339-40.

Thus, another magistrate judge issuing a report and recommendations could easily reach a permissible, contrary conclusion that Minks' opinion testimony about the 11 engines is too problematic to be admitted. Nevertheless, in recognition of the reality that CEP will be able to comprehensively challenge Minks' opinions during cross-examination, exposing the weaknesses outlined in detail above, the Undersigned deems the prudent approach (of not excluding the opinion testimony) to be appropriate. *Id.* at 1341 (holding that district court improperly conflated questions of admissibility and weight of expert opinion testimony when incorrectly excluding testimony and noting that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence").

The Undersigned does not hesitate to describe Minks' expert opinions on the cause of failure for the 11 engines as shaky. They surely are. His failure to provide further details about the so-called contamination and particles is particularly problematic.

Indeed, CEP's effort to place Minks' analysis into the *Kumho Tire* framework (and equate him to Carlson) is far from frivolous. Nevertheless, this comparing-Minks-to-

Carlson approach does not, in my view, reach the higher level of being sufficient to justify outright and complete *exclusion* of all of Minks' opinions. The expert in *Kumho Tire* spent only a short time the morning of his deposition looking at a tire (the product on which he was opining). Here, Minks spent *days* looking at the gensets, and CAT persuasively notes that many limitations on his analysis are of CEP's *own* doing (e.g., parts-swapping).

Based on a review of the documents provided in the *Daubert* briefing, it seems that *none* of the experts disassembled *all* of the 62 alleged failed engines. However, Minks, as a defense expert, need not conduct a root cause analysis of the failed engines. The Undersigned acknowledges that Minks did not personally examine six engines, but, instead, relied upon photographs or videos. However, the law does not require an expert to necessarily personally inspect an item. The opinion might not be persuasive or credible with the jury if the expert did not personally view the engines, but that practical reality concerns *weight*, not admissibility. *Maiz v. Virania*, 253 F.3d 641, 666 (11th Cir. 2001) (noting that gatekeeper role is "not intended to supplant the adversary system or the role of the jury").

Minks opined only on those engines he analyzed (either in person or via photographs) and did not extrapolate his findings across the entire fleet. He did not opine on the other engines. If CEP disagrees with Minks' opinions on the cause for the failure in the 11 engines, then it may certainly cross-examine him at trial. Minks'

opinions may well have myriad flaws, and some of those flaws are far from trifling, but "any flaws in his opinions can be tested through cross-examination and counter-testimony at trial." *City of St. Petersburg v. Total Containment, Inc.*, No. 06-20953, 2009 WL 3335013, at *7 (S.D. Fla. Mar. 19, 2009).[19]

<u>Nathan Rasmussen</u>

For the reasons outlined below, the Undersigned respectfully recommends that Nathan Rasmussen be excluded from testifying as an **expert witness** who offers **opinions** at trial. He is unqualified to offer the expert *opinions* he intends to offer, and he has no helpful or reliable opinion in this case.

But this Report and Recommendations also should not be read as suggesting that Rasmussen (or any other witness discussed herein) is prevented from testifying as a **fact** witness at trial about conditions he observed firsthand (or about his test results). For example, he notes that he saw some gensets started without the operators performing a

---

[19]      CEP also contends that Minks' opinions on a "litany of other topics" are not helpful because he has not connected these opinions to any issue in this case.  [ECF No. 301, p. 23]. However, CEP does not identify with any specificity what these opinions or "other topics" include, and thus the Court cannot consider the issue. His primary opinions concerning damage to the engines would surely be helpful, if accepted as persuasive by the jury despite the presence of several substantial problems. CEP has a similar counter-expert, and both sides agree that the issue of causation is critical.

Of course, a jury could also completely disregard the Minks' opinion because of his CAT employee status. But CEP did not raise Minks' employment status with CAT (and its link to the argument that he is, or could be, a biased expert) as a ground to exclude his opinions.

thorough check of the engines, systems, and environment before starting the gensets.  In a similar fashion, his report details his observation during a March 2015 site visit in which he saw CEP personnel using Scotch-Brite on a partially assembled engine. These are factual observations, not opinions, and this Report would not exclude his factual testimony on this point.

Basically, Rasmussen served as a fact-gatherer for Minks.  His straightforward *observations* about the engines and damage-related issues and the data he collected, as opposed to his opinions about the significance of what he saw or interpretations about what he witnessed, are not being excluded in this Report and Recommendations.

Rasmussen is a CAT Field Service Engineer in Brazil, "mainly [for] . . . large mining trucks." [ECF No. 301-6, 11:4-25]. He visited the CEP site five times to "collect information" about CEP's engine failures. [ECF No. 301-6, 161:21-25, 172:25-173:6]. Rasmussen's report claimed that he would opine on "whether CEP's improper maintenance of or failure to maintain the C32 generator sets **caused** any of the C32 engines to fail."  [ECF No. 301-2, ¶ 2 (emphasis supplied)].

His report provides the following opinion, in the overview section: "It is my opinion that CEP's improper maintenance of or failure to maintain the gensets according to Caterpillar's recommendations **caused** *many* of the engine failures." [ECF No. 301-2, p. 6 (emphasis supplied)]. In his conclusion, Rasmussen said, "I can conclude with *some* certainty that *some* of the engines at CEP failed **due to** CEP's failure to

perform proper corrective or preventative engine maintenance and overhaul." [ECF No. 301-2, p. 50 (emphasis supplied)]. He also offered an opinion criticizing the opinions of CEP's expert, John Poulson, and said: "I conclude that Mr. Poulson's assertions are wrong and any inadequate lubrication was the **result of** CEP's lack of or poor execution of maintenance practices." [ECF No. 301-2, p. 6 (emphasis supplied)].

Rasmussen also offered opinions concerning causation of the Cummins gensets. Specifically, Rasmussen opines: "CEP'S maintenance problems have also **caused** Cummins gensets to fail at the site." [ECF No. 301-2, p. 47 (emphasis supplied)].

These are all opinions about what *caused* the engine failures.

But Rasmussen admitted at his deposition that he is not an expert in failure analysis. He said that the purpose of failure analysis is to come to a root cause, which he defines as "what actually caused the failure." [ECF No. 301-6, 18:24-19:14]. He then confirmed more than twenty times that he did not do root cause analysis at CEP.[20] In fact, he has never determined the root cause of any engine failure.  [ECF No. 301-6, 22:24-23:21]. He has only *assisted*, meaning that he has "collect[ed] information" so that someone else can "assess what the root cause is." [ECF No. 301-6, 17:19-18:4]. He conceded that Minks determined the root cause of the failures and he assisted Minks. [ECF No. 301-6, 20:8-15].

---

[20]     [ECF No. 301-6, 20:8-11, 23:11-21, 79:14-16, 83:22-84:7, 84:9-16, 87:13-20, 89:20-21, 91:8-18, 96:5-19, 159:25-160:4, 172:25-173:6, 198:16-22, 230:8-13, 364:19-20, 410:24-411:14, 490:18-491:9, 525:17-23, 572:2-9, 576:3-14, 606:17-607:6, 610:7-612:13, 613:19-614:24].

Specifically, he assisted Minks by "provid[ing] information to [him] about what I saw down there." [ECF No. 301-6, 19:15-20:15]. When asked, Rasmussen said that his expertise was "witness[ing] what I saw at CEP as far as the maintenance practices go." [ECF No. 301-6, 73:5-22]. His expert opinion, therefore, did not "involve anything other than reporting what [he] witnessed at the CEP site." [ECF No. 301-6, 73:23-75:8]. In sum, Rasmussen did not perform any failure analysis, he only "collected information" for Minks. [ECF No. 301-6, 172:22-173:6].

By his own admission, Rasmussen is not qualified to give an opinion on whether CEP's maintenance (or lack of maintenance or improper maintenance) **caused** the engines to fail. CAT agrees that he only collected information at the site, and is not a failure analysis expert. [ECF No. 325, p. 31 ("Rasmussen provides support for failure analysis of engines by collecting information and data so that another engineer can perform a failure analysis . . . . In this case that [was] . . . Minks.")]. Rasmussen has never done failure analysis and did not do it in this case.[21]

Moreover, collecting information and passing it along to someone else is not the proper subject of *expert* testimony. It does not require scientific, technical, or other specialized knowledge, and is not helpful to the trier of fact. Fed. R. Evid. 702.

---

[21]     Rasmussen is also not qualified to opine about "CEP's fuel choice and fuel-related maintenance," [ECF No. 301-2, ¶ 2] and he does not know whether fuel caused any engine failures [ECF No. 301-6, 570:12-15].

CAT tries to get around this issue by claiming that as a "classic hybrid fact-expert witness," what Rasmussen did is sufficient to earn him the title of expert. [ECF No. 325, p. 31]. But just like any other expert, a hybrid expert also must meet the standards of the Federal Rules of Evidence, *Daubert*, and *Kumho Tire*. Additionally and importantly, he or she must offer the jury the benefit of some specialized expertise beyond merely collecting information and reporting it to someone else. *See Kaplan v. Kaplan*, 10-cv-237, 2012 WL 1660605, at *2 (M.D. Fla. May 11, 2012) (stating that any expert testimony offered by a hybrid witness "must comply with the requirements of the Federal Rules of Evidence and the strictures of *Daubert*") (citing *Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1317 (11th Cir. 2011)); *Farris v. Intel Corp.*, 493 F. Supp. 2d 1174, 1181 n.3 (D.N.M. 2007).

As the Court observed in *BNSF Railway Co. v. LaFarge Southwest, Inc.*:

> Merely conveying one's perception or memory of viewing a particular scene does not require such scientific, technical, or other specialized knowledge . . . and to cloak such a general observation . . . under the guise of a scientific or technical methodology is unfairly prejudicial because of the misleading implication that the witness' observations should be given more credence merely because of his or her credentials as an expert.

No. 06-1076, 2009 WL 4279862, at * 2 (D.N.M. Feb. 15, 2009) (internal citation and quotation marks omitted); *see also Brown v. Cooper*, 11-CV-98, 2012 WL 8897779, at *3 (D. Wyo. Nov. 8, 2012) ("[T]o permit eyewitness testimony to be heard through an expert 'would cloak it with undeserved authority that could unduly sway a jury.'").

In sum, while CAT says the "thrust of [Rasmussen's] opinions are rooted in his role as a fact witness observing the maintenance and operating conditions at CEP and informed by his experience," [ECF No. 325, p. 31], CAT does not sufficiently explain why his "experience" is necessary to communicate what he saw at the site to the jury as an *expert* witness or why he, a fact-gatherer for Minks, should be permitted to offer his own opinions about whether maintenance failures at CEP **caused** the engines to fail.

As noted, Rasmussen's report does contain purported opinions about causation, but he is, at bottom, mostly a mere fact witness, and the Undersigned respectfully recommends that he not be permitted to testify as an expert on whether CEP's maintenance practices **caused** the engine failures. Thus, he should not be permitted to offer opinions about causation (but he may provide fact testimony about his observations, even those which Minks may have used to form his opinions).

One more point about Rasmussen:

Although not contained in the *body* of his report, and not in the sections summarizing or expressly flagging his opinions, Rasmussen does, for all practical purposes, offer *other* opinions beyond the ones discussed above concerning **causation** These opinions concern CEP's maintenance practices -- but they do not (with one exception, described below) necessarily extend farther and reach the next level of opining about causation. CEP's *Daubert* motion does not really challenge these opinions,

perhaps because they are somewhat buried in the text of the report and not flagged as full-fledged opinions.

However, Rasmussen purports to offer expert opinions about the observations he made in his role as fact-gatherer.

Here are illustrations of the maintenance-related, non-causation type of opinions which are embedded in Rasmussen's report: (a) CEP "failed to properly track maintenance intervals;" (b) "CEP failed to perform appropriate startup inspections;" (c) "CEP failed to effectively and consistently perform scheduled sampling;" (d) "CEP improperly reused components;" (e) "CEP improperly rebuilt engines;" (f) "CEP improperly swapped major components;" (g) "CEP failed to investigate and enable warning alarms;" (h) "CEP failed to replace broken air pressure differential gauges;" (i) "CEP failed to utilize proper rebuilding processes;" (j) "CEP uses improper cleaning practices;" (k) "CEP used third party injectors;" (l) "CEP's facilities were disorganized;" and (m) "CEP's choice of fuel and lack of fuel maintenance compounded operational difficulties." [ECF No. 301-2].

These opinions are based on Rasmussen's observations, some of which are accompanied by photographs of what he saw.[22] They actually take up the majority of

---

[22]    For example, Rasmussen commented on his March 2015 visit when discussing his view that CEP improperly reused components and included photographs of scratches on a crank shaft. Likewise, when writing his opinion about CEP's alleged improper swapping of major components, Rasmussen included a photograph showing a mix of old and new injectors.

his entire report (*i.e.*, pages 10 through 48 of a 48-page report). With one exception, they do not contain opinions about causation. Instead, they are, for all practical purposes, a multi-factor opinion explaining all the ways in which CEP allegedly failed to properly maintain and service the engines. They are all discussed under the general category of "Evaluation of John Poulson's Report." [ECF No. 301-2, p. 10].

However, in category "m," Rasmussen's report extended beyond his observations about maintenance and servicing and included the opinion that a higher-than-usual level of contamination has "used up the filters in the fuel delivery area" and that "this is an *indication* that CEP has had problems maintaining and controlling the level of contamination in its fuel, which *can* compromise the performance and service life of the engines at the power plant." [ECF No. 301-2, pp. 47-48]. Although this appears to be an opinion on causation, it is surely an equivocal one, discussing only a possible consequence (*i.e.*, the situation "can" create a "comprom[ising] situation").

Determining whether CEP's *Daubert* motion challenging Rasmussen should be granted depends on the nature of his opinions and whether he is merely offering factual observations.

The Undersigned recommends granting the motion (and excluding his testimony) about Rasmussen's observation-based opinions on **causation** but denying it as to his observations. In addition, as explained below, this Report also recommends exclusion of his additional opinion-type comments based on his observations (*i.e.*, some

of the categories "a" through "l," listed above, which are a rebuttal to Poulson's report). He should be permitted to testify about some of those matters.

Classifying his comments in categories "a" through "l" depends on whether he is offering only factual observations or offering a judgment -- *i.e.*, an opinion about his observations. It is not difficult to determine whether Rasmussen is offering gratuitous opinions about his observations -- because he adds an editorial, evaluative comment, such as "improperly" or "improper."

Therefore, Rasmussen is permitted to testify at trial about categories: "b," "g," "h" and "k." For the other categories, Rasmussen will be permitted to testify about the facts concerning his opinion without offering the actual opinion. For example, in category a, Rasmussen will be permitted to testify about those instances where CEP did not track maintenance intervals, and, for category "f," he will be allowed to testify about the situations where major components were swapped.

Furthermore, his additional opinion in category "m", described in the paragraph immediately above, should also be **excluded** (because it is, for all intents and purposes, only an opinion about causation).[23]

Although I recommend that Rasmussen be permitted to offer testimony about the facts surrounding his now-excluded opinions about maintenance failures by CEP,

---

[23]    The Undersigned easily rejects CEP's conclusory argument that his observations about maintenance and servicing are not helpful because they are not "linked" to an issue in the case. Evidence about CEP's maintenance and servicing practices is surely relevant, and to say otherwise is unrealistic.

he should not be permitted to then offer his opinions that CEP's practices were improper or inadequate. Also, he should not be allowed to also offer the next opinion that these failures **caused** the gensets to explode or otherwise fail.

<u>Alan Daniel</u>

CEP contends that some of Daniel's opinions are cumulative, that he is not qualified to offer many of them and that some are simply not helpful.

In his report, Daniel, a CAT product service manager in the electric power division, provides the following overview of his opinions: "Some of the C32 gensets experience engine failure because CEP did not operate and maintain them properly." [ECF No. 301-3]. For the most part, his opinions are designed to rebut the opinions of Haaland, the CEP-retained expert witness.

By way of summary, Daniel's specific opinions about Haaland's opinions are: (1) he incorrectly opined on power modules, rather that the generator sets, (2) he incorrectly opined that "none of the failures of the C32 Power Module are due to the design and configuration of the power plant," (3) he fundamentally misunderstood the equipment and operating environment because "CEP failed to properly operate and maintain the gensets and many of the units failed catastrophically as a result." [ECF No. 301-3].

His expert report also included his observations during February 2014, March 2015, August 2015 and October 2015 visits to the two sites in Brazil. Finally, his report

also discussed CAT's recommendations to CEP and Sotreq following a February 2014 site visit. These observations are supplemented with photographs, charts and product status reports.

On the final substantive page of his 58-page report, Daniel states that "there are *many* generating sets that have experienced engine failure as a result of poor or improper maintenance." [ECF No. 301-3, p. 60 (emphasis supplied)].

CEP contends that Daniel's opinions are cumulative, especially concerning maintenance observations. It argues that he should not be permitted to opine as to CEP's power plant design because he is not an expert in power plant design, has never designed a power plant, has never participated in the design of a power plant, and has never visited a power plant other than CEP's which use the C32 gensets. In addition, CEP notes that he did not take any readings or measurements.

Moreover, CEP emphasizes that Daniel never conducted a root cause analysis and repeatedly could not link his personal observations to any engine damages.

It describes Daniel's comments about unfollowed recommendations which CAT purportedly made to CEP as being based on hearsay and speculation. And it brands the testimony as unhelpful, in any event, because recounting the purported recommendation "requires no special expertise, knowledge or skill, it is only the stuff or argument." [ECF No. 301, p. 33].

CAT's response does not directly address all the challenges asserted. Instead, it focuses almost exclusively on the argument that Daniel should be permitted to testify about his observations and the data he collected. It also contends that CEP's argument about the unfollowed recommendations "appears to be a hearsay objection and not related to a *Daubert* motion." [ECF No. 325, p. 34]. CAT notes that Daniel was personally involved in creating recommendations for CEP.

In its reply, CEP contends that Daniel is actually a fact witness (not an expert witness), that he is not an expert in plant design, that his observations are merely facts (but not from an expert witness perspective) and that no specialized knowledge is required to discuss recommendations from CAT to CEP.

The Undersigned agrees with most of CEP's challenges to Daniel. He lacks the requisite expertise to opine on plant design and is similarly not able to provide reliable opinion testimony about the cause of any engine damage because he did not conduct a root cause analysis. On the other hand, setting aside the argument that his testimony is cumulative, Daniel should be permitted to testify about his observations. In large part, these observations are factual, and they should therefore be provided as a fact witness. However, there is a possibility that some of his observations will bleed over into opinion or opinion-type testimony, and I respectfully recommend that Daniel not be excluded from providing these observation-type opinions.

But I also recommend that Daniel not be permitted to testify about CAT's recommendations to CEP. Although an expert's opinion is not subject to exclusion merely because the expert considered hearsay information, Daniel's opinions on these recommendations are not actually opinions -- they are merely an attempt to focus on, and emphasize, certain facts which were developed.

In a vacuum, Daniel's proposed testimony about his observations at the plants should not be excluded. However, his anticipated testimony (mostly factual, but perhaps including some hybrid-type opinions) about his observations is cumulative. It repeats Rasmussen's testimony about his observations. The Undersigned recommends that the District Court grant CEP's motion to the extent it seeks to exclude the cumulative testimony of Rasmussen and Daniel.

However, the Undersigned is not recommending that one witness or the other witness necessarily be the one whose testimony about maintenance-related observations should be excluded. Instead, the Undersigned respectfully requests that the District Court permit CAT to <u>choose</u> which witness it will use at trial for testimony about maintenance-related observations during the plant visits -- Rasmussen *or* Daniel. The other witness' testimony about his observations about maintenance should not be permitted because it would offer duplicate, cumulative testimony.

David Nycz

Employed by CAT as a "market professional," Nycz was asked to review and rebut the expert opinions and conclusions of Jim Fitch, a CEP expert, about the alleged principal cause of bearing failure, which Fitch believes damaged the C32 engine component of the generator sets. Nycz teaches oil analysis, created and maintains CAT's oil analysis guidelines and consults with CAT product groups and service engineers to identify and resolve oil-related problems. He has worked at CAT since he graduated college in 1975.

Nycz lists three opinions in the summary of opinions section of his report: (1) "fuel dilution was not present in a significant number of CEP's C32 diesel engines, and, where present, did not cause abnormal bearing wear or failure because the fuel dilution was not severe enough to lower oil viscosity to dangerous levels;" (2) "[t]he oil samples showed that the failures of the CEP C32 diesel engines that [he] inspected and/or analyzed were *primarily* due to oil oxidation;" and (3) "copper is not a measure of main bearing wear in Caterpillar C32 diesel engines as it *primarily* comes from other sources, such as the oil cooler." [ECF No. 301-23, p. 7 (emphasis added)].

Nycz's report condemns Fitch's report for including a "substantial portion" which "contains no technical arguments or analysis." [ECF No. 301-23, p. 12]. He also contends that Fitch's report contains inaccuracies, deficiencies and conclusions based on assumptions.

Nycz concludes that fuel dilution, dirt contamination, and coolant contamination did not significantly contribute to the wear or bearing failures. He also opined that oil oxidation "is a likely contributor to the bearing wear observed on the CEP 32 engines." [ECF No. 301-23, p. 42]. He explained that oil oxidation is caused by several factors and that there is "documented proof" that these factors were present in the CEP 32 engines. [ECF No. 301-23, p. 42]. He also opined that there were examples of oil oxidation and increased lead wear in "some" of the C32 engine oil samples. [ECF No. 301-23, p. 42].

CEP's motion contends that Nycz should be precluded from offering expert testimony about the cause of engine bearing failures at CEP because "he does not link any of his findings to the failures of any of CEP's C32s." [ECF No. 301, p. 33]. CEP notes that Nycz never received or reviewed a list of the engines which failed and assessed only *one* engine in his report -- and that was not even one of the engines that failed. CEP also flags and challenges his testimony that he was providing the fluid analysis and assumed that "somebody else would connect the dots," but did not himself "connect the dots." [ECF No. 301, p. 34].

CEP argues that Nycz's methodology is unreliable because his opinions on fuel dilution are not supported and because he testified in his deposition, contrary to his report, that oil oxidation was not something he saw frequently throughout CEP's fleet of engines and, most importantly, that he was "unable to correlate oil oxidation with CEP's failures." [ECF No. 301, p. 37].

In response, CAT stresses that Nycz rebuts Fitch and that Fitch's opinions "were based on the entire fleet of CEP's C32 Gensets and not a single Genset or any particular engine failure." [ECF No. 325, p. 35]. Thus, CAT notes, Nycz's rebuttal opinions "were of a similar scope." [ECF No. 325, p. 35].

On the merits, CAT argues that CEP is misrepresenting Nycz's opinions and then cross-examining him about the facts he relied upon to form his conclusions. It contends that his failure to review a list of failed engines and the absence of a link between oil samples from the CEP facilities to specific failed engines is a challenge appropriate for trial, not for a pre-trial *Daubert* motion. CAT notes that Nycz's opinions on poor maintenance practices were based on analyzing oil samples across *all* of CEP's C32 engines. And it points out that Fitch's opinion addressed only fleet-wide issues, and then argues that it is therefore appropriate for Nycz to provide rebuttal opinions after a fleet-wide analysis.

CAT argues that some of CEP's other challenges relate to weight of the evidence (and a simple difference of opinion), rather than admissibility. For example, it notes that Fitch uses gas chromatography to test for fuel dilution while Nycz used fuel viscosity. It likewise explains that Nycz's opinion is that oil oxidation was the primary cause of the failures, while Fitch asserted that fuel dilution was responsible.

76

CAT concedes that Nycz was unable to determine the failure mode with more certainty but argues that this was due to CEP's failings, primarily large gaps in sampling and its purported unreliability in accurately listing which engines failed.

At bottom, though, the challenges to Nycz's opinions are insufficient to *preclude* his testimony. Instead, they are the types of attacks which are best addressed at trial, through rigorous cross-examination.

<u>Brian Howe</u>

According to CEP, Howe is an outside expert who CAT retained in order to provide a rebuttal report. CEP contends that Howe's report does not even mention any of CEP's experts and nowhere rebuts any of CEP's expert opinions. Specifically, CEP contends that Howe opines on three issues *untouched* by CEP's experts: that (1) CAT "carefully and thoroughly analyzed and designed the C32 genset," (2) CAT's factory testing "validated engine power and conformance to specifications" and (3) there was "no apparent anomaly in development or production of the Caterpillar C32 engine." [ECF No. 301, p. 38]. Because CEP's experts did not opine on any of these three topics, CEP argues, Howe's report is an improper rebuttal and must be stricken and that he must be precluded from testifying at trial.

Howe does not have an opinion on the root cause of the failure of the C32 engines and did not conduct a forensic analysis of the engines.

Nevertheless, Howe does offer his opinion that CEP "has not followed proper maintenance or operation practices," and CEP does not contend that this specific opinion is improper rebuttal. In his report, Howe states that "the C32 engine failures are **likely** caused by CEP's substandard maintenance and operation." [ECF No. 301-5, ¶ 10 (emphasis supplied)]. But CEP notes that Howe also made a concession: the purported maintenance failures may not be "directly causal" to the C32 engine failures and may therefore be only "indicative of the CEP approach to maintenance." [ECF No. 301-5, ¶ 82]. Therefore, CEP says, Howe's opinions are unhelpful and should be excluded (as they do not connect the purported maintenance failures to the engine failures).

CEP also argues that Howe's opinions about CEP's maintenance are inadmissible because they, in effect, simply regurgitate the questionable findings of other CAT experts.

CEP also contends that Howe's opinions about CAT using a gateway process are not helpful because it simply parrots an unremarkable fact that CAT used a step-by-step process. In addition, CEP argues that Howe did not review the process in any detail and did not adequately consider the fact that CAT issued numerous recalls.

Moreover, CEP also takes issue with Howe's testimony that the "tremendous failure rate" of CEP's C32 engines is "many times the failure rate of the rest of the C32 genset engines population worldwide." [ECF No. 301, p. 40]. CEP brands this opinion as unreliable because it is not based on a comparison of other C32 engines in the same

continuous application -- and is instead based on a comparison to C32 engines in other scenarios, including standby gensets that are run infrequently.

In response, CAT describes Howe's three opinions somewhat differently than CEP's summary. CAT's version of Howe's opinions is: (1) "Caterpillar carefully and thoroughly analyzed and designed the C32 Genset from concept to production, similarly to how other diesel engine manufacturers bring a new product to market;" (2) all 144 C32 Gensets delivered to CEP were tested at the factory and met the corrected full load power specification; and (3) "CEP has not followed proper maintenance and operation practices and has allowed dangerous conditions to exist." [ECF No. 325, p. 38].

Although CEP's motion mentions Howe's views on maintenance, his report actually lists his maintenance-related opinions twice -- in the summary (on page 8) and in the conclusions (on pages 29 and 30). [ECF No. 301-5]. His report also contains a comparatively detailed section on CEP's maintenance procedures (pages 20 – 24). So Howe is an expert who CAT is proffering to provide expert opinion testimony about CEP's supposed maintenance flaws. But CEP emphasizes Howe's admission that his opinions on maintenance may not be directly causal to the catastrophic C32 engine failures at CEP.

In any event, CAT focuses on Howe's experience in working with diesel engines and argues that his opinion (*i.e.*, that CAT followed common industry practices in

designing and testing the engines) will be helpful. CAT minimizes the challenge to his purported failure to adequately consider problems as an alleged analytical flaw which is more appropriate for cross-examination.

CAT takes issue with CEP's argument that Howe's reliance on "rest-of-the-world" comparison data is inappropriate. It says CEP is conveniently ignoring the fact that it registered the gensets at issue for standby use, not continuous use, in order to enjoy the benefit of a longer warranty period. When confronted with this issue at his deposition, Howe admitted that "it would be probably more appropriate to compare continuous units to continuous units." [ECF No. 301-8, p. 41].

On the issue of whether Howe is not an actual rebuttal expert, CAT contends that he rebutted Poulson's conclusion that C32 engines were not properly designed and constructed, and rebutted Poulson's opinion that C32 engines are incapable of producing rated output continuously through a comparison of CEP's C32 failures to the C32 failures in the "Rest of the World." [ECF No. 321].

Like virtually all of the expert opinions offered in this case, Howe's report is far from a problem-free submission.

The first problem, or issue, is that some of his opinions are not rebuttal-type opinions, as they do not directly address the subject matter of the opinions provided by CEP's experts in their initial reports. CAT stresses the fact that it does not bear the

burden of proof, as if that point somehow means that its rebuttal experts can provide new opinions, unconnected to the opposing opinions they are purportedly rebutting.

However, the Undersigned is not prepared to exclude a rebuttal expert because his opinion does not directly match up to the opposing expert on a point-by-point basis. The challenge about whether Howe is a bona fide rebuttal expert can be explored on cross-examination. CEP took Howe's deposition and did not seek permission to supplement its own experts' reports during the nearly three months remaining in the discovery period after the experts were disclosed.

Striking an expert report for a purported failure to technically comply with the applicable rules is a drastic sanction and the Undersigned will not recommend it here, especially because any material prejudice was eliminated or substantially reduced by Howe's deposition. *Woods ex rel. Woods v. Int'l Harvester Co., Inc.*, 697 F.2d 635, 639-40 (5th Cir. 1983); *Monopoly Hotel Grp., LLC v. Hyatt Hotels Corp.*, 291 F.R.D. 684, 689 (N.D. Ga. 2013) (denying reconsideration of denial of motion to strike; stating that where plaintiff-movant received expert rebuttal report arguably untimely but "with time left in the discovery schedule to conduct a deposition, and [movant] did conduct a deposition. . . . There is simply no concrete prejudice to which Plaintiff can point."); *In re Denture Cream Prods. Liab. Litig.*, No. 09-2051, 2012 WL 3639045, at *4 (S.D. Fla. Aug. 23, 2012) (denying motion to strike or exclude supplemental expert submission where "none of the depositions of the experts have occurred yet in this action, and thus

[movant] has not been deprived of the opportunity to either [*sic*] depose Dr. Askari on the basis of any of his opinions, including those that he might arrive at based upon" the subject of the supplemental submission; "It is therefore difficult to conclude that [movant] has suffered any significant prejudice based upon the Plaintiffs' submission.").

Although CEP suggests that CAT acted in bad faith, the Undersigned does not agree. This is a complex, technical-type case which required multiple trips to Brazil, myriad inspections of power plants and engines, the review of a massive amount of documents (many of them in Portuguese) and comparatively aggressive discovery timetable. Under these circumstances, the Undersigned does not find that the timing and circumstances of CAT's disclosure of Howe and his rebuttal report are indicative of bad faith. Therefore, outright exclusion is unwarranted. *See Northrup v. Werner Enter., Inc.*, No. 8:14-cv-1627, 2015 WL 4756947, at *2 (M.D. Fla. Aug. 11, 2015) (denying motion to strike defendant's rebuttal witness and finding late disclosure harmless, where expert was disclosed and written report provided "two months before the discovery deadline and more than six months before trial, giving Plaintiff adequate time to conduct any necessary discovery") (citing *Ferguson v. Bombardier Servs. Corp.*, 244 F. App'x 944, 950 (11th Cir. 2007) and *Ellison v. Windt*, No. 6:99-cv-1268, 2001 WL 118617, at *3 (M.D. Fla. Jan. 24, 2001)).

**However,** there are two other significant problems with the substance of Howe's expert opinions: (1) Howe's initial comments, where he compared the failure rate at CEP to other failure rates around the world; and (2) his opinion that the maintenance deficiencies "likely" caused the engine failures.

Because the comparison should have been made to engines in continuous use and because Howe ultimately conceded that point, he should not be permitted to make those comments or offer opinions about the comparison. Additionally, his opinion that maintenance shortcomings "likely" caused the engine failures is too tenuous to be permitted, especially because he did not conduct a root cause analysis, was not tasked with that assignment, and qualified his opinion by noting that the maintenance issues might not have actually caused the engines to fail.

By way of summary, Howe will not be permitted to provide expert opinion testimony at trial on the two points listed above, but he will not be prevented from offering his opinion that CEP did not adequately perform maintenance. He will not be permitted to testify about his opinion that those maintenance deficiencies **caused** the engines to fail. He will be permitted to offer his opinions on the design process and the testing.

Because Howe's opinions about CEP's purported maintenance failings mirror those of other CAT experts, it is cumulative. But the Undersigned will not now strike all of his maintenance-related opinions. Instead, the Undersigned recommends again that

CAT be required to choose which expert will offer opinions criticizing CEP's maintenance practices at trial. Once CAT makes that choice, other experts should not be permitted to offer similar opinions (because that would be cumulative). This recommendation, however, would not mean that a CAT witness would be precluded from providing <u>fact</u> testimony about observations made about CEP's maintenance practices. Instead, it concerns only expert *opinions*, and it limits CAT to one maintenance <u>opinion</u> (as opposed to factual testimony about maintenance, such as observations) from one expert.

Of course, the mere fact that Howe is not being excluded from providing trial testimony about his observations regarding CEP's maintenance practices does not mean that this fact testimony would necessarily be admissible. To the contrary, the trial judge surely has discretion to exclude cumulative fact testimony concerning his maintenance observations. But that type of evidentiary ruling is beyond the scope of this Report and Recommendations.

<u>Esteban Arroyave</u>

In his reports, Arroyave summarized his opinions by saying that (1) CEP failed to maintain the CAT C32 gensets in a manner which comports with the manual and appropriate maintenance practices; (2) the CEP facility is inadequately designed for the proper operation of 144 gensets; and (3) the site conditions reflect a disregard of legal obligations and employee safety.

CEP's motion does not challenge Arroyave's opinions (even on improper maintenance) as being cumulative. Instead, it argues that Arroyave did not connect his opinions to any engine failures and it emphasizes that he did not perform a root cause analysis. It also attacks the specifics of his opinions, pinpointing purported deficiencies. For example, CEP notes that Arroyave believes the plants are too hot but has no evidence of the actual temperature and took no temperature readings. Likewise, it points out Arroyave believes the in-plant ventilation is insufficient but he took no air flow or other measurements.

But these point-specific challenges relate to the weight of Arroyave's opinions, not their admissibility. CEP will, of course, be free at trial to expose the purported weaknesses in his opinions through cross-examination (on issues such as how he can opine that the gensets were too close when he did not use a tape measure).

Arroyave's first broad opinion (concerning improper maintenance) is indeed cumulative, and CAT will need to select one expert to offer an opinion about CEP's maintenance practices at trial.

His second opinion (as described above) on design flaws is not unduly cumulative and CAT will therefore not need to select which expert to use for that point.

CEP did not assert any specific challenges to Arroyave's third opinion (concerning the plant's site conditions), so the Undersigned has nothing to review and

nothing to rule upon. However, the Undersigned notes that the discussion of this third issue takes up only half a page.

<u>Reza Nikain</u>

Mr. Nikain is an expert CAT selected to rebut CEP's damages expert, Economatrix Research Associates, Inc. CEP challenges his credentials, noting that he is not a certified public accountant, economist or certified evaluation analyst. He has not worked in those fields and is not a member of any professional economics or financial expert organization. At his deposition, he explained his view that he is qualified to offer expert opinions based on his experience in construction project development.

Nikain is a managing director in the Global Construction Practice of Navigant Consulting. Navigant's expert report was prepared at his direction. Several other Navigant staffers helped in his analysis. The Report summary opines that CEP's damages, estimated by Economatrix at approximately $74.1 million, should be revised downward to $977,000.

Because CEP challenges his credentials and experience, it is appropriate to discuss his background. He has a Master's degree in civil engineering (structures) and is a registered professional engineer, certified forensic claims consultant, certified project management professional, and certified construction auditor. He has been appointed as an expert on several hundred construction projects around the world on various types

of power generation facilities. He led a team of experts in the quantification of damages associated with a delayed power plant completion on an $8 billion industrial complex.

In addition, Nikain was assisted by his colleague, Michael Rutkowski, who is a professional engineer with an M.B.A. in Finance and Strategy from Northwestern University's Kellogg Graduate School of Management. The Court notes that it is commonly accepted for consulting firms retained as experts to have a team of professionals working on the engagement and courts understand this reality and follow the notion that experts may rely on other experts when forming their opinions. *See e.g., Carnegie Mellon Univ. v. Marvell Tech Grp., Ltd.,* 807 F.3d 1283, 1303 (Fed. Cir. 2015) (upholding order permitting the expert testimony of a damages expert who did not have a Ph.D. or traditional academic appointment and who was accused of disregarding evidence which the challenging party believed to favor its much-lower damages estimate).

CAT's response notes that Nikain's resume reflects his involvement in two matters involving Brazilian power plants and his experience providing testimony as an expert in arbitrations and trials where he quantified damages. [ECF No. 318]. This experience is sufficient, notwithstanding his status as a non-accountant. *Eberli v. Cirrus Design Corp.,* 615 F. Supp. 2d 1357, 1362 (S.D. Fla. 2009) (citing *United States v. Hensel,* 711 F.2d 1000, 1006 (11th Cir. 1983)); s*ee also Rushing,* 185 F.3d at 507.

In addition to challenging the Navigant report (in general) and Nikain (in particular), CEP contends that the opinions are unreliable (and intended only to undermine Economatrix's conclusions without offering a competing analysis). It also argues that the opinions are impermissibly conclusory. In addition, CEP challenges Nikain's view that the party responsible for the damages needs to be identified in order to properly allocate the damages and that a technical, root cause analysis would be required. More specifically, CEP describes his opinion as relying on a root cause analysis performed by CAT.

CEP contends that Nikain adopted a "bizarre requirement that CAT serves as the arbiter of this lawsuit." [ECF No. 301, p. 43]. But that is not exactly what he said. Instead, his deposition testimony, in response to the question, "So **it** would be the maintenance expert appointed by CAT [who decides the root cause of the failure]?", was: "It would be – the loss profit needs to be allocated based on the failure analysis that is performed to identify whether the generator maintenance and operations were performed properly or not and who was the responsible for – for those operations." [ECF No. 301-32, p. 76].

At bottom, CEP's challenge is somewhat analogous to CAT's challenge to Fuentes. As outlined above, the Undersigned denied CAT's motion concerning Fuentes, even though his opinions were subject to significant challenge (*e.g.*, the use of a discount factor selected on his own opinion, rather than with a specific scientific method). It

would be inequitable to exclude Nikain but permit Fuentes. The same flexibility and discretion I afforded to the Fuentes challenge should similarly be applied to Nikain.

CEP may pursue its challenge to the purportedly conclusory nature of Nikain's testimony at trial, through cross-examination and comparison of his opinions with those of CEP's own damages expert. Excluding Nikain's expert report and opinions based on a broad challenge about a lack of specificity is too harsh a remedy for this alleged fault in his opinions. *See U.S. v. Scarpon*, No. 05-20419, 2006 WL 5100541, at *1 (S.D. Fla. Sept. 12, 2006) (denying motion to exclude expert testimony where arguments in favor of exclusion were "vague and conclusory").

## IV.  CONCLUSION

Therefore, based on the significant discretion afforded to trial courts about the admissibility of expert opinion testimony, the Undersigned **respectfully recommends** that the District Court adopt the myriad rulings outlined above concerning the motions to exclude expert witnesses.

## V.  OBJECTIONS

The parties will have fourteen[24] days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with United States District Judge Jose E. Martinez. Each party may file a response to the other party's objection within fourteen days of the objection. Failure to file objections

---

[24]  The fourteen-day deadline runs from the date of the under-seal Report and Recommendations, not this public version.

timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.   *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2016).

      **RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, June 12, 2017.

 

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**<u>Copies furnished to</u>**:
The Honorable Jose E. Martinez
All Counsel of Record