**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No.: 14-CV-24277-CIV-Martinez/Otazo-Reyes**

COMPANHIA ENERGÉTICA POTIGUAR,

      Plaintiff,

      --against--

CATERPILLAR INC., CATERPILLAR
AMERICAS SERVICES CO. and
CATERPILLAR AMERICAS CO.,

      Defendants.

**PLAINTIFF'S PROPOSED DECISION AND ORDER ON**
**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

JOSÉ E. MARTINEZ, UNITED STATES DISTRICT JUDGE

THIS CAUSE comes before the Court on Caterpillar Inc.'s, Caterpillar Americas Services Co.'s and Caterpillar Americas Co.'s (collectively "CAT" or "Defendants") Motion for Summary Judgment [ECF No. 303] (the "Motion"). The Court has carefully considered the Motion, the Declaration of Shawnna M. Yashar dated April 1, 2016, with exhibits [ECF No. 303], Defendants' Statement of Material Facts dated April 1, 2016 [ECF No. 303], Plaintiff Companhia Energética Potiguar's ("Plaintiff" or "CEP") Opposition [ECF Nos. 339-41], the Declaration of Patrick J. Boyle dated May 2, 2016, with exhibits, CEP's Counter Statement of Material Facts dated May 2, 2016, and Defendants' Reply [ECF Nos. 339-41].[1] The Court also held oral argument on the Motion on November 22, 2019. For the reasons set forth below, Defendants' Motion is DENIED.

I.      **Background**

        A.      **Background Facts**

        CEP, the owner of a Brazilian power plant, claims that 62 out of the 144 gensets it bought from CAT have catastrophically failed during normal operation. CAT Ex. 40. Many of the

---

[1] On Reply, CAT submitted a document styled as a "Response to Plaintiff's Counter-Statement of Material Facts" on May 17, 2016 [ECF Nos. 353-54] (the "Response"). CEP moved to strike the Response on May 25, 2016 [ECF No. 357] on the grounds that it was not allowed by Local Rule 56.1, did not comply with the numbering requirements of Local Rule 56.1, was not permitted by this Court's Order setting forth the documents the parties were to file in connection with the Motion [ECF No. 272] and contained improper legal argument. This Court agrees with CEP that the Response was procedurally improper and contains impermissible legal argument, and therefore strikes the Response from the record on this Motion. The Motion at ECF No. 357 is therefore GRANTED. *See* Local Rule 56.1(a); *Qantum Commc'ns Corp. v. Star Broadcasting, Inc.*, 473 F, Supp, 2d 1249, 1260 (S.D. Fla. 2007) ("[L]egal conclusions and legal arguments" do not have probative value when contained in statement of material facts); *Barnext Offshore, Ltd. v. Ferretti Group USA, Inc.*, No. 10-cv-23869, 2012 WL 1570057, at *3 n.8 (S.D. Fla. May 2, 2012) (declining to consider legal arguments contained in statement of facts); *Hurtado v. Raly Dev., Inc.*, No. 11-cv-24476, 2012 WL 3687488, at *15 n.21 (S.D. Fla. Aug. 27, 2012) (same); *Lugo v. Carnival Corp.*, 154 F. Supp. 3d 1341, 1342-3 (S.D. Fla. 2015) (refusing to consider response to summary judgment motion that did not comply with Local Rule 56.1(a)); *see also Joseph v. Napolitano*, 839 F. Supp. 2d 1324, 1329 (S.D. Fla. 2012) (same); *Gossard v. JP Morgan Chase & Co.*, 612 F. Supp. 2d 1242, 1245 (S.D. Fla. 2009) (same).

engines have exploded, leaving behind gaping holes in their engine blocks.  CEP Ex. 60.  The factual background of CEP's claims and CAT's defenses is as follows:

**B.     CEP's Predecessor, TEP, Wins an Energy Auction in Brazil**

In 2005, to address severe power shortages, the Government of Brazil began holding energy auctions where private companies could win contracts to produce energy for the public, called PPAs.  CEP Ex. 1; Ex. 2; Ex. 3; Ex. 4 at 28:3-34:15.  These private power plants operate only when needed, and once built, may stand idle for weeks, months or even years.  CEP Ex. 4 at 33:9-36:19.  But when called upon to provide electricity, they must then do so immediately, and must continuously produce a predetermined power output until ordered by the Government to stop.  *Id.*  Each power plant gets a fixed fee, whether it produces electricity or not, and an additional fee for the energy it produces when dispatched.  *Id.* at 36:20-38:8.

Plaintiff CEP is a private Brazilian power company.  *Id.* at 6:17-7:3, 24:3-10.  In 2006, CEP's predecessor Termoelétrica Potiguar S/A ("TEP") won two energy auctions.  *Id.* at 33:9-34:15.  TEP then constructed two thermoelectric (diesel fueled) power plants at its site in Macaíba, Brazil.  *Id.* at 42:6-25.  One plant has an installed capacity of about 53 MW, the other about 66 MW, for a total installed capacity of about 119 MW.  *Id.*

**C.     CAT Is Directly Involved in TEP's Purchase of the CAT C32 Gensets**

The energy auctions created a new market for equipment manufacturers.  CAT, Mitsubishi and others aggressively competed to supply power generation equipment (engines and generators, together called "gensets") to privately-owned power companies.  CEP Ex. 2, at CAT535551.  Several manufacturers approached TEP's CEO, Fernando Magalhães, about supplying TEP with the gensets would need.  CEP Ex. 4 at 106:21-109:25.  In October 2006, Fernando Costa from Sotreq, CAT's exclusive equipment dealer, approached Magalhães.  *Id.* at

99:22-102:11; CF 41.[2]  Magalhães said he was interested in purchasing the 3516, a larger CAT

genset, because he had heard it was reliable.  CF 41; CEP Ex. 4 at 110:9-23.

Costa then asked CAT for a quote for the project using 3516s.  CAT did not have enough

3516s to supply TEP's project, but believed that winning TEP's business was "critical to prevent

Mitsubishi from entering the investor energy market in Brazil."  CEP Ex. 2, at CAT535551.

CAT therefore told Costa that because of "availability constraints of 3500 products," CAT

"elected to quote C32 gensets for these opportunities."  CEP Ex. 74 at CAT336611.  Costa told

Magalhães that 3516s were not available, but that the smaller C32 was fine, if not better, for his

purposes.  CF 41.

Because, in CAT's words, this project could be an "[i]mportant showcase for paralleled

C32 gensets as a viable substitution for 3516's in investor energy projects," CAT wanted to

convince TEP that a much larger quantity of smaller and less powerful C32 gensets would work

for its project.  CEP Ex. 2 at CAT535551; CEP Ex. 6 at CAT535585 ("How do we meet the

needs of a 3516 customer with the C32?").

According to CAT, the TEP project was CAT's "[f]irst large C32 paralleling project in

the world," and CAT knew that "all eyes [would] be on CAT/Sotreq to manage effectively."  CF

41; CEP Ex. 1 at CAT535628.  According to CEP, no one from CAT ever told CEP that this was

going to be CAT's first attempt to use the C32s in a continuous power generating application,

and CAT has introduced no evidence to the contrary.  CEP Opp. at 2 (citing CEP Ex. 6, 41).

CEP claims that before the sale, CAT knew exactly what TEP wanted the gensets for

(CEP Ex. 2 at CAT5355547-48), where TEP's plants were to be located (*id.* at CAT535547),

how much power TEP needed to produce overall (*id.*), and CAT determined how many C32s it

would take to do that, a total of 144, each delivering 830 ekW.  *Id.*  CAT also knew that the

---

[2] "CF" refers to Plaintiff's Local Rule 56.1 Counter Statement of Material Facts dated May 2,
2016.

gensets would have to produce that power output continuously for an unlimited period of time, at the direction of the Government of Brazil.  CEP Ex. 1, at CAT535624-26; CEP Ex. 2 at CAT535547-8; CEP Ex. 5 at CAT069403.  CAT does not point to any evidence disputing this.

> **D.    CAT Makes Pre-Sale Representations to CEP that CEP Claims Induced it to Purchase the C32s**

CAT provided TEP with a document containing the specifications for the C32 gensets (the "Spec Sheet").  CEP Ex. 7; Ex. 8 at CAT382453.  Importantly, the Spec Sheet stated that the gensets were "CONTINUOUS" with a power rating of "830 ekW" and that "continuous" meant "[o]utput available without varying load for an unlimited time."  *Id*.  CEP has also submitted evidence on this Motion that CAT's District Manager for South America, Tim Scott, met with Magalhães at CAT's office in São Paulo, Brazil on May 4, 2007, while CEP was making its final decision between Mitsubishi and CAT equipment (the "May 2007 Meeting").  CF 37-38; CEP Ex. 4 at 117-118 (Magalhães deposition testimony); CEP Ex. 75 (email from Costa to Magalhães confirming meeting and Scott's attendance).  Magalhães testified that at that meeting, he asked for assurances that the C32 gensets would be able to operate continuously to deliver the output required by the PPAs.  CF 9, 37.  According to Magalhães, Scott represented that they would. *Id.*  TEP believed CAT, because CAT had a reputation for rugged, dependable products, TEP knew the 3516s to be reliable, and TEP assumed, based on what CAT said, that the same was true for the C32s.  See CEP Ex. 4, Magalhães Tr. at 110:9-23; 120:1-19.  Based on CAT's representations, TEP entered into an agreement with Sotreq on May 31, 2007 to buy 144 C32 gensets from CAT (the "TEP-Sotreq Agreement"), paid CAT $13.824M directly, and spent an additional $2,311,879 for the installation and commissioning of the gensets. CAT Ex. 7 at CEP5409-12.

> **E.    Evidence that CAT Lacked the Basis to Make Those Representations**

CEP submits that CAT knew it lacked the basis to represent to CEP that the smaller

C32s, untested in this type of application, could reliably deliver the promised amount of power continuously.  Or, at the very least, CAT did not have enough information to know one way or the other at that time.  CAT argues in response that the C32 went through a rigorous product development process, but CEP argues that discovery has shown that rather than substantiating CAT's claims, the product development process revealed serious defects with the C32.

Initially, the C32 was only rated as a "standby" genset, not as one that could operate continuously in electric power applications.  CEP Ex. 56 at CAT590609, CAT590612.  CAT began developing the C32 for continuous mode because an existing model of genset, the 3508, was not profitable enough.  CAT decided to replace the "Loser 3508" with the "Winner C32," to "stop the bleeding."  CEP Ex. 54 at CAT712982; CEP Ex. 79 at CAT713009.  The C32 would be "~ 20%" cheaper to produce and, if it could achieve a continuous rating, would also allow CAT to become a player in the high revenue spare parts market.  CEP Ex. 54; *see also* CF 41; CEP Ex. 56 at CAT590609; CEP Ex. 57 at 47:5-18, 50:20-24.  A genset running continuously would need maintenance and overhauls much more frequently than one on standby, and as customers went through spare parts, CAT would profit.  CEP Ex. 58 at CAT712942 (CAT could increase profitability by up to 29%); CEP Ex. 55, at CAT713007; CEP Ex. 57 at 83:16-87:11, 175:21-176:24.

While CAT argues that the "engine" was "released" in 2004, the evidence shows that the C32 continuous genset was not cleared for production until 2006.  SF 17; CEP Ex. 58 (as of October 12, 2006, in "Gateway 6" of the C32's development, CAT was seeking approval to put C32 into prime and continuous production); CEP Ex. 82 (CAT announcing the opening of the C32 Order Board in March 2006).

Moreover, the evidence shows that during the development process, defects and problems emerged including radiator issues, aftercooler failures, overheating, exhaust tube failures, resonant vibrations, high combustion temperatures and other problems.  *Id.* at CAT712922-31;

CEP Ex. 72 at CAT713030; CEP Ex. 67 at 158:24-169:24.  Although 19 of these problems

persisted, CAT "closed" them, thereby permitting shipment to customers.  *See* CEP Ex. 58 at

CAT712922.  While CAT had a target of 7,683 reliability hours in C32 testing (CAT Ex. 12 at

CAT712947), the actual number of "reliability hours" achieved by the C32 was zero.  CEP Ex.

58 at CAT712936.  Finally, 6 CEP engines tested below CAT's specifications, and of those, 3

failed.  CEP Ex. 21 at 57:11-62:13.  A number of CEP's engines also had to be "corrected" after

testing.  *Id.* at 33:3-36:23.

CAT has also acknowledged internally that the first continuous C32s off the assembly

line (including those sold to CEP) had numerous product defects.  *See* CEP Ex. 49 at

CAT318804 (acknowledging early product issues); CEP Ex. 59 (acknowledging that the C32

"experienced initial product quality issues"); CEP Ex. 77 (describing "serious performance

concerns and multiple failures resulted in significant threats of law suits (>20m$)").

### F.     CEP's Gensets Begin Malfunctioning After Only Minor Use

CAT was closely involved in the ordering and delivery of the gensets.  CF 41; CEP Ex.

10 at 82:10-83:11, 91:2-17, 96:7-98:25.  CAT assembled the gensets in Griffin, GA during

March and April 2008 and then delivered them to CEP in Jacksonville, FL.  CAT Ex. 7 at

CEP5406; CEP Ex. 10 at 43:21-24; CEP Ex. 11.  The gensets were installed in 2008.  Tim Scott,

the CAT salesman who had met with Fernando Magalhães in May 2007, came to the site to

observe the installation, something he had rarely done before.  CEP Ex. 12; CEP Ex. 13 at 65:10-

20, 136:22-138:4.

By March 2009, the gensets were ready for commercial operation.  CEP Ex. 4 at 89:2-5.

Between then and October 26, 2012 (the date of the first continuous dispatch) the gensets were

only operated intermittently (about 75 to 100 hours) but still had failures and malfunctions that

CAT admitted were "product issues," meaning design or manufacturing defects.  CEP Ex. 14;

CEP Ex. 15.  CAT provided repairs for these initial issues, at its expense, under warranty.  Mot.

at 21.

### G.    CAT Does Not Tell CEP about Other Catastrophic Failures or That CEP's Gensets are at High Risk

CEP has provided evidence that CAT knew, well before CEP began to operate the

gensets continuously in October 2012, that they were flawed mechanically and would explode if

operated under normal conditions.  CAT did not share any of that information with CEP.

For example, in 2010, two years before CEP began to run full time, a private power

company called Genrent began having serious problems with its C32 continuous gensets, that

(like CEP) it used to generate electricity for the Government of Brazil.  CEP Ex. 24 at

CAT181760.  Out of Genrent's 70 C32s, 5 had "ventilated," CAT's euphemism for exploding,

leaving behind gaping holes in their engine blocks.  CEP Ex. 23 at CAT576546.  The documents

show that CAT initially blamed Genrent for the failures, claiming that "bad fuel, oil change

intervals, dirt, plugged radiator, etc." was 75% of the cause.  CEP Ex. 17 at CAT180634-35; *see

also* CEP Ex. 23.  CAT ultimately decided, however, that Genrent's explosions were caused by

"piston scuffing," a product defect that had affected C32 engines in other applications, such as

off-highway trucks and other machines.  CF 63; CEP Ex. 18.

João Giglio, a former 12-year employee of Sotreq who then worked at CEP's plants,

testified firsthand about Sotreq's investigation of Genrent's failures, including his participation

in the disassembly of Genrent's C32 engines.  CEP Ex. 19 at 9:10-15, 15:11-17:4, 29:15-30:6,

232:10-235:20, 332:24-336:3.  He testified that Genrent's failures, including ventilated blocks,

were the same as those he saw later at CEP.  *Id.* at 332:24-336:3.  He believed that Genrent's

failures were caused by fuel dilution, the same cause that he, CEP, CEP's experts, and even

CAT's own employees and experts saw at CEP.  *Id.* at 337:24-339:11; CEP Ex. 20 ¶¶ 19, 66;

CEP Ex. 21 at 73:19-25, 79:3-82:2; CEP Ex. 22 at 664:3-665:7.

Even though CAT knew that CEP could be called into continuous operation at any time, no one told CEP about Genrent's problems. CEP Ex. 23; CEP Ex. 24; CEP Ex. 25 at 54:20-56:5, 62:5-64:2, 108:9-109:6, 258:5-260:12. Instead CAT began surreptitiously monitoring CEP's gensets for symptoms. CEP Ex. 24 at CAT 181769; CEP Ex. 26 at CAT320649-50; CEP Ex. 27 at CAT733687; CEP Ex. 29 at CAT067471-73.

In April 2010, CEP had barely begun to run its engines. They all had less than 100 hours on them. CEP Ex. 26 at CAT320650; CEP Ex. 25 at 110:3-12. At that time, in an internal email, the CAT salesman Tim Scott noted that both Genrent and CEP had already experienced the same relatively minor failures, such as broken side bolts, aftercooler core holes, broken valve springs, head gasket leaks, timing cover leaks and paint defects. CEP Ex. 26 at 320649-50. CEP's gensets also had 95 control pad failures and 58 broken fan guards. CEP Ex. 27 at CAT733677, CAT733683. Genrent had piston scuffing in 38 of its 70 engines, and 5 catastrophic failures. *Id.* Scott said that CEP's gensets did not have piston scuffing and catastrophic failures because they had "only 100 hours accumulated" on them. *Id.* Finally, Scott stated that "*in my area, we are currently not offering any C32's on continuous, and in prime, only in limited lower risk situations.*" *Id.* at CAT320650 (emphasis added). In other words, CEP maintains, by April 2010, things were so bad with the continuous C32 gensets that Scott wasn't selling them anymore. *See also* CEP Ex. 28.

In June 2010, although CAT identified CEP as being in the "risk group" because its gensets were "set up for continuous rating," it again noted that CEP had not experienced these failures "so far" because of the low hours. CEP Ex. 29 at CAT067473. In CAT's words, CEP was not showing these problems, "*yet.*" CEP Ex. 27 at CAT733687 (emphasis added).

Eventually, CAT embarked on a massive product recall to replace the pistons, rings and liners in all C32 engines in continuous mode. CF 63. CAT did not reveal the recall to CEP until November 2010, and it did not tell CEP about any explosions at Genrent or elsewhere. Instead it

8

said the piston design was not meeting "customer expectations," and was creating "accelerated wear" on engine parts.  CEP Ex. 30 at CAT733639; CEP Ex. 25 at 227:21-228:10, 245:7-246:24, 258:5-260:12; CEP Ex. 31 at CAT353079-80.

In all, it took over a year for CAT's authorized service representative, Marcosa, to open up every single one of CEP's 144 engines (*in situ* in the power plants) and replace the entire piston system.  SF 64; CEP Ex. 32.  CEP was leery of this procedure, convinced that Marcosa was introducing contamination into its engines because of Marcosa's shoddy work habits.  CEP Ex. 33 at CAT068197.  CAT also recommended that CEP change the oil every 250 hours or 19,000 liters of fuel burn, and add a 100-liter external oil tank to each genset.  CEP Ex. 30 at CAT733640-42.  CEP's oil expert believes that this recommendation, and the ultimate replacement of CEP's 68-liter oil pans with 99-liter pans, was CAT's effort to add more lubricating oil to the engine system to counteract fuel dilution.  Ex. 20 ¶¶ 13, 66.

### H.    CAT Makes a New Warranty to CEP in 2011

CEP was uncomfortable about CAT's "product update," and wanted written assurances from CAT that the gensets would deliver 830 ekW, and that CEP could change the oil every 250 hours.  *See* CEP Ex. 30; CEP Ex. 32; CEP Ex. 33.  In response, CAT Product Manager Mark Smalley (working out of CAT's office in Miramar, FL) wrote a letter dated June 3, 2011 (the "June 2011 Letter") that was given to CEP.  CEP Ex. 34.  The June 2011 Letter performed several functions.  As CAT's "official technical response and commitment," it provided (in a section called "**Product updates, performance and warranty**") that "[a]fter completing the service updates and repairs on the 144 units installed at the CEP power plant in Natal, the 144 gensets will perform as originally purchased delivering 830 [ekW] in a continuous operation . . . ."  *Id.* (emphasis in original).

The June 2011 Letter also promised (in a section called "**Oil change intervals**") that CEP could change the oil in its C32s every 250 hours.  *Id.* (emphasis in original).  Pre-sale, Sotreq had

told CEP in writing that the oil only needed to be changed every 250 hours, and that the engines would need top end overhauls (significant maintenance that takes about 12 days) at 7,500 hours and major overhauls at 15,000 hours of operation.  CEP Ex. 35 at CONFIDENTIAL CEP 015693; CAT Ex. 7 at CEP5451.

After the C32s were delivered, CEP learned that according to the manual (the "OMM") the oil needed to be changed every 250 hours, or every 19,000 liters of fuel burn, whichever came first.  *Id.* at 211:23-212:3.  CEP calculated that, once they started running continuously, the C32s would need oil changes every 90 hours, or every 4 days.  SF 33; CEP Ex. 36 at 51:2-52:7, 250:10-251:9.  CEP was upset about this discrepancy, and alleges that it never would have purchased the C32s if it had known that to be the oil change interval.  CEP Ex. 4 at 118:24-119:7, 239:12-240:3.  CEP tried to implement 90 hour changes but found that to be almost impossible on a fleet of 144 engines.  CEP Ex. 36 at 250:10-251:9.  CEP complained to Sotreq, and after oil testing and analysis, Sotreq bumped CEP's oil change interval up to 150 hours.  *Id.* at 51:2-52:7.  But that still was unworkable, and CEP asked Sotreq how the 250 hour interval could be achieved.  CEP Ex. 37.  Sotreq said that adding a larger oil sump (which was part of the piston recall) would give CEP the 250 hour interval it wanted.  CEP Ex. 38.

CEP was concerned about following that course of action unless it was specifically sanctioned by CAT, especially since as of June 2011, CEP still had not been dispatched to run continuously.  CF 36.  In the June 2011 Letter, CAT confirmed that using the new 99 liter oil pans would "result in [the] 250 hour oil change interval" CEP wanted.  CEP Ex. 34.  CAT admits now that this guarantee of a 250 hour oil change interval was based on a test CAT had previously performed at Genrent.  SF 59-62.  CAT did not tell CEP this at the time.  Smalley (the author of the June 2011 Letter) wrote in his contemporaneous private notes that the 250 hour interval could only be met "assuming [the engines] don't operate."  *See* CEP Ex. 39 at CAT916113.  In other words, CEP learned in discovery that CAT gave CEP the assurance of a 250 hour oil

change interval, knowing that to be false because of the problems at Genrent, and only workable if CEP's engines sat idle.  And indeed, CEP was not able to achieve any workable oil change interval once it started operating continuously and nearly half of its fleet catastrophically failed.

In January 2013, Sotreq gave CEP another piece of troubling news: top end overhauls would need to be done at 4,500 hours, not 7,500, at an enormous added cost to CEP in labor, parts and downtime.  CEP Ex. 40 at CAT379254.  CEP would not have purchased the C32s had it known they would need such frequent intervention.  CEP Ex. 4 at 118:24-119:7.

> **I.    62 of CEP's 144 Engines Catastrophically Fail**

CEP maintains that the piston pack update did not prevent CEP from having catastrophic failures.  And, CEP claims, it did not prevent further catastrophic failures at Genrent either.  CEP Ex. 16 at CAT353981; CF 56.  In May 2010, Genrent settled its legal claims against CAT and purchased Cummins gensets to replace its C32s.  CEP Ex. 41 at CAT830342-43; CEP Ex. 29. At the time CEP filed the Complaint in November 2014, 5 engines had failed in 2012, 3 in 2013, and 36 in 2014.  CAT Ex. 40.  Another 19 failed after the Complaint was filed.  *Id*.  CEP maintains that the failures only stopped once it "derated" the engines, meaning that it backed them off by about 20%, so that each only delivered 650 to 750 ekW, instead of the 830 ekW CAT had promised.  CEP has submitted damage surveys of the engines, including photographs showing the gaping holes and broken connecting rods left behind when its engines "ventilate." CEP Ex. 60.  Workers found the situation to be so dangerous that they would not approach a non-operating genset in the plant until a bulletproof screen was installed between it and the operating one next to it, just in case the operating engine exploded.  CEP Ex. 19 at 142:23-143:14; CEP Ex. 44 at 257:25-260:17.

> **J.    CAT Made Multiple Visits to the Site**

CAT did not observe the conditions at CEP from afar.  In all, CAT assembled a "Core Team" of 22 employees to monitor and investigate the failures at CEP.  CEP Ex. 47 at

CAT010497.  CAT employees Smalley and Salvador visited the plants numerous times.  CEP

Ex. 45 at 105:13-15, 190:23-191:4; CEP Ex. 25 at 37:19-38:8.  CAT employee Roberto Vivas

performed an installation audit in April 2013 and found nothing wrong.  CEP Ex. 46 at 220:9-

229:6.  In February and April 2014, CAT sent two teams to CEP to analyze, inspect and report

back on the damaged equipment.  CEP Ex. 47; CEP Ex. 48 at 106:7-107:3.  They could not find

a root cause for the failures, and did not offer any recommendations to CEP, or make any

criticisms of the way CEP had installed, operated or maintained the C32s.  CEP Ex. 48 at

112:11-113:22, 199:25-200:3, 203:15-17, 213:11-13, 511:20-528:7; CEP Exs. 49-51.

 Finally, CEP maintains that discovery has shown that catastrophic failures in C32s did

not just occur at CEP and Genrent, but around the world.  CF 25; CEP Ex. 68 (report from

Macallister Machinery Co. (Indiana) on spun bearing with photo showing ventilated block); CEP

Ex. 69 (report from Zahid Tractor and Heavy Machinery (Saudi Arabia) describing "2 blocks

broken in last few months" at same customer, with photo showing ventilated block and broken

connecting rod); CEP Ex. 70 (report from Mantrac Group (Egypt) describing "catastrophic

engine failure" though recent "SOS [oil test] was OK," with photo showing ventilated block with

protruding connecting rod); CEP Ex. 71 (report from Zahid (Saudi Arabia) describing third

failure at same customer; No. 7 connecting rod "smashed the cylinder block;" Nos. 4, 5, 6, 7

main bearings spun with photo showing ventilated block with protruding connecting rod).

## II. CEP's Claims

 CEP filed its Complaint in 2014.  During discovery, the parties took 39 depositions,

exchanged 15 preliminary and rebuttal expert reports and produced over one million pages of

documents.  Discovery closed on January 29, 2016.  Based on the evidence adduced during

discovery, CEP's claims are:

 **A.** **Fraudulent Inducement and Negligent Misrepresentation:**  Pre-sale, CAT

fraudulently induced CEP to purchase the gensets: (a) by CAT representing on the Spec Sheet that the gensets could deliver 830 ekW continuously; and (b) by Tim Scott representing directly to Fernando Magalhães during the May 2007 Meeting that the C32 gensets would be able to operate continuously to deliver the output required by the PPAs.  CAT did not tell CEP that this was the first time C32s would be used for power generation in continuous mode.  CAT drove the sale of C32s to CEP because it lacked 3516s, but still wanted to make the sale; in fact the sale was "critical" for CAT to compete with Mitsubishi in the new energy investor market.  CEP relied on those representations in making its decision to purchase the gensets.  CAT knew that those representations were false, or at the very least did not know if they were true or false, because it had specific knowledge of "product issues" (defects and failures) the C32s experienced during the development and product testing phase that CAT did not resolve before the C32s went to market.  In the alternative, CAT negligently misrepresented these facts.

B.      **Fraudulent Concealment:** Post-sale, in 2010 and thereafter, CAT fraudulently concealed from CEP the grave and dangerous situation Genrent was facing with identical C32s in an identical power generation application in Brazil.  CAT sent employees from the United States to surreptitiously monitor CEP's gensets for signs of these defects and failures.  CAT did not expect CEP to be experiencing them, yet, because of the low number of hours the machines had run at that time.  Rather than admitting the failings of its product, CAT hid these issues from CEP and others around the world in order to avoid liability and lawsuits.  CAT hoped, but did not know, that a product recall would solve the problem.  CAT misrepresented the reasons behind the recall and the installation of 99 liter oil pans in an attempt to ward off liability. Importantly, CAT was so certain that the C32s could not operate continuously in a power generation application that by 2010 it stopped selling them in South America in an effort to contain its exposure.  Had CEP known the true facts, it would not have begun running the C32s

13

continuously in 2012, and would have avoided millions of dollars of damages caused by the catastrophic failures.

C.      **Fraudulent Misrepresentations Post-Sale:**  Post-sale, in 2011, CEP insisted on a representation from CAT that CEP could change the oil in the gensets every 250 hours (something that had been promised to it by Sotreq, CAT's exclusive dealer, pre-sale).  Under continuing pressure to conceal the problems with the C32, CAT represented that CEP could do so, in writing, in the June 2011 Letter.  CAT knew this representation was false at the time it was made (or alternatively negligently made this representation), because the 250 hour interval was based on tests at Genrent and could only be met "assuming [the engines] don't operate."  CEP relied on this representation by continuing to operate its power plant, and continuing to incur increased oil costs, and was damaged when half of its fleet catastrophically failed and it was passed over by the Government of Brazil for not meeting its energy output requirements.

D.      **Breach of Express Warranty:**  In 2011, CAT warranted in the June 2011 Letter that "[a]fter completing the service updates and repairs on the 144 units installed at the CEP power plant in Natal, the 144 gensets will perform as originally purchased delivering 830 [ekW] in a continuous operation . . . ."  CEP Ex. 34.  Just as CAT had anticipated, that warranty was breached.  In 2012, when CEP began running the gensets continuously with an output of 830 ekW, they catastrophically failed.  Those that did not fail have been derated from 830 ekW to 650-750 ekW to prevent further explosions.

E.      **Breach of Implied Warranty of Fitness for a Particular Purpose:** Pre-sale, CAT knew that CEP intended to use the 144 CAT C32 gensets for a very specific purpose: the generation of electricity for the Government of Brazil through the continuous operation of two power plants located in Macaíba, Brazil with a total installed capacity of 119 MW.  CAT was aware that its representations concerning the capabilities of the gensets were of the utmost importance to CEP.  CAT repeatedly represented both orally and in writing, pre-sale, that the

14

CAT C32 generator sets were fit for this particular purpose, including on the Spec Sheet and at the May 2007 Meeting. CEP relied on CAT's expertise to select the equipment. In fact, it was CAT that chose to quote C32s for CEP's particular application, and CAT that drove the sale of 144 of them to CEP in order to meet CEP's power generation requirements. The gensets are unfit for the particular purpose for which they were intended. When operated continuously to deliver 830 ekW and generate electrical power at CEP's power plants, the specific purpose for which they were intended, they catastrophically fail.

F. **Promissory Estoppel**: CAT made specific promises to CEP that the gensets could run continuously and deliver the electrical output CEP required, including CAT's statements: (a) on the Spec Sheet that the CAT C32 generator sets could run "without varying load for an unlimited time;" and (b) in the June 2011 Letter that "the 144 gensets will perform as originally purchased delivering 830 [ekW] in a continuous operation . . . ." CEP Ex. 34. These promises were false. CAT knew that CEP intended to use the gensets for electrical power generation and CEP relied upon CAT's promises to its detriment.

G. **Revocation of Acceptance:** Section 672.608(1) of the Florida Statutes provides: "The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it: (a) On the reasonable assumption that its nonconformity would be cured and it has been seasonably cured; or (b) Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances." *Frank Griffin Volkswagen, Inc. v. Smith*, 610 So. 2d 597, 599 (1st DCA 1992). Here, CEP's acceptance of the 144 generator sets was reasonably induced by CAT's assurances and it was difficult (if not impossible) to discover the nonconformity before being dispatched to produce continuous power in 2012. The statute by its terms requires either reasonable inducement or difficulty of discovery, but CEP meets both, alternative prongs of the test.

15

**H.  Product Liability:**  The gensets designed and manufactured by CAT are defective and unreasonably dangerous.  CEP used the gensets in exactly the way, pre-sale, that CAT understood they were going to be used.  Nearly half of the fleet of 144 CAT C32 gensets has catastrophically failed, and the remaining gensets have been derated.

**I.  FDUTPA:**  CAT has violated Florida's Deceptive and Unfair Trade Practices Act.  CEP is a consumer under FDUTPA and eligible for its protections.  CAT's sale of the C32 gensets in Florida and its misrepresentations made in Florida regarding the quality and capabilities of the gensets, leading up to and including the June 2011 Letter, qualify as "deceptive" within the meaning of FDUTPA, because the evidence shows that by June 2011, CAT knew that the gensets would catastrophically fail when put to continuous use.

**III.  The Standard on this Motion: CAT May Not Merely Rely on Pleading Inadequacies; It Must Show an Absence of Evidence, or Cite to Evidence in the Record Entitling it to Summary Judgment**

Summary judgment may only be granted "where the evidence is such that it would require a directed verdict for the moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).  To meet this burden, CAT may not merely rely on what it perceives as inadequacies in CEP's pleadings, because the time to make a motion to dismiss has long passed.  Instead, *CAT must show an absence of evidence, or cite to actual evidence* that entitles it to summary judgment.  *See Martinez v. Weyerhaeuser Mortg. Co.*, 959 F. Supp. 1511, 1514 (S.D. Fla. 1996) ("The legal standard when considering a motion for summary judgment differs substantially from that of a motion to dismiss.  Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.  Fed.R.Civ.P.56(c).  The moving party bears the initial burden of showing, *by reference to materials on record*, that there are no genuine issues of material fact to be decided at trial.") (emphasis added); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (moving party must identify portions of the record showing the "absence of

16

a genuine issue of material fact."); *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437-38 (11th Cir. 1991) (movant must either "show . . . that there is an absence of evidence to support the nonmoving party's case," or point to "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial.")  Summary judgment "will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  Material facts are ones that "might affect the outcome of the suit under the governing law." *Id.*  Finally, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  This Court finds that CAT has not sustained its burden with respect to any of CEP's claims.

IV.    **Discussion**

A.    **The Grounds for CAT's Motion**

CAT seeks dismissal of all of CEP's claims by relying on four main arguments: (i) CEP's fraud, negligent misrepresentation, strict product liability and promissory estoppel claims are barred by the economic loss rule (but its express warranty, implied warranty of fitness for a particular purpose, revocation of acceptance and FDUTPA claims are not); (ii) CEP's fraud claims based on the Spec Sheet, Tim Scott's representations at the May 2007 Meeting and the oil change interval representation contained in the June 2011 Letter fail as a matter of law; (iii) CEP's express warranty, implied warranty of fitness for a particular purpose and revocation of acceptance claims are limited by a Limited Warranty that CAT contends applies; and (iv) CEP's oil change and maintenance interval claims are barred by the statute of limitations.  None of these arguments warrants dismissal of CEP's claims.

B.    **CEP's Claims are Not Barred by the Economic Loss Doctrine**

This case comes before this Court not at its outset, on a motion to dismiss, but after nearly two years of discovery.  Thus, this Court does not merely have the allegations in CEP's

Complaint to consider, but a summary judgment record consisting of 141 exhibits and deposition testimony excerpts from 20 different witnesses.  What that record shows is extensive, continual contact between CAT and CEP, both pre- and post-sale.  And this contact is not just regarding the one-off sale of a product to a consumer, but instead involved the selection, sale, supervision of installation and commissioning, inspection, testing, failure analysis, repair, recall and *in situ* reconfiguration of 144 CAT C32 gensets by Caterpillar itself.

This case thus goes far beyond the product liability context and sits squarely in the realm of fraud and negligent misrepresentation.  On the basis of its review of this particular record, this Court finds that CEP has submitted evidence demonstrating that its fraudulent inducement, fraudulent concealment, fraudulent misrepresentation and negligent misrepresentation claims exist separate and apart from its breach of express warranty claim.  As a result, the economic loss doctrine does not warrant dismissal of CEP's claims, under the particular circumstances shown here.

**First: The Court does not agree with CAT that there is no longer a fraud and negligent misrepresentation exception to the economic loss rule in this District.**

In its Motion, CAT stated that "Florida law recognizes an exception to the economic loss rule for intentional torts, such as fraudulent inducement and negligent misrepresentation, but only when the acts giving rise to those claims are independent from the product liability claim." Mot. at 5; *see also* Reply at 1, 7.  However, at oral argument, CAT seemed to be arguing that this exception no longer exists in this District.  *See* Transcript of Motion Hearing dated November 22, 2019 ("Tr.") at 5-6.

Besides the fact that CAT is not permitted to change course so abruptly, the Court finds that CAT's first position more accurately represents the state of the law.  The exception to the economic loss rule for intentional torts exists, provided that the plaintiff's tort claims are not the same as the plaintiff's claims for breach of warranty.

18

The economic loss rule is a "judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses." *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 401 (Fla. 2013). In *Tiara*, the Florida Supreme Court rejected a "Legacy of Unprincipled Expansion" of the rule, and curtailed it so that it now applies only in "cases involving products liability." *Id.* at 407.

Importantly, in *Tiara*, the Florida Supreme Court did not announce a blanket prohibition on all tort claims against a manufacturer in the products liability context. Rather, it specifically noted that "fraudulent inducement, and negligent misrepresentation, or free-standing statutory causes of action" were "exceptions to the economic loss rule" that the Florida Supreme Court "ha[d] developed" under its prior rulings. *Id.* at 406. Then, the Florida Supreme Court did not eliminate those exceptions. Instead, it held that it was only "reced[ing] from [its] prior rulings *to the extent that they have applied the economic loss rule to cases other than products liability.*" (emphasis added). *Id.* at 407. In other words, the rule and its exceptions remain, but are only to be applied to product liability cases.

CAT is correct that neither party has cited a case in this Circuit, post-*Tiara*, where a court has specifically applied the fraud and negligent misrepresentation exceptions in a case involving products liability. But nor, for that matter, has either party cited any case in this Circuit where a court has definitively held that those exceptions no longer exist in that context. Rather, each case involved a motion to dismiss, not a motion for summary judgment, and each court thus reviewed only the plaintiff's allegations in that particular case and concluded on the basis of those allegations that the exception did not apply. *See, e.g., Burns v. Winnebago Indus.*, No. 8:13-cv-1427-T-24MAP, 2013 WL 4437246, at *3, *4 (M.D. Fla. 2013) (stating that "it is unclear whether the *Tiara* decision affects the viability of these exceptions when negligent misrepresentation and fraudulent inducement claims are made in the product liability context" and that "the Court concludes that *under the facts alleged*, the exceptions under the economic

19

loss rule for fraudulent inducement and negligent misrepresentation do not apply.") (emphasis added); *Aprigliano v. American Honda Motor Co.*, 979 F. Supp. 2d 1331, 1337 (S.D. Fla. 2013)[3] ("*Usually* claims for negligent misrepresentation are barred by the economic loss rule where, as here, there are claims for breach of warranty alongside tort claims and the allegations contained in both are similar.") (emphasis added); *Id.* at 1343 ("Plaintiffs plead facts regarding the existence of a defect in the GL 1800's transmission, but *fail to plead facts sufficient to establish Honda's knowledge and concealment of the defect*.") (emphasis added); *see also Cardenas v. Toyota Motor Corp.*, No. 18-22798-CIV-MORENO, 2019 WL 4777891, at *7 (S.D. Fla. Sept. 30, 2019) (dismissing fraud and fraudulent concealment claims based on the allegations in that case, in which lead plaintiff "*allege[d]* precisely what his breach of warranty claim allege[d]— that his Toyota Camry did not work as promised," without addressing whether exceptions to the economic loss rule for fraud-based claims could exist in other circumstances); *Thompson v. Proctor and Gamble Co.*, No. 18-cv-60107-GAYLES/SELTZER, 2018 WL 5113052, at *3 (S.D. Fla. Oct. 19, 2018) (acknowledging that *Tiara* has "created confusion" about whether exceptions to the economic loss rule still survive, and dismissing negligent misrepresentation claim because plaintiff essentially alleged that the defendant's product failed to conform to its label); *Vazquez v. General Motors, LLC*, No. 17-22209-CIV-GAYLES, 2018 WL 447644, at *5 (S.D. Fla. Jan. 16, 2018) (dismissing fraudulent concealment claim where plaintiff alleged only economic losses based on defect to General Motors's Corvette Z06 and concluding that the Florida Supreme Court "did not intend to allow *such* products liability claims to survive") (emphasis added) (internal quotation marks omitted); *Koski v. Carrier Corp.*, 347 F. Supp. 3d 1185, 1198 (S.D.

---

[3] We note that *Aprigliano* states in dicta that *Burns* held that "the exceptions to the economic loss rule for fraudulent inducement and negligent misrepresentation did not apply in the products liability context post-*Tiara* . . . ." *Aprigliano*, 979 F. Supp. 2d at 1338. Respectfully, *Burns* did not so hold, rather it held that the application of the exception post-*Tiara* was "unclear." *Burns*, 2013 WL 4437246, at *3.

Fla. Aug. 18, 2017) ("In light of the *Tiara* decision, courts have noted that the viability of the

negligent misrepresentation exception to the economic loss rule is unsettled."); *Id.* (holding that

"[h]ere, the allegations supporting the fraudulent concealment claim are the same as those

supporting all of Plaintiff's claims" and therefore should be dismissed); *Tyman v. Pfizer, Inc.*,

No. 16-cv-06941, 2017 WL 6988936, at *18 (S.D.N.Y. Dec. 27, 2017) (explaining that "after

*Tiara*, claims for negligent misrepresentation are *usually* barred by the economic loss rule where,

as here, there are claims for breach of warranty alongside tort claims and the allegations

contained in both are similar") (emphasis added); *Melton v. Century Arms, Inc.*, 243 F. Supp. 3d

1290, 1301, 1302 (S.D. Fla. Mar. 30, 2017) (dismissing tort claims because they "pertain[ed]

only to the quality of [the defendant's] products" and agreeing that "*[u]sually* claims for

negligent misrepresentation are barred by the economic loss rule where, as here, there are claims

for breach of warranty alongside tort claims and the allegations contained in both are similar")

(emphasis added); *Monsoon, Inc. v. Bizjet Int'l Sales & Support, Inc.*, No. 16-80722-CIV-

MARRA/MATTHEWMAN, 2017 WL 747555, at *8-10 (S.D. Fla. Feb. 27, 2017) (granting

motion to dismiss gross negligence claim under economic loss doctrine in breach of contract case

because plaintiff's allegations with respect to the gross negligence claim "concern[ed] the heart

of the parties' agreement" and did not allege any independent duties sufficient to give rise to a

separate tort claim); *Callaway Marine Technologies, Inc. v. Tetra Tech, Inc.*, No. 16-cv-20855,

2016 WL 7407769, at *4 (S.D. Fla. Dec. 22, 2016) (dismissing the plaintiff's fraudulent

concealment claims for failure to allege conduct "independent of a breach of contract amounting

to an independent tort" where each of the allegedly fraudulent statements was "later

memorialized in the Subcontract"); *WW Sports Importadora Exportadora e Comercial LTDA v.

BPI Sports, LLC*, No. 0:16-cv-60147-WPD, 2016 WL 9375202, at *4 (S.D. Fla. 2016) (agreeing

with other district courts that had decided post-*Tiara* that "Florida's Supreme Court did not

intend to allow fraudulent inducement and negligent misrepresentation claims to go forward

21

where they are asserted in conjunction with a warranty claim *premised on the same allegations*"

and dismissing fraudulent and negligent misrepresentation claims on that basis) (emphasis

added); *In re Takata Airbag Products Liability Litigation*, 193 F. Supp. 3d 1324, 1339 (S.D. Fla.

2016) (concluding the economic loss rule applied to a consumer's fraudulent concealment claims

against a retailer that allege "precisely what a breach of warranty claim would allege," *i.e.*, "the

product did not work as promised," and the economic loss rule "usually" bars claims for

"negligent misrepresentation where there are claims of breach of warranty alongside tort claims

and the allegations contained in both are similar").

Perhaps *Thermoset Corp. v. Building Materials Corp. of Am.*, No. 14-60268-CIV-

COHN/SELTZER, 2014 WL 11775929, at *4 (S.D. Fla. June 4, 2014) best sums up the post-

*Tiara* state of the fraud and negligent misrepresentation exception in this Circuit: that there is no

definitive decision on whether the exception remains, and that in the meantime where courts

have decided not to apply the exception, that decision has been based on the specific allegations

pled in the Plaintiff's complaint before them on the defendant's motion to dismiss:

> The viability of the exceptions to the rule post-*Tiara*, however, is unsettled . . . .The
> two courts to address the question [*Burns* and *Aprigliano*] have rejected the
> exception, but have limited their holdings to the facts before them . . . .Without
> determining that the negligent misrepresentation exception could *never* apply in a
> products liability case, the *Burns* court rejected the exception in the case before it .
> . . .The *Aprigliano* court endorsed the reasoning of *Burns*, finding that to permit
> negligent misrepresentation claims *on the facts before it* [would circumvent the
> economic loss rule].
>
> *Id.* (emphasis added).

 Both parties cite post-*Tiara* cases decided outside of this Circuit, but under Florida law.

This Court finds the reasoning of two of them, *Miller v. Samsung Elecs. Am. Inc.*, No. 14-cv-

4076, 2015 WL 3965608, at *10 (D.N.J. June 29, 2015) and *In re MyFord Touch*, 46 F. Supp. 3d

936, 965 (N.D. Cal. 2014) to be persuasive on this issue of the viability of the fraud and

negligent misrepresentation exceptions.  In *Miller*, the Court held that the plaintiff's fraud claim

based on a manufacturer's representation in the specifications for its laptop that a port had
"Super Speed," was not barred by *Tiara*, distinguishing *Burns* and *Aprigliano* as being limited
only to the facts pled in those cases.  *Miller*, 2015 WL 3965608, at *9-10.  Similarly, the Court in
*MyFord Touch* relied on the exceptions noted in *Tiara* and sustained the plaintiff's fraud claim
based on the allegation that Ford knew its systems were defective at the time of sale,
distinguishing *Burns* as limited to the facts pled.  *In re MyFord Touch*, 46 F. Supp. 3d at 965
("[Burns] made no ruling that all claims for fraud are necessarily barred by the rule.").

 Moreover, CEP has cited numerous cases inside this Circuit, post-*Tiara*, recognizing the
exception in other contexts.  In *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238
(Fla. 1996) the Florida Supreme Court held that "fraud in the inducement is an independent tort
and is not barred by the economic loss rule."  *Id.* at 1240.  The *Tiara* decision did not explicitly,
or implicitly, do away with the fraud exception to the economic loss rule.  *See, e.g.*, *Fed. Deposit
Ins. Co. v. Lennar Corp.*, No. 12-cv-595, 2014 WL 201663, at *7 (M.D. Fla. Jan. 1, 2014) (citing
*Tiara* and holding "the economic loss rule historically has never barred traditional tort claims
such as . . . fraud"); *Fed. Deposit Ins. Co. v. Pearl*, No. 12-cv-1813, 2013 WL 1405941, at *5
(M.D. Fla. Apr. 8, 2013) (noting that Tiara "drastically curtailed" the application of the
economic loss rule and that economic loss rule never barred traditional tort claims such as
negligent misrepresentation or fraud); *Appleton Prods., Inc. v. Auto Sport Grp., Inc.*, No. 9:18-
CV-81435, 2018 WL 7287158, at *3 (S.D. Fla. Dec. 26, 2018) (citing *Tiara* and holding
"fraudulent inducement is an independent tort in that it requires proof of facts separate and
distinct from the breach of contract"); *CCA Bahamas Ltd. v. Conquest Fin. Mgmt. Corp.*, No.
1:17-CV-22437-KMM, 2017 WL 10846263, at *2 (S.D. Fla. Nov. 28, 2017) (citing *Tiara* and
holding "a misrepresentation made before the contract's execution is distinct from any
subsequent breach of that contract"); *Michael Shane Enterprises, LLC v. Courtroom Connect
LLC*, No. 16-CV-80881, 2017 WL 3025980, at *8 (S.D. Fla. Mar. 21, 2017) (citing *Tiara* and

holding that in assessing whether fraud is a distinct claim "the critical inquiry focuses on whether the alleged fraud is separate from the performance of the contract").

In sum, the statement of the law that CAT made at argument is too broad. The exceptions to the economic loss rule were *not* specifically abolished by the *Tiara* Court or any other court in this Circuit.

**Second: The exceptions apply here.** Turning next to whether the fraud and negligent misrepresentation exceptions to the economic loss rule apply here, this Court finds that they do.

Courts in this Circuit uniformly agree, post-*Tiara*, that at the motion to dismiss stage a plaintiff may not maintain a fraud or negligent misrepresentation claim, in a case involving products liability, if that claim *alleges* "precisely what a breach of warranty claim would *allege*—namely that the [product] did not work as promised." *In re Takata*, 193 F. Supp. 3d at 1339 (emphasis added).

Again, this is a motion for summary judgment brought after the close of nearly two years of extensive discovery. The Court thus looks beyond the wording of CEP's allegations in its Complaint, and finds that CEP has submitted sufficient evidence to raise genuine issues of material fact as to whether CAT committed fraud in the inducement, negligent misrepresentation, fraudulent concealment and fraudulent misrepresentation.[4] The Court further finds that these claims are not precisely the same as CEP's breach of warranty claim.

CEP has presented evidence of the following very specific circumstances over the course of its dealings with CAT:

- In late 2006, into 2007, CAT drove the sale of C32s to CEP because it lacked 3516s, but still wanted to make the sale; in fact, doing so was "critical" to its business;

- CAT did not tell CEP that it was CAT's first customer for the use of C32s in this application;

- CAT repeatedly assured CEP pre-sale (in 2006 and 2007), that the C32s would

---

[4] *See infra* at 28, holding that CAT's argument that CEP's tort claims fail on their merits is unavailing.

deliver 830 ekW continuously, when it had specific knowledge to the contrary based on "product issues" experienced during the development phase;

- Post-sale (in 2010), when serious problems developed at Genrent, CAT omitted to tell CEP that it was in the "risk group" for dangerous engine explosions and instead surreptitiously monitored CEP's gensets for signs of the failures it knew would come when CEP began operating them continuously;

- In 2010, CAT also misrepresented the reasons behind the piston pack "product update" and the installation of 99 liter oil pans in an attempt to ward off liability;

- In 2011, CAT misrepresented to CEP that it could change the oil in the gensets every 250 hours; at that time, CAT knew that this oil change interval could only be met if the gensets did not run; and

- CAT failed to tell CEP that by April of 2010 the failures of C32s at Genrent were so serious that it had decided not to sell C32s in continuous mode anymore.[5]

CEP's breach of warranty claims are also very specific, and entirely different:

- CEP's breach of express warranty claim is that in 2011, post-sale, CAT provided CEP with a written warranty that "[a]fter completing the service updates and repairs on the 144 units installed at the CEP power plant in Natal, the 144 gensets will perform as originally purchased delivering 830 [ekW] in a continuous operation . . . ." That warranty was breached in 2012, when CEP began running the gensets continuously with an output of 830 ekW, and they catastrophically failed. Those that did not fail have been derated from 830 ekW to 650-750 ekW to prevent further explosions.

- CEP's breach of implied warranty of fitness for a particular purpose is that, pre-sale, CAT knew that CEP intended to use the 144 CAT C32 gensets for a very specific purpose: the generation of electricity for the Government of Brazil through the continuous operation of two power plants located in Macaíba, Brazil with a total installed capacity of 119 MW. CAT was aware that its representations concerning the capabilities of the gensets were of the utmost importance to CEP. CAT repeatedly represented both orally and in writing, pre-sale, that the CAT C32 generator sets were fit for this particular purpose, including on the Spec Sheet and at the May 2007 Meeting. CEP relied on CAT's expertise to select the equipment. In fact, it was CAT that chose to quote C32s for CEP's particular application. When operated for the specific purpose for which they were intended, they catastrophically fail.

In sum, and in contrast to all of the motion to dismiss cases cited above where the

exception was not applied, neither CEP's fraud and negligent misrepresentation claims, nor its

breach of warranty claims for that matter, merely allege that a product did not work as promised.

In the cases cited by CAT, the plaintiffs (individually and often also on behalf of a putative class

---

[5] In addition, as CAT's agent, Sotreq made pre-sale false or negligent representations to CEP regarding the oil change and overhaul intervals; a mistake that has cost CEP millions of dollars in oil, labor and unproductive downtime and has nothing to do with any product liability claim.

of other consumers who bought the product) had no contact whatsoever with the manufacturer at any time.[6]  With no representations ever made specifically to them, and no injury to their person or property, they attempted to plead around the economic loss rule by alleging that they were fraudulently induced to purchase the product by some statement on its label or in its advertising, or that the manufacturer fraudulently or negligently concealed from them, pre-sale, that its product would not meet their expectations.

This is not one of those cases.  As a result, these claims satisfy the exception to the economic loss rule and may proceed to trial.

**Third: CAT's remaining economic loss rule arguments do not warrant dismissal of CEP's claims.**

CEP's promissory estoppel claims are not subject to the economic loss rule because a promissory estoppel claim sounds in quasi-contract, not tort.  *Mobil Oil Corp. v. Dade County Esoil Management Co., Inc*., 982 F. Supp. 873, 880-881 (S.D. Fla. 1997) (holding that the economic loss doctrine is inapplicable to unjust enrichment and promissory estoppel).

CAT also argues that CEP's promissory estoppel claim cannot stand where "the parties have a written contract addressing the relevant issue."  Mot. at 13.  But CAT also argues that

---

[6] At oral argument, counsel for CAT argued that one of the cases it cited in its Supplemental Authorities, *WW Sports Importadora Exportadora e Comercial LTDA v. BPI Sports, LLC*, No. 0:16-cv-60147-WPD, 2016 WL 9375202, at *2 (S.D. Fla. Aug. 10, 2016), *did* involve pre-sale contact between the buyer and the manufacturer.  Tr. at 49.  That is incorrect.  In that case, the plaintiff (WW Sports) entered into an agreement with defendant BPI Sports to distribute a beef protein product that BPI developed and produced. Another defendant, Hi-Tech, manufactured and labeled the product under BPI's direction. Due to a misstatement on the product label, WW Sports had to recall and destroy the product.  *Id.* at *2.  It sued both BPI and Hi-Tech for breach of express warranty, fraudulent misrepresentation, negligent misrepresentation and other claims. *Id.* at *2.  While there may have been pre-sale communications between the plaintiff and BPI, it was *Hi-Tech*, not BPI, that moved to dismiss the fraudulent and negligent misrepresentation claims against it as barred by the economic loss doctrine.  *Id.* at *3–4.  Nowhere in the opinion does it state that there were any pre-sale communications between Hi-Tech (the movant) and plaintiff WW Sports.

there is no contract, and no privity whatsoever between CEP and CAT.  *Id.* at 23.  CAT cannot

have it both ways, and there is no written contract between CAT and CEP addressing all of these

issues.

Moreover, the June 2011 Letter is not "too indefinite," as CAT maintains, instead it is

very specific.  The June 2011 Letter, CAT's "official technical response and commitment" states

that the service updates and installation of a 99 liter capacity oil pan "will result in a 250 hour oil

change interval" and states unequivocally that "[a]fter completing the service updates and repairs

on the 144 units installed at the CEP power plant" the C32s "will perform as originally

purchased delivering 830 ekVA (sic) in a continuous operation."  There is nothing indefinite

about that.[7]

Finally, CAT's argument that the strict liability claim fails because the gensets are not

unreasonably dangerous is rejected.  The evidence in the record shows that over 60 of CEP's

generator sets catastrophically failed, many by way of a crankcase explosion that hurls shrapnel

into the air and leaves behind a gaping hole.  CF 25; CEP Ex. 60.  Workers use bulletproof

screens to protect themselves when they work near an operating genset.  CEP Ex. 19 at 142:23-

143:14; Ex. 44 at 257:25-260:17.  It is hard to imagine a more unreasonably dangerous product.

For its evidence on this point, CAT points only to the fact that CEP "admits that the Gensets ran

continuously in the beginning."  That is only true if, by in the beginning, CAT means for the first

70 hours.  Compl. ¶¶ 73-93.  And even in that short time, they exhibited numerous admitted

---

[7] CAT's cases are readily distinguishable.  *See Vencor Hosps. v. Blue Cross Blue Shield of Rhode Island*, 284 F.3d 1174, 1176-1186 (11th Cir. 2002) (plaintiff sought to enforce alleged promise from insurer to pay for care only on alleged statement that patients were "covered," without reference to cost or coverage limits).  *Id.* at 1184-1185; *Am. Coach Lines of Orlando, Inc. v. N. Am. Bus Indus., Inc.*, No. 09-cv-1999, 2010 WL 3958692, at *13 (M.D. Fla. Oct. 8, 2010) (promises plaintiff sought to enforce were that defendants "would help" and "would resolve the issues.").  Here, CAT promised exactly what it would do and when it would do it.

product defects.  CAT also presumably agrees that they were never intended to explode.  CAT has no evidence warranting the dismissal of CEP's product liability claim on the ground that the C32s are not unreasonably dangerous.

### C.   CEP's Fraud Claims Based on the Spec Sheet, the May 2007 Meeting and the June 2011 Letter Do Not "Fail on Their Merits"

This Court rejects CAT's argument that CEP's fraud claims with respect to the Spec Sheet, the May 2007 Meeting and the June 2011 Letter fail.  Whether the Spec Sheet is true, because it is based on CAT's product development data (Mot. at 8-9) is at the very least an issue of fact, where discovery has shown that pre-launch testing revealed numerous product issues that later emerged in CEP's gensets and others around the world.  CF 16, 26.  CEP has also introduced evidence of over 60 catastrophic failures at its site and more at Genrent, and four expert opinions regarding those gensets' capabilities.

As for the May 2007 Meeting, the statements CEP alleges Tim Scott made (that the C32 gensets would be able to operate continuously with the total power outputs required by the PPAs) were about very specific facts, not opinion.  They were intended to allay CEP's concerns, and to convince CEP to purchase the gensets, something that was "critical" to CAT in order to remain competitive with Mitsubishi.  CAT's argument that these statements, regarding the specific capability of the engines to perform, should be dismissed because they concern future events (Mot. at 9) is rejected because it would nullify any fraud claim based on pre-sale representations against any manufacturer, in that the product would always fail, if at all, sometime in the future.[8]

---

[8] CAT's case *Vance v. Indian Hammock Hunt & Riding Club, Ltd.*, 403 So. 2d 1367, 1371-72 (Fla. 4th DCA 1981), held that representations about "improvements which were to be made in the future" to a plot of land were not actionable, but those improvements clearly did not exist at the time of the representations.  The ability of a product to meet specifications is not a promise to do something in the future.  *See W. Coast Roofing & Waterproofing, Inc. v. Johns Manville*, No. 07-13421, 2008 WL 2845215, at *88-89 (11th Cir. July 24, 2008) (reversing dismissal of

CAT also argues that Scott's representations at the May 2007 Meeting cannot support a fraud or negligent misrepresentation claim because the gensets' ratings, technical specifications and maintenance intervals "were covered by the TEP-Sotreq Contract and the CEP-Marcosa Contract." Mot. at 9.  But the cases CAT cites in support of this point (*id.* at 9-10) all stand for the black-letter proposition that a party cannot recover in fraud for alleged misrepresentations that are expressly contradicted by a later written agreement.  Thus, for example, a plaintiff cannot claim fraud based on a defendant's representation that the plaintiff's agreement would be for a 12-year term, when the plaintiff later signed an agreement unambiguously providing for a 4-year term.  *See Rosa v. Amoco Oil Co.*, 262 F. Supp. 2d 1364, 1367 (S.D. Fla. 2003).  This is distinguishable from CEP's claims—the Sotreq and Marcosa agreements confirmed, not contradicted, the representations Scott made to TEP.  CF 11.  Thus, CEP was not on notice of any discrepancy between Scott's statements and the written agreements with Sotreq and Marcosa, unlike the claimants in the cases cited by CAT.  Mot. at 9-10.

As for the June 2011 Letter, CAT focuses on whether Mark Smalley believed the statements to be true or false.  But CEP's claim is against CAT, and it is CAT's corporate knowledge that is relevant, not Smalley's.  *See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 655-664, 684-692 (6th Cir. 2005) (reversing dismissal against tire manufacturer because lawsuits, "higher rates of problems," settlements, internal investigations and product recalls could be imputed to corporation to satisfy corporate scienter, and knowledge of employee who oversaw investigation could be imputed to corporation regarding reckless material omission in annual report) ("[K]nowledge of a corporate officer or agent acting within the scope of [his] authority is attributable to the corporation.").  Similarly, it does not matter that the June 2011 Letter is addressed to Sotreq, not CEP, when CAT's 30(b)(6) witness (Smalley)

---

plaintiff's fraud claim where manufacturer made representation that roofing system complied with a certain standard and would withstand a specific amount of uplift pressure).

testified that the June 2011 Letter concerned CEP's C32s (in fact, the June 2011 Letter says that) and that it was intended to reach CEP.  CF 62.

Moreover, CEP has submitted evidence showing that Smalley *did* know that his statement in the June 2011 Letter that CEP could change the oil every 250 hours was false when he made it.  At the same time he made that representation, he also made a note that the 250 hour interval could only be reached "assuming [the engines] don't operate."  CEP Ex. 39 at CAT916113.

CEP has raised enough evidence to get to the jury on these claims.  *Dantzler, Inc. v. PNC Bank*, 946 F. Supp. 2d 1344, 1359 (S.D. Fla. 2013) (fraud and negligent misrepresentation ordinarily present issues of fact); *Tew v. Chase Manhattan Bank, N.A.*, 728 F. Supp. 1551, 1555 (S.D. Fla. 1990) ("[c]ertain issues such as fraud, intent, and knowledge lend themselves to trial, rather than summary judgment."); *State Farm Mut. Auto. Ins. Co. v. Weiss*, 410 F. Supp. 2d 1146, 1159 (M.D. Fla. 2006) ("Generally, the issue of fraud is not properly the subject of summary judgment, because a resolution of the issues involved requires an exploration of the relevant facts and circumstances, and thus a court can seldom determine the presence of fraud absent a trial or evidentiary hearing.").[9]

> ### D.  CEP's Express Warranty, Implied Warranty of Fitness for a Particular Purpose and Revocation of Acceptance Claims are Not Limited by the Warranty that CAT Contends Applies
>
> #### 1.  CAT Has Not Submitted Any Evidence that CEP Received or Agreed to CAT's Limited Warranty

CAT argues that a limited warranty was "provided with and signed with the contract in this case."  Tr. at 4.  But CAT has submitted no evidence on its Motion that any such limited

---

[9] *Companhia de Elaborados de Café v. Cardinal Capital Mgmt., Inc.*, 401 F. Supp. 2d 1270, 1275 (S.D. Fla 2003) is also distinguishable.  In that case, plaintiff failed to meet its burden because it did not "present any proof concerning the essential elements of [its] claims" or any "material disputed facts in opposition to the motion."  That is clearly not the case here.

warranty was ever provided to CEP or agreed to by CEP at any time.  In fact, CEP points out that Magalhães testified at his deposition that he did not receive any such warranty with the contract. CEP Ex. 4 at 188:24-189-1.  As such, there is at least an issue of fact regarding this issue.

This Court also finds that CAT has not submitted a complete, authenticated copy of the TEP-Sotreq Contract that it claims includes the limited warranty it is relying on.  What CAT has submitted instead is a document CAT's counsel put together, using pages produced hundreds of thousands of bates numbers apart, that was not authenticated by any witness.  *See* CF ¶ 14.

This Court notes that even at oral argument when CAT's counsel argued that "every version of the Caterpillar limited warranty identified in this case contains identical operative language" counsel noted that "*someone* initialed these corners of the contract."  Tr. at 12, 14. Counsel did not and could not identify who that *someone* was, because that fact was never adduced during discovery or submitted on CAT's Motion.

CAT attempts to overcome CEP's objection by noting that in a particular answer to an interrogatory, CEP says that it received "Appendix I," which CAT says is the limited warranty it is relying on.  But in that same interrogatory answer, CEP identified two other warranty documents it received, and in its Counter-Statement of Material Facts, CEP identified no fewer than four different versions of warranty documents it received through the years.  CF 47.

Moreover, *CAT's* interrogatory responses contradict *CAT's* position on this Motion. CAT was asked to "[i]dentify all warranties covering any application or use of CAT C32 Diesel Generator Sets and/or CAT C32 Diesel Engines from January 1, 2004 to present."  CAT Ex. 33, Interr. No. 21.  In response, CAT identified "2 warranties Caterpillar previously produced," one numbered "SELF5419," for two engines sold to CEP, and one numbered "SELF5440" for the remaining 142.  *Id.*  CAT did not identify "SPLF5405" at all, the limited warranty it now seeks to rely on for this Motion.  CF 27; CAT Ex. 33.  In fact, when CAT moved to dismiss this case

under the doctrine of *forum non conveniens*, it submitted on reply a version of the TEP-Sotreq

Contract that did not include any limited warranty document at all.  [ECF Nos. 45, 46].

In sum, pursuant to Rule 56(c)(2), CEP has validly objected that the "fact" that CAT

issued limited warranty "SPLF5405" to CEP because it is not supported by admissible evidence

and cannot be considered by this Court.

### 2.    Even If It Were Admissible, the Limited Warranty Does Not Undercut CEP's Breach of Warranty Claims

Even if this Court were to consider the unauthenticated limited warranty document that

CAT has attempted to submit, it would not bar CEP's breach of warranty claims here.

CEP argues that even if CAT provided CEP with a limited warranty at the time of sale,

that warranty was modified and superceded by the express warranty CAT provided to CEP in the

June 2011 Letter, that the Gensets would deliver "830 [ekW] in a continuous operation" once the

product recall was completed.  *See* Complaint ¶ 119 & Ex. B.; CEP Ex. 34; CEP Ex. 45, 128:2-

23.  The Court agrees.  Under Florida law, express warranties are enforceable despite the

existence of earlier limited warranties.  *See, e.g.*, *Premix-Marbletite Mfg. Corp. v. SKW Chems.,*

*Inc.*, 145 F. Supp. 2d 1348, 1352 (S.D. Fla. 2001) (plaintiff buyer's express warranty claims

survived summary judgment even though it was undisputed that defendant manufacturer alleged

it provided a limited warranty "disclaim[ing] all other warranties whether express or implied.");

*New Nautical Coatings, Inc. v. Scoggin*, 731 So. 2d 145, 146-147 (Fla. 4th DCA 1999)

(affirming breach of express warranty under § 672.313 despite written disclaimer of other

warranties).

CAT next argues that CEP's breach of express warranty claim fails because of a lack of

privity of contract, but that argument fails.  First, there is no privity requirement for such express

warranties.  *Bohlke v. Shearer's Foods*, *LLC*, No. 14-cv-80727, 2015 WL 249418, at *10 (S.D.

Fla. Jan. 20, 2015) (holding that privity with the manufacturer not necessary under Fla. Stat.

672.313); *Smith v. Wm Wrigley Jr. Co.*, 663 F. Supp. 2d 1336, 1341-1343 (S.D. Fla. 2009) (privity with manufacturer not necessary for breach of warranty claim); *Morano v. BMW of N. Am., LLC*, 928 F. Supp. 2d 826, 835 (D.N.J. 2013) (same).

In any event, the extensive involvement between CAT and CEP here would satisfy that requirement. *Carnival Corp. v. Rolls Royce PLC*, No. 08-cv-23318, 2009 WL 3861450, at *3 (S.D. Fla. 2009) (manufacturer's pre-purchase contacts with buyer were sufficient to establish privity in absence of direct purchase where there were extensive negotiations between the manufacturer and owner regarding the propulsion system of the Queen Mary 2); *Cedars of Lebanon Hospital Corp. v. European X-Ray*, 444 So.2d 1068, 1070 (3rd DCA 1984) ("It seems fundamentally unfair and anomalous in the extreme to allow the manufacturer to hide behind the doctrine of privity when the product, which it induced the purchaser to buy, turns out to be worthless.")  Here, any privity requirement is satisfied by the pre-sale, post-sale and pre-June 2011 Letter contact between CEP and CAT.  CAT's motion to dismiss CEP's express warranty claim based on the June 2011 Letter is therefore denied.

CEP's implied warranty claim is that the gensets were not fit for a particular purpose, to generate a specified amount of electricity continuously in power plants in Brazil, and that CAT knew TEP was buying them for that very purpose.  CEP has established breach of this implied warranty and injury.  CF 69; CEP Ex. 42 at 98-101; CEP Ex. 20 ¶¶ 19, 23-27, 58-60; CEP Ex. 43 at 88-99.  For the same reasons as stated above, no limitation language in a factory warranty could apply.  CAT's other argument, that privity is required in order to make an implied warranty claim, is incorrect.  Where the manufacturer has direct, pre-sale contact with the buyer, an implied warranty of fitness for a particular purpose is created, even though the buyer purchased the product from a dealer.  *See, e.g.*, *Carnival Corp. v. Rolls-Royce PLC*, No. 08-cv-23318, 2009 WL 3861450, at *3 (S.D. Fla. Nov. 17, 2009) (manufacturer's pre-purchase contacts with buyer were sufficient to establish privity in absence of direct purchase); *Cedars of*

*Lebanon Hosp. Corp. v. European X-Ray Distribs. of Am., Inc.*, 444 So. 2d 1068, 1072 (Fla. 3d DCA 1984) (same).

CAT argues that the limited warranty also bars CEP's claim for revocation of acceptance. But the cases CAT cites all involve a limited warranty that specifically disclaims revocation of acceptance. *See, e.g., McKissic v. Country Coach, Inc.*, No. 07-cv-1488, 2009 WL 500502, at *1, *7 (M.D. Fla. 2009) (quoting limited warranty language as waiving remedies including "Revocation of Acceptance" and so holding that under UCC 672.719(a) "Plaintiff surrendered the right to revoke acceptance"); *Ames v. Winnebago Indus., Inc.*, No. 04-cv-359OC10GRJ, 2005 WL 2614614, at *2 (M.D. Fla. 2005) (limited warranty expressly disclaimed revocation of acceptance); *Chmura, v. Monaco Coach Corp.*, No. 04-cv-2054-T-24MAP, 2006 WL 709325, at *2 (M.D. Fla. 2006) (same). Here, CAT's purported limited warranty does not refer in any way to revocation of acceptance. *See* CAT Ex. 7. Thus, all the above cited cases are inapplicable to the facts presented here and do not provide a basis to dismiss CEP's revocation of acceptance claim under Florida law.[10]

### E.    CEP's Claims are Not Barred by the Statute of Limitations

#### 1.    CEP's Tort and Promissory Estoppel Claims are Not Time-Barred

CAT asserts that CEP's actions for fraud, negligent misrepresentation, strict liability, and promissory estoppel are barred under the applicable four-year statute of limitations. Mot. at 15-16 (citing Fl. Stat. § 95.11(3)(j)). Importantly, CAT points to only on two of the misrepresentations CEP relies on in this case: that the oil could be changed every 250 hours, and

---

[10] CAT's case *McCormick Machinery, Inc. v. Julian E. Johnson & Sons, Inc.*, 523 So. 2d 651 (1ˢᵗ DCA 1988) is inapposite. That case concerns the "no warranty" sale of a used bulldozer where the Court reversed the lower court's finding in favor of revocation of acceptance, but solely on the basis that the used bulldozer could not have been "nonconforming" because there was no standard for it to conform to. CAT has not challenged, with admissible evidence, that there was no standard for the C32s to conform to.

that the overhaul interval was 7500 hours, not 4500 hours.[11]  *Id.*  CAT argues that CEP should have been aware of the falsity of these statements when it received the OMM Manual in June 2008, because, CAT contends, the OMM provided the "proper information regarding oil change and overhaul intervals."  *Id.* at 16.  CAT also points to an email from Marcosa that CAT says recommended an oil change interval of 19,000 liters of fuel burn or 250 operating hours, whichever comes first, as stated in the Manual. *Id.*

Regarding the oil change intervals, CAT appears to have misunderstood CEP's claim. CEP is claiming that in 2011, specifically in the June 2011 Letter, CAT represented to CEP that it could change the oil in the gensets every 250 hours.  Opp. at 16.  CEP contends that CAT knew this representation was false at the time it was made, because it was based on information collected at Genrent, and CAT noted that this 250 hour interval could only be met if the engines did not operate.  *See* Opp. at 16; CEP Ex. 39 at CAT916113.  CEP filed its Complaint in November 2014, within 4 years of that statement having been made, and therefore the claim cannot be time barred.

Regarding the overhaul intervals, CAT claims that the correct information was in the OMM.  But the Manual does not refer to specific overhaul intervals.  CAT Ex. 26.  CAT also claims that CEP knew the correct information (4500 hours) in September 2010, citing CEP Meeting Minutes (CAT Ex. 29).  But those Meeting Minutes also say nothing about the overhaul interval.  Finally, CEP has submitted evidence that it did not learn of the overhaul intervals until January 2013, less than four years before it filed suit.  CEP Ex. 40.  The Court finds that CEP's overhaul interval claim is timely, or at the very least, there is an issue of fact as to when CEP learned the correct information.

---

[11] Specifically, CAT claims that it never made any representation to TEP about the proper oil change and overhaul intervals prior to the gensets' sale and that any such representations were made by Sotreq.[11]

Moving beyond the oil change and maintenance interval representations, all of CEP's other claims for fraud, negligent misrepresentation, strict liability, and promissory estoppel are timely.  All are subject to four-year statutes of limitations.  *See* Fl. Stat. § 95.11(3)(c), (j), (k); *Servicios de Almacen Fiscal Zona Franca Y Mandatos S.A. v. Ryder Int'l*, 264 Fed. Appx. 878, 881 (11th Cir. 2008) (stating promissory estoppel is an "'equitable action on a contract, obligation, or liability not founded on a written instrument'") (citing Fl. Stat. § 95.11(3)(k)); *Mayor's Jewelers, Inc. v. Barry N. Meyrowitz & Meyrowitz, Inc.*, No. 12-80055-CIV-COHN/SELTZER, 2012 U.S. Dist. LEXIS 85186, at *12 (S.D. Fla. June 20, 2012) (negligent misrepresentation claims sound in fraud and are subject to the same four-year statute of limitations).

Under Florida law, CEP had no claims based on any misrepresentations until it accrued damages as a result.  *See Jones v. Childers*, 18 F.3d 899, 906 (11th Cir. 1994) (statute of limitations begins to accrue once plaintiff discovers or should have discovered the "existence of [its] cause of action."); *Lyle v. Nat'l Sav. Life Ins. Co.*, 558 So. 2d 1047, 1048 (Fla. 1st DCA 1990) (damages are "an essential element" of fraud); *GEICO Gen. Ins. Co. v. Hoy*, 136 So. 3d 647 (Fla. 2d DCA 2013) (fraud without damage does not "constitute a good cause of action"); *Sciaretta v. Lincoln Nat'l Life Ins. Co.*, 899 F. Supp. 2d 1318, 1330 (S.D. Fla. 2012) (injury is essential element of negligent misrepresentation); *Alpha Data Corp. v. HX5, LLC*, 139 So. 3d 907, 910 (Fla. 1st DCA 2013) (at trial appellant would have to "prove how it was damaged" for promissory estoppel claim); *Pioneer Nat'l Title Ins. Co. v. Andrews*, 652 F.2d 439, 442 (5th Cir. 1981) ("[T]he Florida statute of limitations begins to run not upon the discovery of a potential cause of action, but only upon the discovery of an existing cause of action."); Fla. Stat. § 95.031(1) ("A cause of action accrues when the last element constituting the cause of action occurs.").

Here, the first catastrophic failures occurred in 2012.  Five engines failed in 2012, three

in 2013, and 36 in 2014.  CAT Ex. 40.  Another 19 failed after the Complaint was filed.  *Id*.  CEP
filed suit within 4 years of the first catastrophic failure, and thus all of its claims are timely.

CAT argues that CEP had to bring its claims when the first minor failures began
occurring in 2010.  That is incorrect, because CEP suffered no damage at that time.  Those
failures were repaired by CAT, at no cost to CEP.  *See* CAT Mot. at 21 ("to the extent repairs
were required during that period [June 2009 to June 2011], all were repaired by Sotreq and/or
Caterpillar at their own expense.").  Accordingly, CAT does not point to any evidence showing
that CEP was damaged prior to 2012 or that it should have known it was damaged and its own
motion concedes that is not the case.  Therefore, CAT has failed to demonstrate that the
undisputed facts show that CEP's tort and promissory estoppel claims are time barred.

## 2. CEP's Implied Warranty of Fitness for a Particular Purpose Claim is Not Time-Barred

CAT also argues that CEP's breach of implied warranty claim is barred by a four-year
statute of limitations under Fla. Stat. Ann. § 95.031(2).  Relying on the Complaint's allegations
alone, CAT says, again, that CEP claims it was experiencing problems with the Gensets
operating continuously in December 2009 and April 2010, so CEP should not have waited until
November 2014 to file suit. Mot. at 28 (citing Compl. ¶¶ 77-78 [ECF No. 1]).  It further argues
that even though CAT agreed to extend the Limited Warranty in the June 2011 Letter, that does
not impact the statute of limitations.  *Id.*  (citing *Pinnacle Point Cmty. Ass'n v. Orenstein*, 1987
U.S. Dist. LEXIS 15143, at *42 (N.D. Fla. Aug. 17, 1987)).  But for the same reasons as above,
CEP's implied warranty claim is not time-barred because it did not accrue damages on that claim
until August 2012.  CAT admits that CAT or Sotreq made all of the earlier repairs to the gensets
at no cost to CEP.  Mot. at 21.

In addition, CAT has failed to submit any evidence showing that CEP should have known
about its implied warranty claim before it started running the Gensets continuously in 2012.

Indeed, the gravamen of CEP's implied warranty of fitness for a particular purpose claim is that

CAT knew that CEP intended to use the C32s for the purpose of *continuous* operation of power

plants generating electricity for public use and that the C32s are unfit for that purpose, causing

damage to CEP.  Compl. ¶¶ 188-99. CAT identifies no evidence to suggest that CEP should have

known that the C32s were unfit for continuous use prior to the time it actually tried to run the

machines continuously and they failed.  Therefore, CAT is not entitled to summary judgment on

this claim.

> **3.     CEP's FDUTPA Claims Are Valid; The Offending Conduct Took Place in Florida**

CEP has brought a claim against CAT for violations of the Florida Deceptive and Unfair

Trade Practices Act ("FDUTPA").  Under FDUTPA the plaintiff must allege: "(1) a deceptive

act or unfair practice; (2) causation; and (3) actual damages."  *Smith v. Wm. Wrigley Jr. Co.*, 663

F. Supp. 2d 1336, 1339 (S.D. Fla. 2009) (quotation marks and citations omitted).  FDUTPA is to

be "construed liberally." Fla. Stat. § 501.202.

CAT argues that CEP is not entitled to the protections of FDUTPA because (i) CEP is not

an in-state consumer; and (ii) CAT's representations were not "deceptive."  CAT's argument

fails for two reasons: **First**, CEP is a consumer under FDUTPA and eligible for its protections;

and **Second**, CAT's sale of the C32 generator sets in Florida and its alleged misrepresentations

regarding the quality and capabilities of its C32s made in Florida (*See* Complaint Ex. B and CEP

Ex. 34) would qualify as "deceptive" within the meaning of FDUTPA.

FDUTPA section 501.203(7) defines "consumer" as including any commercial entity.

And CAT admits that courts have extended FDUTPA's protections to out-of-state entities.  *See*

*Karhu v. Vital Pharm., Inc.*, No. 13-cv-60768, 2013 WL 4047016, at *9, 10 (S.D. Fla. Aug. 9,

2013) ("the Court concludes that FDUPTA applies to non-Florida residents if *the offending*

*conduct* took place predominantly or entirely in Florida") (emphasis added); *Millennium*

*Commc'ns & Fulfillment, Inc. v. Office of Atty. Gen., Dep't of Legal Affairs, State of Fla.*, 761 So. 2d 1256, 1261-62 (Fla. 3d DCA 2000) (FDUTPA does not "only protect[] in-state consumers" because "there are no geographical or residential restrictions contained in the express language of section 501.202.").   While CAT focuses on either the place of manufacture of the gensets (Georgia) or the later-in-time catastrophic failures in Brazil, it is not the place of manufacture of the product or the place of the harm that controls, but the place where the deceptive practices occurred.  *Millenium*, 761 So. 2d at 1262 ("FDUTPA [ ] seeks to prohibit unfair, deceptive and/or unconscionable practices which have transpired within the territorial boundaries of this state without limitation."); *Carnival Corp. v. Rolls-Royce PLC*, No. 08-23318-cv, 2009 WL 3861450, at *6 (sustaining FDUTPA claims to the extent that complained of actions occurred within the State of Florida).

FDUTPA is applicable to CEP's claim because CAT's misconduct predominantly occurred in Florida.  *See Karhu*, 2013 WL 4047016, at *10.  The C32 gensets were delivered by CAT in Florida, title to the C32 generator sets passed to TEP in Florida, and CAT's false statements and promises contained in the June 2011 Letter were made by CAT from within Florida.

Moreover, given that FDUPTA is a consumer protection statute, in the context of a product sale, the location of the sale is what is crucial.  *See Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*, No. 10-23869-cv, 2012 WL 1570057, at *1, 5 (S.D. Fla. May 2, 2012) (Altonaga, J.) ("The Court has already explained that Barnext, a foreign corporation, may bring FDUPTA claims against Defendants, which include a domestic corporation and foreign entities, based on Barnext's allegations that the Vessel was sold in Florida."); *compare Stein v. Marquis Yachts, LLC*, No. 14-24756-cv, 2015 WL 1288146 (dismissing FDUPTA claim against Marquis and Caterpillar because although there were "bad acts" in Florida, the claim was based on "the sale of the goods, which occurred in Canada not Florida").

CAT also claims that even if FDUTPA applies, CAT's actions were not deceptive. But whether CAT's representations were "deceptive" under FDUTPA is a question of fact that cannot be determined on summary judgment. *See Siever v. BWGaskets, Inc*., 669 F. Supp. 2d 1286, 1293 (M.D. Fla. 2009) ("Whether particular conduct constitutes such an unfair or deceptive trade practice is a question of fact."); *Witt v. La Gorce Country Club, Inc*., 35 So. 3d 1033, 1040 (Fla. 3d DCA 2010) ("Whether conduct constitutes an unfair or deceptive trade practice is also a question for the fact finder."). Here, CEP has submitted sufficient evidence to raise a genuine issue of material fact regarding these issues. The motion to dismiss CEP's FDUTPA claim is therefore denied.

### 4. CAT Is Liable for Sotreq's Misrepresentations to CEP

CAT says it cannot be held responsible for any statements Sotreq made to CEP. Mot. at 16. The issue is not whether Sotreq is CAT's agent in all respects, but whether Sotreq acted as CAT's agent when it made two representations regarding maintenance intervals, in writing, to CEP. There are factual issues, as set forth below, which prevents adjudication of this issue on summary judgment.

"Ordinarily the existence of an agency relationship is a question of fact to be resolved by the factfinder." *Gillet v. Watchtower Bible & Tract Soc. of Pa., Inc.*, 913 So. 2d 618, 620 (Fla. 3d DCA 2005); *Hickman v. Barclay's Int'l Realty, Inc.*, 5 So. 3d 804, 807 (Fla. 4th DCA 2009). Only when the party with the burden of proof "fails to produce any supportive evidence" or when "all of the evidence presented by both parties is so unequivocal that reasonable persons could reach but one conclusion" may the Court determine the issue of agency as a matter of law. *Id.* Such is not the case here.

CAT points to boilerplate language in its agreements with Sotreq disavowing an agency relationship (Mot. at 17; SF 7) but CAT witness Tim Scott, the employee CAT quotes as saying Sotreq is independent (SF 8), also says CAT would "try to make sure" that Sotreq would assess

the correct product for the customer and that CAT would "ensure [Sotreq] had the right people in their staff who can analyze a customer's needs, their application considerations, and apply the appropriate product" for the customer.  CF 8-9; CAT Ex. 5 at 267:14-268:23.  This testimony points to control by CAT over Sotreq, not a lack thereof.

There is substantial other evidence of Sotreq's agency, as related to the representations at issue.  CF 7-9.  The dealer agreements CAT relies on expressly recognize it is CAT that provides Sotreq with "technical and marketing information, materials and services (including access to computer databases) as [CAT] deems desirable with or without charge as [CAT] specifies."  CF 7.  CAT "designates as available for distribution to Dealer's customers" the "information and materials" or "promotional materials clearly intended for further distribution."  *Id.*  Aside from such materials, "all such information, materials and services furnished by [CAT] are proprietary data of [CAT] and will be treated as confidential information to be disclosed only to those employees of [Sotreq] who have a need to know to enable [Sotreq] to fulfill its responsibilities under this Agreement."  *Id.*  Thus, pursuant to its agreements with Sotreq, CAT absolutely controls the dissemination of "technical and marketing information" and databases to customers.

Moreover, the customer can only get maintenance interval information from the dealer.  CAT's own OMM states that when the engine's actual record of fuel consumption is not available, as was the case when Sotreq made these pre-sale representations to CEP, the customer must "[r]efer to the data for fuel consumption in the Technical Marketing Information (TMI) for your engine," but TMI is only available from "your Caterpillar dealer."  CF 7.  In other words, the OMM directs the customer to consult the dealer for the proper maintenance interval, based on data that CAT must authorize Sotreq to provide.  *Id.*  This creates sufficient evidence of agency to present the issue to the jury.

CAT's agreement with Sotreq further says that CAT will evaluate Sotreq's sales efforts based on criteria established by CAT, and that "no Sales effort is satisfactory or complete unless

41

an engine (i) is Sold for an application which is within the capabilities of the engine and (ii) is installed in a manner which will permit proper operation of the engine.  [CAT] shall from time to time furnish [Sotreq] with engine application and installation control guidelines and procedures. . . [Sotreq] further agrees to advise its customers fully and in writing of the recommended application and installation guidelines and procedures . . . . [Sotreq] further agrees to follow, and use its best efforts to see that each customer follows, such guidelines and procedures." *Id.*  Thus, CAT exerts control over Sotreq's communication of proper "guidelines and procedures" to customers like CEP, and both CEP and CAT employees gave substantial testimony supporting the notion that Sotreq was CAT's agent in its dealings with CEP.  CF 9.  Given all of this, a reasonable juror could certainly find that Sotreq acted as CAT's agent in providing technical maintenance interval information to CEP pre-sale.  SF 11.

The cases CAT cites are inapposite.  Mot. at 17-18.  In most, the plaintiff tries to hold the defendant vicariously liable for negligence or intentional torts by individuals with tenuous, or no, relationship to the defendant.  *See Gillet*, 913 So. 2d at 620; *Eberhardy v. Gen. Motors Corp.*, 404 F. Supp. 826, 828 (M.D. Fla. 1975); *Cain v. Shell Oil Co.*, 994 F. Supp. 2d 1251, 1252 (N.D. Fla. 2014); *Mobil Oil Corp. v. Bransford*, 648 So. 2d 119, 120 (Fla. 1995); *Goldschmidt v. Holman*, 571 So. 2d 422, 423 (Fla. 1990).  CAT cites *Branham v. Material Sys. Corp.*, 354 F. Supp. 1048 (S.D. Fla. 1973) for the proposition that if the parties dispute that a conversation took place, no agency can be established.  That is incorrect.  By use of ellipses, CAT omits the most pertinent part of the decision, where the court "specifically" found there was no conversation in which the principal told the plaintiff he could "rely" on the agent.  354 F. Supp. at 1053 n.4, 1054-55.  Here, at the very least, there is a factual dispute about whether Scott ratified all of Sotreq's prior representations to CEP at the May 2007 Meeting.  SF & CF 38-39, 42.  In three more cases cited by CAT, plaintiffs tried to hold a principal responsible for a dealer's acts, but in each case the principal lacked control over the specific elements of the dealer's operation most

relevant to the claim of agency.  *See Estate of Miller v. Thrifty Rent-A-Car Sys., Inc.*, 637 F. Supp. 2d 1029, 1031, 1034, 1041 (M.D. Fla. 2009); *Carlisle v. Deere & Co.*, 576 F.3d 649, 657 (7th Cir. 2009); *Ortega v. Gen. Motors Corp.*, 392 So. 2d 40, 41 (Fla. 4th DCA 1980).  By contrast, CAT's agreements with Sotreq provide specifically for control over dissemination of technical information to customers like CEP, and the misrepresentations at issue fit precisely into that category of information.  *Cf. Ortega*, 392 So. 2d at 41.  *See also Nazworth v. Swire Fla., Inc.*, 486 So. 2d 637, 639 (Fla. 1st DCA 1986) (case cited by CAT where court found issue of fact as to shopping center's liability for negligence of security guard employed by center's manager, where specific facts in management agreement pointed to center's control over manager's hiring of security guards).  This is also not a case where a plaintiff asserts agency solely based on a typical franchise or display of trademarks.  *Cain*, 994 F. Supp. at 1253.

CAT also cites *Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1347-1348 (S.D. Fla. 2018) in its Supplemental Authorities, which sets forth the pleading requirements of vicarious liability, and argues that it should get summary judgment on CEP's agency claims because CEP did not plead a separate claim for vicarious liability in its 2014 Complaint.  Tr. at 17-18.  But CAT never made a motion to dismiss the Complaint on this basis in 2014, nor did it raise this issue in its summary judgment motion in 2016 (which is underscored by the fact that it cites to a 2018 case).  And CAT again seeks to dismiss CEP's claims based on the pleadings, rather than record evidence.  Moreover, the Complaint gave CAT fair notice of CEP's agency theory.  The Complaint mentions Sotreq 36 times, including a specific allegation that Sotreq was acting as CAT's agent (Complaint ¶ 25) and the nature of CEP's claims against CAT are detailed and clear.  CAT's argument is rejected.

## V.     Conclusion

For all of the foregoing reasons, CAT's Motion for Summary Judgment is DENIED.

Dated: November 27, 2019

HALL, LAMB AND HALL, P.A.

/s/ Matthew P. Leto
Andrew C. Hall, Esq.
Matthew P. Leto, Esq.
2665 South Bayshore Drive
Penthouse One
Miami, Florida 33133
Phone: (305) 374-5033
Fax: (305) 374-5030
andyhall@hlhlawfirm.com
mleto@hlhlawfirm.com

*Local Counsel for Plaintiff*

VENABLE LLP
*Patrick J. Boyle
*Jessie F. Beeber
Rockefeller Center
1270 Avenue of the Americas, 24th Floor
New York, NY 10020
Phone: (212) 307-5500
Fax: (212) 307-5598
pboyle@venable.com
jbeeber@venable.com
spark@venable.com
nmbuell@venable.com

*Lead Counsel for Plaintiff*
*admitted pro hac vice*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 27, 2019, I electronically filed the foregoing under seal with the Clerk of the Court by using the CM/ECF system.  I also verify that the foregoing document is being served this day on all counsel of record by e-mail.

/s/ Matthew P. Leto